# EXHIBIT 6

**JAMS DISPUTE RESOLUTION**

| | |
|---|---|
| CARTRIDGE WORLD USA, LLC,<br>    a Nevada limited liability company; and<br>CARTRIDGE WORLD AUSTRALIA PTY, LTD.,<br>    an Australia corporation,<br><br>                    Claimants,<br><br>And<br><br>HIS INK, LLC,<br>    a Wisconsin limited liability company;<br>SHAWN NARESKI,<br>    a resident of the state of Wisconsin; and<br>CORRINE NARESKI,<br>    a resident of the state of Wisconsin,<br><br>                    Respondents. | Case No. _____<br><br><br><br>**DECLARATION OF ROB<br>LEONARD IN SUPPORT OF<br>CLAIMANTS' MOTION FOR<br>IMMEDIATE INJUNCTIVE<br>RELIEF** |

I, Rob Leonard, being first duly sworn, state and declare as follows:

1.      I am the CEO of Cartridge World USA, LLC ("CW USA").  I provide this Declaration in support of Claimants' Motion for Immediate Injunctive Relief based on my personal knowledge and my review of CW USA's business records.

## Cartridge World® Marks and Franchise System

2.      Cartridge World Pty. Ltd ("CW PTY") is the owner of the Cartridge World® franchise system, which consists of, among other things, a unique and distinct business system of retail stores and executive offices that provide individual and bundled printer inkjet cartridges, laser cartridges, printers, printer service and repair, and other products and services that may be specified by CW PTY or CW USA from street fronts, malls and other fixed retail and office business locations.  The Cartridge World® business system is characterized by certain trademarks and logos ("Cartridge World® Marks" or "Marks"), operating systems, training and marketing

concepts, the Operations Manuals, distinctive color schemes and other elements, and includes methods for marketing and operating businesses that offer home and office printing solutions.

3. Cartridge World Australia Pty, Ltd ("CW Australia") is the owner of Cartridge World® trademark, and other trademarks, services marks, trade names, insignia, emblems, logos, commercial symbols, signs, and other visual identification ("Cartridge World® Marks" or "Marks") by which the Cartridge World® business system is identified and publicized. CW Australia owns the goodwill associated with all of its Marks. The Marks include those registered with the United States Patent and Trademark Office under Registration Nos. 2631733, 2717527, and 2860187. Each of these registrations is in full force and effect. A true and correct copy of the United States Patent and Trademark Office trademark registrations for the Cartridge World® Marks is attached to as Exhibit A.

4. CW Australia licenses the Cartridge World® Marks to CW USA, which in turn licenses them to Cartridge World® franchisees in the United States.

5. The Cartridge World® Marks have been used continuously in the United States since at least 2003 to identify the Cartridge World® business system and the products and services associated with that system. The Marks are utilized in interstate commerce.

6. The Cartridge World® Marks have been widely advertised and promoted by Cartridge World and its predecessors and affiliates over the years. As a result of the extensive sales, advertising, and promotion of products and services identified by the Cartridge World® Marks, the public has come to know and recognize the Marks and to associate them exclusively with the products and services offered by Cartridge World® Unit Franchisees.

7. In 2002, CW PTY granted CWNA the exclusive right and license to award Master Franchises using the Cartridge World® Marks and business system in, among other places, the

United States. Under the license granted by CW PTY, CWNA allows Master Franchisees to award and service Cartridge World® Store Unit Franchises to Unit Franchisees.

8.      Cartridge World Midwest, LLC ("CW Midwest") entered into a Master Franchise Agreement with CWNA on November 15, 2003 ("MFA").

9.      The MFA granted CW Midwest the license and right to award Cartridge World® Unit Franchises using the Cartridge World® Marks and business system in a defined territory consisting of the states of Minnesota, Wisconsin, North Dakota, South Dakota, and portions of Illinois and Iowa.

**The Unit Franchise Agreement and Guarantee**

10.      His Ink, LLC ("His Ink") is a party to a Unit Franchise Agreement ("UFA") with an effective date of January 17, 2007, pursuant to an Assignment and Assumption of Franchise Agreement dated July 16, 2012, under which CW Midwest granted His Ink the license and right to operate a Cartridge World® franchised business in Brookfield, Wisconsin. A true and correct copy of the UFA and Assignment and Assumption Franchise Agreement are attached to as Exhibits B and C.

11.      At or about the same time CW Midwest and His Ink executed the UFA, Shawn Nareski, owner of His Ink[1], signed a "Continuing Personal Guarantee," in which he guaranteed that he would be personally liable and responsible for all of the obligations and covenants that are set forth in the UFA. A true and correct copy of the Continuing Personal Guarantee is attached as Exhibit D.

12.      Pursuant to a confidential settlement agreement between CWNA and CW Midwest with an effective date of July 31, 2017, CW Midwest transferred all of its rights, title, and interest

---

[1] His Ink, Shawn Nareski, and Corrine Nareski are collectively referred to as "Respondents".

in the UFA to CWNA. In addition, pursuant to Section 1.1(D) of the UFA, CWNA is an intended beneficiary of the UFA and may take legal action to enforce the UFA.

13. In December 2019, CWNA's license to award Master Franchises and to license others to use the Cartridge World® Marks and business system was assigned to CW USA. This license agreement is confidential and proprietary and will be provided to the Arbitrator and Respondents after a mutually agreeable protective order is entered.

14. Under an Amendment to Franchise Agreement dated January 29, 2018, Respondents agreed to extend the term of the UFA so it would expire January 29, 2020. Under the terms of the Amendment, they agreed that the extension of the term would not affect the terms, duration, or enforceability of the post-termination provisions of the UFA. A true and correct copy of the Amendment to Franchise Agreement attached to as Exhibit E.

15. After January 29, 2020, Respondents and CW USA mutually continued to operate and perform under the terms of the UFA.

**Respondents' Operation of Their Cartridge World® Franchised Business**

16. As a Unit Franchisee within the Cartridge World® System, Respondents received several operating manuals, marketing and advertising materials, business forms and other materials. This information received by Respondents is confidential, proprietary and competitively sensitive. Respondents also had the opportunity to attend regional and national meetings for additional training, and received periodic updates on new products, programs and procedures. In addition, Respondents received proprietary training on how to manufacture ink and toner cartridges, market and sell new products and services, and introductions to key vendors in this industry.

17.     Respondents operated a Cartridge World® franchised business for over 8 years. During that time, Respondents' personnel—including Shawn and Corrine Nareksi—were trained by and/or given access to CW USA's comprehensive business system, technology and know-how developed over many years at great expense to CW USA and CW PTY.  This included printer repair and service training, access to a comprehensive range of technical and remanufacturing instructions, and access to all marketing and end-user collateral to sell Cartridge World® products and services.   When Respondents became a Cartridge World® franchisee, they received comprehensive training that included all aspects of operating a Cartridge World® business.

## Termination Due to Respondents' Breach of the UFA

18.     On or about February 5, 2021, after being unable to collect His Ink's sales information for two months, CW USA contacted Respondents and was told they closed their franchised business in December 2020. However, a visit to the store on February 5, 2021 revealed that Respondents were continuing to operate their store under the Cartridge World® Marks and selling Cartridge World® branded products. A true and correct copy of a picture of Respondents' store on February 5, 2021 is attached as Exhibit F.

19.     On February 8, 2021, CW USA emailed a letter to Respondents informing them they were in default under the UFA for not providing sales information. This letter informed Respondents that although the UFA's expiration date was January 2020, because Respondents continued to operate under the Cartridge World® Marks and the terms of the UFA, they were operating under the UFA on a month-to-month basis, and their obligations under the UFA remained in full force and effect. A true and correct copy of the February 8, 2021 letter is attached as Exhibit G.

20.     On or about February 10, 2021, CW USA received a letter from Respondents stating: "Our company, His Ink, LLC (DBA Cartridge World Brookfield) is no longer." The letter enclosed a royalty statement and payment for December 2020. A true and correct copy of the February 10, 2021 letter is attached as Exhibit H.

21.     On or about February 10, 2021, CW USA sent Respondents a response letter noting that their statement that their company was "no longer" was inconsistent with Respondents' continued operation of the store, and informed Respondents that payment was incorrect and unverified because CW USA had not received sales reports for October, 2020, November 2020, or January 2021. The letter stated that the February 8, 2021 default letter was still in effect. A true and correct copy of the February 10, 2021 letter is attached as Exhibit I.

22.     Thereafter, CW USA attempted to communicate with Respondents numerous times to resolve these issues, but was unsuccessful. Thus, by letter dated February 26, 2021, CW USA advised Respondents that they were in breach of the UFA for failure to report sales and pay the corresponding royalties. CW USA advised Respondents that they had sixty (60) days, or until April 27, 2021, to cure their breaches, or CW USA would proceed with terminating the UFA. A true and correct copy of the February 26, 2021 notice of default letter is attached to as Exhibit J.

23.     After sending the February 26, 2021 letter, CW USA discovered that Respondents had ceased operating as a Cartridge World® store and began competing under the name of "Printer World" in the exact space where they formerly operated their Cartridge World® store.

24.     Respondents failed to cure the defaults set forth in the February 26, 2021 notice of default letter. As a result, on May 21, 2021, CW USA sent a letter to Respondents advising them that their UFA would terminate effective May 27, 2021, or ninety (90) days from receipt of the notice of default letter. As part of the letter, CW USA demanded Respondents immediately cease

operation of their competing Printer World business and cease using the Cartridge World® Marks in violation of the UFA and its non-compete provisions. A true and correct copy of the May 20, 2021 notice of termination letter is attached as Exhibit K.

### Respondents' Breach of the Covenant Not to Compete and Trademark Infringement

25. Respondents refused to comply with CW USA's directives and continued to operate their competing store in violation of the UFA. Respondents have also failed to comply with their post-termination obligations in the UFA. CW USA is left with no other option but to commence this action.

26. Respondents continue to use the Cartridge World® Marks to operate, advertise, and promote their competing Printer World store. Among other places, Respondents are using the Cartridge World® Marks in connection with their business listings on Google, Facebook, Yelp, Visit Brookfield Wisconsin, and Malls & Centers Shopping Guide. True and correct copies of the current Google, Facebook, Yelp, Visit Brookfield Wisconsin, and Malls & Centers Shopping Guide pages are attached as Exhibit L.

27. The Google page for Respondents' business was updated on April 12, 2021 to read: "We are now PRINTER WORLD!!! Formally [sic] 'Cartridge World'. Same location, same customer service, and pricing. Stop by to see what's new!!" This update is still currently displayed on the Google page.

28. Respondents also still control and operate the Cartridge World-Brookfield, Wisconsin Facebook page. As recently as November 17, 2021, Cartridge World® marketing posts were added to and displayed on the store's Facebook page by Respondents. All Facebook posts, including Cartridge World® marketing posts, are made by Respondents as CW USA does not have access to, nor does it control, the Facebook page.

29.     Despite the UFA termination, Respondents continue to operate Printer World as the same type of business they operated under the Cartridge World® name and at the same location. Respondents also continue to use the same number they used in operation of their former Cartridge World® store (262-754-2901) to operate their competing business. Respondents offer the same products under the Printer World name as they did under the Cartridge World® name. Respondents accept and solicit business from the same customers under the Printer World name as they did under the Cartridge World® name. CW USA believes that Respondents continue to use the same vendors and suppliers as they did under the Cartridge World® name.

30.     Respondents are using CW USA's Confidential Information and Intellectual Property—including customer information—for their own benefit and in competition with other Cartridge World® franchisees. Despite having a contractual obligation to return this Confidential Information, Respondents have failed to do so.

31.     Respondents have also failed to return all software, manuals, forms, materials, signage, and any other items containing Cartridge World® Intellectual Property or Marks, failed to deidentify the store of any features associated with the Cartridge World® Marks and trade dress and have failed to assign all telephone numbers, domain names, internet sites, or other communications services used in connection with their operation of their former Cartridge World® store. Respondents have also wrongfully continued to identify, advertise, or promote themselves and Printer World, as a present or former Cartridge World® franchise.

## CW's Legitimate Business Interests

32.     CW USA will be irreparably harmed by Respondents' continuing infringement of the Cartridge World® Marks, use of Cartridge World® Confidential Information and Intellectual Property, and violations of the non-compete and other post-termination provisions of the UFA.

Cartridge World will lose valuable business opportunities and the goodwill that was built by Cartridge World, and its predecessors, in these customer relationships as well as the value of its Confidential Information and Intellectual Property built up over decades in the industry.

33.     CW USA has a legitimate interest in protecting the goodwill associated with Cartridge World® Marks and the Franchise System in and around the Brookfield, Wisconsin area, and elsewhere, because this goodwill generates new and repeated business, as well as referrals, for Cartridge World and its franchisees.

34.     CW USA has a legitimate interest in preventing Respondents from wrongfully damaging or appropriating the customer goodwill associated with Cartridge World® Marks and System.

35.     By the very nature of the franchise business model, a franchisee receives the right to trade off the customer goodwill associated with the franchisor's trademark. If a terminated franchisee is permitted to continue operating a competitive business in the same territory as the previously franchised business, that former franchisee is able to continue to capitalize impermissibly on the customer goodwill formerly associated with the franchised business through its display of the franchisor's trademarks or name.

36.     CW USA has a legitimate interest in protecting the Confidential Information and Intellectual Property provided to Respondents in connection with their former Cartridge World® franchise. CW USA and its predecessors have invested substantial sums creating and improving this Confidential Information and Intellectual Property and is entitled to the competitive advantage afforded by their efforts. Allowing a competitor to use the Confidential Information and Intellectual Property diminishes the value of that commercially sensitive information.

37.     CW USA also has a legitimate interest in protecting itself and its franchisees from unfair competition by former franchisees. A customer who disapproves of Respondents' services or products is likely to associate it with the Cartridge World® name.  This is potentially damaging not only to CW USA, but also to all of the Cartridge World® franchisees who rely on the reputation of the Cartridge World® Marks in the operation of their businesses.  In addition, the harm suffered to Cartridge World's goodwill will make it difficult for CW USA to refranchise the area as it will have lost some of the customer base and goodwill.

38.     Because Respondents are not a current unit franchisee, Cartridge World has no control over them, their competing Printer World business, or their use of the Cartridge World® Marks. Nor does Cartridge World have any control over the services being offered by Respondents. This has the potential of causing significant harm to the reputation and goodwill associated with the Cartridge World franchise system and the Marks.

### Irreparable Harm

39.     The Cartridge World® system will be harmed by Respondents' competition with other franchisees, resulting in decreased profitability and making it difficult for CW USA to refranchise the area surrounding Respondents' new store.  Any decrease in the profitability and marketability of these franchises will adversely affect CW USA and the Cartridge World® brand and its goodwill.

40.     Potential franchisees are going to be reluctant to compete against a former Cartridge World® franchisee that is operating its competing business using the knowledge, materials, and confidential information it obtained as a Cartridge World® franchisee.

41.     Additionally, other franchisees may choose to breach their agreements, stop paying franchise fees, and operate a competing business knowing that the non-compete provisions of their

unit franchise agreements will not be enforced. This would have a devastating impact on the entire Cartridge World® franchise system, and on the franchisees that honor their obligations and have worked so hard to develop business in their own territories.

42.     There are currently five Cartridge World® franchises in Wisconsin. Three franchises are located within 50 miles of Respondents' competing business. They include the franchised businesses in Wauwatosa, Thiensville, and Fond Du Lac. These franchises are entitled to the competitive advantage associated use of the Marks, Confidential Information and Intellectual Property. Respondents are directly pulling business and customers that would otherwise be serviced by these franchised businesses in the region. Respondents' continued misuse impacts the success of these Cartridge World® franchisees, which leads to lost revenues and may cause these franchisees to leave the Cartridge World® franchise system.

I declare under penalty of perjury under the laws of the United States that the foregoing statements are true and correct to the best of my knowledge.

Executed on December 21 2021.

_Robert L Leonard Jr_

Rob Leonard

47924528v6

11

EXHIBIT A

Int. Cls.: **35 and 37**

Prior U.S. Cls.: **100, 101, 102, 103 and 106**

**Reg. No. 2,631,733**

## United States Patent and Trademark Office

Registered Oct. 8, 2002

## SERVICE MARK
### PRINCIPAL REGISTER



CARTRIDGE WORLD PTY LTD. (AUSTRALIA CORPORATION)
8 GRENFELL STREET
KENT TOWN, SOUTH AUSTRALIA, AUSTRALIA

FOR: RETAIL AND WHOLESALE STORE SERVICES OF PRINTER AND PHOTOCOPIER AND CONSUMABLES IN THE NATURE OF PRINTER CARTRIDGES, PAPER, TONER, INKS AND FAX ROLLS, IN CLASS 35 (U.S. CLS. 100, 101 AND 102).

FOR: INSTALLATION, REPAIR, MAINTENANCE AND SERVICING OF COPYING AND PRINTING APPARATUS AND EQUIPMENT, INCLUDING REFILLING OF PRINTER CARTRIDGES, IN CLASS 37 (U.S. CLS. 100, 103 AND 106).

OWNER OF AUSTRALIA REG. NO. 786500, DATED 2-24-1999, EXPIRES 2-24-2009.

OWNER OF AUSTRALIA REG. NO. 086234826, DATED 2-10-1999, EXPIRES 2-10-2009.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "CARTRIDGE", APART FROM THE MARK AS SHOWN.

THE MARK CONSISTS OF THE WORDS "CARTRIDGE WORLD" ALONG WITH A STYLIZED DEPICTION OF A 7 POINTED STAR AND A SINGLE ARROW CIRCLING THE STAR.

SER. NO. 78-030,122, FILED 10-11-2000.

IRENE D. WILLIAMS, EXAMINING ATTORNEY

**Int. Cls.: 2 and 16**

**Prior U.S. Cls.: 2, 5, 6, 11, 16, 22, 23, 29, 37, 38 and 50**

**Reg. No. 2,860,187**

## United States Patent and Trademark Office

Registered July 6, 2004

## TRADEMARK
### PRINCIPAL REGISTER

## CARTRIDGE WORLD

CARTRIDGE WORLD PTY. LTD. (AUSTRALIA CORPORATION)
39 CHARLES STREET
NORWOOD ADELAIDE, AUSTRALIA 5067

FOR: COLOR PIGMENTS, COLORANTS FOR THE MANUFACTURE OF PRINTING INK, PRINTER INK, PHOTOCOPIER AND PRINTER TONER, PHOTOCOPIER AND PRINTER TONER IN CARTRIDGES, PRINTER INK FOR INKJET AND LASER PRINTERS, IN CLASS 2 (U.S. CLS. 6, 11 AND 16).

FIRST USE 2-24-1999; IN COMMERCE 5-12-2001.

FOR: CARDBOARD BOXES, CARDBOARD CARTONS, CARDBOARD CONTAINERS, PAPER BOXES, PAPER CARTONS, PAPER CONTAINERS; SPECIALTY PAPER FOR QUALITY PHOTOGRAPHIC PRINTS; BROCHURES ABOUT– PRINTING INK, PHOTOCOPIER AND PRINTER TONER AND CARTRIDGES; BULLETINS ABOUT PRINTING INK, PHOTOCOPIER TONER AND CARTRIDGES; MAN-

UALS FOR PRINTING AND PHOTOCOPYING; PRINTING FONTS; DUPLICATING INK; COMPUTER PRINTER INK RIBBONS; CASH REGISTER RIBBONS; INK ROLLERS FOR OFFICE MACHINES; INSTRUCTION SHEETS; OFFICE MACHINE RIBBONS; PAMPHLETS FOR PHOTOCOPIER AND PRINTER INK AND TONER; COMPUTER PRINTER RIBBONS, IN CLASS 16 (U.S. CLS. 2, 5, 22, 23, 29, 37, 38 AND 50).

FIRST USE 2-24-1999; IN COMMERCE 5-12-2001.

OWNER OF U.S. REG. NO. 2,631,733.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE CARTRIDGE, APART FROM THE MARK AS SHOWN.

SER. NO. 78-236,484, FILED 4-10-2003.

VERNA BETH RIRIE, EXAMINING ATTORNEY

Int. Cl.: 35

Prior U.S. Cls.: 100, 101 and 102

**United States Patent and Trademark Office**

Reg. No. 2,717,527
Registered May 20, 2003

## SERVICE MARK
### PRINCIPAL REGISTER

## CARTRIDGE WORLD

CARTRIDGE WORLD PTY LTD. (AUSTRALIA CORPORATION)
39 CHARLES STREET
NORWOOD, AUSTRALIA 5067

FOR: RETAIL AND WHOLESALE STORE, CATA-LOG, MAIL ORDER, AND ONLINE RETAIL AND WHOLESALE STORE SERVICES, ALL FEATURING PRINTER AND PHOTOCOPIER CONSUMABLES, NAMELY, PRINTER CARTRIDGES, PAPER, TO-NER, BULK INKS AND FAX ROLLS, IN CLASS 35 (U.S. CLS. 100, 101 AND 102).

FIRST USE 1-25-2000; IN COMMERCE 5-15-2002.

PRIORITY CLAIMED UNDER SEC. 44(D) ON CANADA APPLICATION NO. 1134217, FILED 3-14-2002.

OWNER OF U.S. REG. NO. 2,631,733.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "CARTRIDGE", APART FROM THE MARK AS SHOWN.

SER. NO. 76-449,555, FILED 9-13-2002.

YONG KIM, EXAMINING ATTORNEY

## TRADEMARK ASSIGNMENT

Electronic Version v1.1
Stylesheet Version v1.1

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | ASSIGNS THE ENTIRE INTEREST AND THE GOODWILL |

**CONVEYING PARTY DATA**

| Name | Formerly | Execution Date | Entity Type |
|---|---|---|---|
| Cartridge World Pty. Ltd. | | 06/22/2010 | CORPORATION: AUSTRALIA |

**RECEIVING PARTY DATA**

| | |
|---|---|
| Name: | Cartridge World North America, LLC |
| Street Address: | 6460 Hollis Street |
| City: | Emeryville |
| State/Country: | CALIFORNIA |
| Postal Code: | 94608 |
| Entity Type: | LTD LIAB JT ST CO: NEVADA |

**PROPERTY NUMBERS  Total: 3**

| Property Type | Number | Word Mark |
|---|---|---|
| Registration Number: | 2717527 | CARTRIDGE WORLD |
| Registration Number: | 2860187 | CARTRIDGE WORLD |
| Registration Number: | 2631733 | CARTRIDGE WORLD |

**CORRESPONDENCE DATA**

Fax Number: (310)377-5039

*Correspondence will be sent via US Mail when the fax attempt is unsuccessful.*

Phone: 310
Email: asarabia@cox.net
Correspondent Name: Antonio R. Sarabia II
Address Line 1: 3463 Tanglewood Lane
Address Line 4: Rolling Hills Estate,  CALIFORNIA   90274

| ATTORNEY DOCKET NUMBER: | 903-001 |
|---|---|
| NAME OF SUBMITTER: | Antonio R. Sarabia II |
| Signature: | /ARSII/ |

OP  $90.00  2717527

**900165573**

TRADEMARK
REEL: 004231 FRAME: 0723

| Date: | 06/25/2010 |
|---|---|
| Total Attachments: 1<br>source=CWass#page1.tif | |

**TRADEMARK**
**REEL: 004231 FRAME: 0724**

## ASSIGNMENT OF TRADEMARKS

Whereas, Cartridge World Pty. Ltd. ("Assignor"), a Australian corporation, residing at 39 Charles Street, Norwood, Australia, has adopted, used and is using the following:

1. "Cartridge World", United States Patent and Trademark Office Registrations Nos. 2,717,527 and 2,860,187; and

2. "Cartridge World" and design, United States Patent and Trademark Office Registration No. 2,631,733.

Whereas, Cartridge World North America, LLC ("Assignee"), a Nevada Limited Liability Corporation with offices at 6460 Hollis Street, Emeryville, CA 94608, wishes to acquire the Marks and the registrations;

Now, therefore, for good and valuable consideration, receipt of which is acknowledged, Cartridge World Pty. Ltd. assigns to Cartridge World North America, LLC all right, title and interest in and to the Marks, together with the good will of the business symbolized by the Marks and the registrations of them.

June _____, 2010

Cartridge World Pty. Ltd

By: _____

_____
**Printed Name**

_____
**Title**

State of California, County of _____ ALAMEDA
On 06-22-10 before me, SUNIL JASWAL,
Notary Public, personally appeared THOMAS S. FRIEL,
who proved to me on the basis of satisfactory evidence to be the person(s)
whose name(s) is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their authorized capacity(ies),
and that by his/her/their signature(s) on the instrument the person(s), or the entity
upon behalf of which the person(s) acted, executed the instrument.
I certify under PENALTY OF PERJURY under the laws of the State of California
that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

_____

> **SUNIL JASWAL**
> Commission # 1883191
> Notary Public - California
> Alameda County
> My Comm. Expires Apr 2, 2014

**(Must be Notarized)**

**900224472      05/31/2012**

| TRADEMARK ASSIGNMENT |
| --- |

Electronic Version v1.1
Stylesheet Version v1.1

| SUBMISSION TYPE: | NEW ASSIGNMENT |
| --- | --- |
| NATURE OF CONVEYANCE: | ASSIGNS THE ENTIRE INTEREST AND THE GOODWILL |

**CONVEYING PARTY DATA**

| Name | Formerly | Execution Date | Entity Type |
| --- | --- | --- | --- |
| Cartridge World North America, LLC | | 05/30/2012 | LIMITED LIABILITY COMPANY: NEVADA |

**RECEIVING PARTY DATA**

| | |
| --- | --- |
| Name: | Cartridge World Australia Pty Ltd |
| Street Address: | 200 Greenhill Road |
| City: | Eastwood, SA |
| State/Country: | AUSTRALIA |
| Postal Code: | 5063 |
| Entity Type: | CORPORATION: AUSTRALIA |

**PROPERTY NUMBERS  Total: 3**

| Property Type | Number | Word Mark |
| --- | --- | --- |
| Registration Number: | 2717527 | CARTRIDGE WORLD |
| Registration Number: | 2860187 | CARTRIDGE WORLD |
| Registration Number: | 2631733 | CARTRIDGE WORLD |

**CORRESPONDENCE DATA**

Fax Number:          3103775039
*Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent via US Mail.*
Phone:               3103775171
Email:               asarabia@cox.net
Correspondent Name:  Antonio R. Sarabia II
Address Line 1:      3463 Tanglewood Lane
Address Line 4:      Rolling Hills Estate, CALIFORNIA   90274

**DOMESTIC REPRESENTATIVE**

Name:

**TRADEMARK**
**REEL: 004791 FRAME: 0961**

**900224472**

| Address Line 1: | |
|---|---|
| Address Line 2: | |
| Address Line 3: | |
| Address Line 4: | |

| NAME OF SUBMITTER: | Antonio R. Sarabia II |
|---|---|
| Signature: | /ARSII/ |
| Date: | 05/31/2012 |

Total Attachments: 1
source=CW-assgnsig#page1.tif

TRADEMARK
REEL: 004791 FRAME: 0962

## ASSIGNMENT OF TRADEMARKS

Whereas, Cartridge World North America, LLC ("Assignor"), a Nevada Limited Liability Corporation, residing at 3106 N. US Highway 12, Spring Grove, Illinois, 60081 has adopted, used and is using the following:

1.  "Cartridge World", United States Patent and Trademark Office Registrations Nos. 2,717,527 and 2,860,187; and

2.  "Cartridge World" and design, United States Patent and Trademark Office Registration No. 2,631,733.

Whereas, Cartridge World Australia Pty Ltd ("Assignee"), an Australian Corporation with offices at 200 Greenhill Road, Eastwood, SA 5063, Australia, wishes to acquire the Marks and the registrations;

Now, therefore, for good and valuable consideration, receipt of which is acknowledged, Cartridge World North America, LLC assigns to Cartridge World Australia Pty Ltd all right, title and interest in and to the Marks, together with the good will of the business symbolized by the Marks and the registrations.

Date: 30 MAY , 2012

Cartridge World North America, LLC

By: _William Swanson_

WILLIAM SWANSON
Printed Name

CFO
Title

"OFFICIAL SEAL"
Katherine Masopust
Notary Public, State of Illinois
My Commission Expires April 19, 2014

Katherine Masopust
5/30/2012

**(Must be Notarized)**

E:\tml\CW-assgn

EXHIBIT B

**THIS IS OUR <u>CURRENT</u> FORM FOR UNIT FRANCHISE AGREEMENT**
**(subject to change)**

**CARTRIDGE WORLD®**
**UNIT FRANCHISE AGREEMENT**

_Todd C Lucich_
Franchisee

_Nancy M Lucich_

_Brookfield WI_
Location

_January 17, 2007_
Date of Agreement

#244334 060411 fa (22246)

**SECTION**                                                                                          **PAGE**

1.  INTRODUCTION, DEFINITIONS, AND PRELIMINARY AGREEMENTS                                              1
    1.1   Introduction                                                                                 1
    1.2   Definitions                                                                                  3

2.  AWARD OF FRANCHISE                                                                                 7
    2.1   Award of Franchise; Term, Your Basic Commitment                                              7
    2.2   Territory                                                                                    8

3.  DEVELOPMENT AND OPENING OF YOUR CARTRIDGE WORLD STORE                                              8
    3.1   Site Selection                                                                               8
    3.2   Lease of Premises                                                                            8
    3.3   CARTRIDGE WORLD Store Design Standards and Facility Services Fee                             9
    3.4   Development for Your CARTRIDGE WORLD STORE                                                   9
    3.5   Equipment, Furniture, Fixtures and Signs                                                     10
    3.6   CARTRIDGE WORLD Store Opening                                                                10
    3.7   Grand Opening Program – Marketing Fee                                                        10
    3.8   Relocation of CARTRIDGE WORLD Store Premises                                                 10

4.  COMPUTER HARDWARE AND SOFTWARE SYSTEMS                                                             10

5.  TRAINING AND GUIDANCE                                                                              10
    5.1   Training                                                                                     10
    5.2   Guidance and Assistance                                                                      11
    5.3   Manuals                                                                                      12

6.  MARKS                                                                                              12
    6.1   Goodwill and Ownership of Marks                                                              12
    6.2   Limitations and Use of Marks                                                                 12
    6.3   Notification of Infringements and Claims                                                     12
    6.4   Discontinuance of Use of Marks                                                               12

7.  RELATIONSHIP OF PARTIES; INDEMNIFICATION                                                           12
    7.1   Independent Contractor                                                                       12
    7.2   No Liability for Acts of Other Party                                                         13
    7.3   Taxes                                                                                        13
    7.4   Responsibility, Indemnity, etc.                                                              13
    7.5   Disclosure                                                                                   14

8.  CONFIDENTIAL INFORMATION; EXCLUSIVE RELATIONSHIP                                                   14
    8.1   Confidential Information – Non-Disclosure and Non-Use                                         14
    8.2   Exclusive Relationship, Restrictions on Similar Businesses During
          Franchise Term and After Transfer, Termination, Expiration, Repurchase, etc.                 14

9.  FEES                                                                                               16
    9.1   Initial Franchise Fee, Releases, etc.                                                        16
    9.2   Royalty – Percentage Payment Dates                                                           16
    9.3   Electronic Funds Transfer                                                                    17

| **SECTION** | | **PAGE** |
|---|---|---|
| 9.4 | Interest and Late Fees on Late Payments and/or Reports/Connections Costs | 17 |
| 9.5 | Application of Payments, Set-Offs, etc. | 17 |
| 9.6 | Inflation Adjustments/Currency Requirements | 18 |
| 9.7 | Mandatory Convention Attendance, Possible Fee | 18 |
| 9.8 | Payment Instructions | 18 |
| 10. | YOUR CARTRIDGE WORLD STORE — IMAGE AND OPERATION | 18 |
| 10.1 | Application of Payments, Set-Offs, etc. | 18 |
| 10.2 | Designated Equipment, Products, Services and/or Suppliers | 19 |
| 10.3 | Purchasing Cooperative | 19 |
| 10.4 | Compliance with Laws and Ethical Business Practices | 20 |
| 10.5 | Management and Personnel of Your CARTRIDGE WORLD Store, Training | 20 |
| 10.6 | Insurance | 20 |
| 10.7 | Program Participation | 21 |
| 10.8 | Continued Payment of Royalties, etc., During Closure | 21 |
| 10.9 | Customer Satisfaction, Quality Controls, etc. | 21 |
| 10.10 | Franchisee Advisory Council and Selection | 21 |
| 11. | MARKETING | 22 |
| 11.1 | National Marketing Fund | 22 |
| 11.2 | Your Participation in the Marketing Fund | 24 |
| 11.3 | Your Local Store Marketing Activities | 24 |
| 11.4 | Regional Franchisee Marketing Group(s) ("FMG") | 25 |
| 12. | STORE RECORDS AND REPORTING | 26 |
| 12.1 | Bookkeeping, Accounting and Records, Cash Register, Computer and Other Systems | 26 |
| 12.2 | Reports, Financial Statements and Tax Returns | 26 |
| 13. | INSPECTIONS AND AUDITS | 26 |
| 13.1 | Our Inspections, etc. | 26 |
| 13.2 | Audit | 26 |
| 13.3 | Gross Volume Understatements | 27 |
| 14. | TRANSFER | 27 |
| 14.1 | Transfers by Us | 27 |
| 14.2 | Transfers by You | 28 |
| 14.3 | Conditions for Approval of Any Transfer | 28 |
| 14.4 | Additional Conditions for Transfer to a Business Entity | 30 |
| 14.5 | Death or Disability of Franchisee | 31 |
| 14.6 | Effect of Consent to Transfer | 31 |
| 14.7 | Our Right-of-First Refusal | 32 |
| 14.8 | Our Right to Repurchase | 32 |

| **SECTION** | | | **PAGE** |
|---|---|---|---|
| 15. | RENEWAL FRANCHISE | | 34 |
| | 15.1 | Your Rights | 34 |
| | 15.2 | Notice of Election | 34 |
| | 15.3 | Conditions to the Award of a Renewal | 34 |
| | | | |
| 16.1 | TERMINATION OF THE FRANCHISE | | 35 |
| | 16.1 | Defaults with No Right to Cure | 35 |
| | 16.2 | Defaults with Right to Cure | 36 |
| | 16.3 | Repeated Defaults | 37 |
| | 16.4 | Cross-Defaults | 37 |
| | 16.5 | Non-Exclusive Remedies | 38 |
| | 16.6 | No Equity on Termination, etc. | 38 |
| | 16.7 | Extended Cure Period | 38 |
| | 16.8 | Management of the Store After Issuance of Notice of Default | 38 |
| | 16.9 | Our Right to Discontinue Supplying Items Upon Default | 38 |
| | 16.10 | Termination, Expiration, or Repurchase of Our Master Franchise Agreement | 39 |
| | 16.11 | Prompt Notice of Claims by You | 39 |
| | | | |
| 17. | RIGHTS AND OBLIGATIONS ON TRANSFER, REPURCHASE, TERMINATION AND/OR EXPIRATION OF THE FRANCHISE | | 39 |
| | 17.1 | Payments of All Amounts Owed, etc. | 39 |
| | 17.2 | Intellectual Property, Confidential Information, Trade Dress, etc. | 39 |
| | 17.3 | Telephone and Other Directory Listings, Internet Sites | 40 |
| | 17.4 | Continuing Obligations | 40 |
| | | | |
| 18. | GRANT OF SECURITY INTEREST | | 41 |
| | | | |
| 19. | DISPUTE AVOIDANCE AND RESOLUTION | | 42 |
| | 19.1 | MEDIATION AND MANDATORY BINDING ARBITRATION, WAIVER OF RIGHT TO TRIAL IN COURT, etc. | 42 |
| | 19.2 | Venue | 45 |
| | 19.3 | Terms Applicable to All Proceedings, Waiver of Jury Trial, Class Action Rights | 45 |
| | 19.4 | Limitations on Damages and/or Remedies | 45 |
| | 19.5 | Periods in Which to Make Claims | 46 |
| | 19.6 | Survival of Obligations | 46 |
| | 19.7 | Costs and Attorneys Fees | 46 |
| | 19.8 | Binding Effect, Modification | 47 |
| | 19.9 | Our Exercise of "Business Judgment" and/or Meaning of "Sole Discretion"; Express Agreement | 47 |
| | 19.10 | Construction, etc. | 47 |
| | 19.11 | Non-Retention of Funds | 48 |
| | 19.12 | Severability; Substitution of Valid Provisions | 48 |
| | 19.13 | Waivers; Cumulative Rights | 48 |
| | 19.14 | Choice of Laws | 48 |

#244334 060411 fa (22246)

**SECTION**                                                                                                          **PAGE**

    19.15    Application of Agreement to Parties and Others;
               Joint and Several Liability        49
    19.16    Fundamental Business Intention to Mediate and/or Arbitrate,
               Severability of Dispute Resolution Provisions,
               Federal Arbitration Act Governs, etc.        49

20.    NOTICES AND PAYMENTS        49

21.    ACKNOWLEDGMENTS, AND REPRESENTATIONS, ENTIRE AGREEMENT,
       NO FIDUCIARY RELATIONSHIP, ETC.        50

EXHIBIT 1:
               CONTINUING PERSONAL GUARANTEE        54
EXHIBIT 1.2:    CURRENT FORM OF RELEASING LANGUAGE        56
EXHIBIT 2.2:    TERRITORY AND DESIGNATED INDIVIDUAL        58
EXHIBIT 3.2:    COLLATERAL ASSIGNMENT OF LEASE        62
EXHIBIT 3.3     SITE SELECTION ACKNOWLEDGMENT AND ADA CERTIFICATION FORM   65

#244334 060411 fa (22246)

Franchise Agreement Number: _____

**CARTRIDGE WORLD®**
**Unit Franchise Agreement**
**(current form – subject to change)**

Date of this Agreement: _January 17, 2007_

Expiration Date: _January 17, 2017_

Franchisor: Cartridge World Midwest, LLC

Franchisee: _Todd C Lucich    Nancy M Lucich_

In a number of places in this Franchise Agreement, you're asked to initial certain items to show that they've been fully discussed with you, and read, understood and agreed to by you. Initialing those areas doesn't lessen the importance of other areas or mean that they are not fully enforceable. Please initial below and at all other points indicated.

Your Initials: _tcl_ , _nml_

## 1. INTRODUCTION, DEFINITIONS, AND PRELIMINARY AGREEMENTS.

### 1.1 Introduction.

A. In this Agreement, the Franchisor's Master Franchisor, Cartridge World North America LLC, is referred to as "the Master Franchisor" or "CWNA". CWNA's Managing Member, Cartridge World, Inc., is referred to as "CW, Inc.". Cartridge World Pty Ltd, CW Inc.'s Australian parent company and an Affiliate of CWNA, is referred to as "CW International". The Franchisee is referred to as "you," "your," or the "Franchisee".

B. CARTRIDGE WORLD® Stores operate at a retail level using distinctive methods, which provide products and services related to refilling of printer (and other) cartridges, including refilling of inkjet cartridges; remanufacturing of laser cartridges; sales of toner, computer hardware (including printers) and software, and ancillary products and services. We refer to these businesses as "Traditional CARTRIDGE WORLD Stores" or "CARTRIDGE WORLD Stores."

C. CARTRIDGE WORLD Stores use certain proprietary knowledge, procedures, formats, systems, forms, printed materials, applications, specifications, standards and techniques (all of which are part of the "CARTRIDGE WORLD System"), all of which has been developed at considerable expense. Distinguishing characteristics of the CARTRIDGE WORLD System include, but are not necessarily limited to, certain trade marks and logos and other forms of commercial identity, training, marketing concepts, the Manuals, distinctive color schemes and Trade Dress, and the Confidential Information, as defined in this Agreement.

D. CW International has granted CWNA the exclusive right to grant Master Franchises in the United States, Central and South America for the award of Traditional CARTRIDGE WORLD Store Franchises

using the CARTRIDGE WORLD System. We are a Master Franchisee, and CWNA has granted us the exclusive right in a defined geographic area to award single unit Traditional CARTRIDGE WORLD Store Franchises using the CARTRIDGE WORLD System. Although CW International, CWNA and CW Inc. each is an intended beneficiary of this Agreement and may sue to enforce it, neither CW International, CWNA nor CW Inc. is a party to it, and none is bound by it in any way. All obligations and rights under this Agreement are directly between you and us.

E.  To simplify this Agreement and make it easier to read and understand, we have defined certain terms used in this Agreement in Section 1.2, below. When you see a capitalized word, or if you don't understand the meaning of a particular pronoun reference, look at Section 1.2 to see whether the term has been defined. Capitalized words that are not defined in Section 1.2 are defined in the section where they first appear.

F.  You applied for a franchise to own and operate a Traditional CARTRIDGE WORLD Store and your application has been approved by us in reliance on the information you gave us.

G.  Your CARTRIDGE WORLD franchise is a licensing arrangement, awarded under specific terms and conditions. You must comply fully with this Agreement and the Manuals in order to use the CARTRIDGE WORLD Marks, System and other Intellectual Property.

H.  You agree that it is critical to you, us, CWNA, and each CARTRIDGE WORLD franchisee for the System to be flexible to respond to commercial opportunities and challenges. An inability to change the System could adversely affect other CARTRIDGE WORLD franchisees. You, therefore, agree and anticipate that the Manual and the System may be changed by us and/or CWNA, from time-to-time in our/their Business Judgment. You agree to comply with the Manuals and the System as they are changed by us/them.

I.  Every detail of your CARTRIDGE WORLD Franchised Business is important — not only to you, but to us and to all CARTRIDGE WORLD franchisees — to increase and maintain the value of the Marks and the businesses associated with them. Therefore, during the term of this Agreement, you must at all times develop, maintain and operate your CARTRIDGE WORLD Franchised Business in accordance with each CARTRIDGE WORLD System Standard, as modified and supplemented by us and/or CWNA and/or CW International from time to time in our/their Business Judgment.

J.  You understand and agree that your investment in a CARTRIDGE WORLD Franchise involves risks, including, but not limited to, the following: CARTRIDGE WORLD is a relatively young brand in the United States.,. Positive name recognition and good will to be established will be the result, in large measure, of you and other CARTRIDGE WORLD franchisees providing quality business services and following the Manuals and System. The Traditional CARTRIDGE WORLD Store business model is relatively young in the United States. Substantial competition to the CARTRIDGE WORLD concept may exist in the United States, with certain competitors having established units and/or channels of distribution. Competition includes, among others, internet suppliers, office supply stores, other cartridge refilling franchises, mail order, and other channels of distribution. The Traditional CARTRIDGE WORLD Store business is subject to frequent changes in the business environment, including technological developments, some of which might impact you negatively. All of these and other factors make your investment speculative.

K.  Without your commitment to the System and to fulfill each of the obligations detailed in this Agreement, we would not form this franchise relationship with you.

### 1.2    Definitions.

**"Affiliate"** - Any person or entity which controls, is controlled by or is under common control with another person or entity; as to the Franchisee, Affiliate also includes any director, officer or owner of any interest in the Franchisee (and any entity controlled by any of the foregoing).

**"Agreement"** - This Franchise Agreement.

**"Attorneys' Fees"** - Includes, without limitation, legal fees; whether incurred in preparation of the filing of any written demand or claim, action, hearing, arbitration, or other proceeding to enforce the obligations of this Agreement, or during any such proceeding, plus all costs incurred in connection therewith.

**"Brand"** - The CARTRIDGE WORLD® brand, as applied to various goods and/or services as authorized by us from time-to-time.

**"Business Entity"** - Includes a corporation, partnership, joint venture, limited liability company, limited partnership, or other form of business recognized in any jurisdiction.

**"Business Judgment"** - Means that we and/or the Related Companies are allowed to exercise our/their judgment however we/they consider appropriate in our/their sole and absolute discretion, without any limitation. You and we agree that when in this Agreement we describe instances in which we/they may exercise Business Judgment, we must and do have the unrestricted right to make decisions and/or take (or refrain from taking) actions. We have this right even if a particular decision/action may have negative consequences for you, a particular franchisee or group of franchisees. You understand and agree that the exercise of Business Judgment is critical to our role as a Franchisor of the System and to our goals for its continuing improvement. This is a defined term for the purposes of this Agreement and is not intended to incorporate principles related to the application of the business judgment rule in a corporate law context.

**"Confidential Information"** - As defined in Section 8.1.

**"Customary Representations, Warranties and Agreements"** - Includes commitments generally made by a transferor in connection with a transfer of a business and/or related assets, including but not limited to: representations as to ownership, condition and title to stock and/or assets, liens and encumbrances relating to the stock and/or assets, validity of contracts, and liabilities, contingent or otherwise, relating to the business/assets/entity to be acquired; full indemnification obligations and non-competition covenants by the transferor and each Affiliate, substantially similar to those required in Sections 7.4 and 8.2 B of this Agreement; the delivery at closing of instruments transferring good and merchantable title to the assets purchased, free and clear of all liens and encumbrances (other than liens and security interests acceptable to us in our Business Judgment), and demonstrating that all sales, transfer and/or similar taxes are to be paid by the transferor through escrow if we so require; the transfer at closing of all licenses and permits which may be assigned or transferred.

**"Designated Equipment"** - Equipment that meets our requirements and which you must obtain and use in the operation of your CARTRIDGE WORLD Store.

**"Designated Individual"** - A person who has the largest ownership interest in the Franchise or the Franchisee, is responsible for the management of the Franchised Business, and is identified on Exhibit 2.2, or a substitute individual reasonably approved by us in writing.

**"Franchise"** - The right to operate a single Traditional CARTRIDGE WORLD Store at the Premises under the terms of this Agreement.

**"Franchise Advisory Council" or "FAC"** - The advisory group selected (or which may be selected) in accordance with this Agreement, which shall provide Input as provided in this Agreement and as we may request from time to time.

**"Franchised Business"** - The business operations authorized to be conducted by, at or in connection with your CARTRIDGE WORLD Store under this Agreement

**"Franchisor-Related Persons/Entities"** –Franchisor, Cartridge World North America, LLC, Cartridge World Pty Ltd., Cartridge World, Inc., the Marketing Fund, the FAC and each and all of the following, whether past, current and/or future: each and all company(ies) and/or person(s) acting through, in concert with us and/or any of the foregoing, and/or as Affiliates of ours and/or of any of the foregoing; each and all of the partners, shareholders, officers, directors, agents, attorneys, accountants, and/or employees of us and/or any of the foregoing; and each and all of the predecessors, successors and/or assigns of us and/or any of the foregoing.

**"General Release"** - A general release, in the then-current form prescribed by us at the time such release is to be delivered, of any and all claims, liabilities and/or obligations, of any nature whatsoever, including existing as of, and/or arising before, the date of any such release, however arising, known or unknown, whether against us and/or any or all of the Franchisor-Related Persons/Entities, and whether by you, any owner of you (if you are or become a Business Entity), any person/entity claiming on the basis of an alleged right of yours, and/or any Affiliate of any of the foregoing. A copy of our general releasing language as currently used by us (which is subject to change) is attached as Exhibit 1.2 and is approved by you.

**"Good Standing"** - You are in "Good Standing" if you (and each of your owners and Affiliates) are not in default of any obligation to us and/or any of the Franchisor-Related Persons/Entities, whether arising under this Agreement or any other agreement between you (and each of your owners and Affiliates) and us (and/or any of the Franchisor-Related Persons/Entities), the Manuals or other System requirements (collectively, the "Obligations"); provided that you are not in Good Standing if you have been in default of any Obligations and such defaults are incurable by nature and/or part of a series of repeated defaults as defined in this Agreement, whether or not cured.

**"Gross Profit"** - Gross Profit is Gross Volume less the actual direct product cost (before deducting all overhead costs, including without limitation rent, payroll, insurance, taxes, and all other Store operating expenses) that you incurred and paid for in connection with the products/services which are sold and/or distributed by your Traditional CARTRIDGE WORLD Store.

**"Gross Volume"** - Gross Volume includes all charges and/or revenues which are, or could be, received or earned by you (and/or any Affiliate):

A)      by, at or in connection with your CARTRIDGE WORLD Store;

B)       relating to the kinds of goods or services available now or in the future through a CARTRIDGE WORLD Store and/or distributed in association with the Marks or the CARTRIDGE WORLD System;

C)       relating to the operation of any Similar Business;

D)       with respect to, any tenants and/or subtenants of yours on the Premises (including rent and other lease payments); and/or

E)       with respect to any co-branding activities.

All sales and/or billings, whether collected or not, will be included in Gross Volume, with no deduction for credit card or other charges.  Gross Volume does not include sales tax, value added and similar taxes collected and paid when due to the appropriate taxing authority or actual customer refunds, adjustments and credits.

**"Immediate Family"** - With respect to any person, "immediate family" includes that person's spouse and/or domestic partner and each of their respective parents, guardians, grandparents, siblings, children, grandchildren, aunts, uncles, cousins, nieces and/or nephews.

**"Input"** - Advice and suggestions regarding specified matters.  When we receive Input from the FAC or any other franchisee group we will retain the ultimate decision-making authority and responsibility for all matters for which Input is sought.  FAC (or any other franchisee group) Input, votes or other collective actions will not be binding on us unless we have otherwise agreed in writing.  FAC (or any other franchisee group) approval or consent will not be required as a pre-condition to any decision and/or action we may take, unless we agree otherwise in writing.

**"Intellectual Property"** - Includes, regardless of the form or medium involved, i) all CARTRIDGE WORLD Software, including the data and information processed or stored thereby; ii) the Manuals and all other directives, policies or information we and/or a Related Company(ies) issue from time to time; iii) all Customer relationships and information; iv) the Marks; v) all Confidential Information and trade secrets; and vi) all other proprietary, copyrightable and/or trade secret information and materials developed, acquired, licensed or used by us and/or a Related Company(ies) in our operation of the System.

**"Manuals"** - Specifications, standards, policies and procedures prescribed by us and/or a Related Company(ies) and published to you in any media (including electronic) and which are to be followed in the operation of your CARTRIDGE WORLD Store as they may be changed or eliminated by us or them in our or their Business Judgment.

**"Marketing Fund"** - The fund established and defined under Section 11.1.

**"Marks"** - The trademarks, service marks and other commercial symbols now and/or in the future owned by (or licensed to) us to identify the services and/or products offered by CARTRIDGE WORLD Stores, including (but not limited to) "CARTRIDGE WORLD®", the Trade Dress and other logos and identifiers designated by us from time-to-time.

**"PUA" or "Per Unit Average"** - The average Gross Volume for all CARTRIDGE WORLD Stores in the United States during the most recent six (6) month period before the measuring date.

**"Post Termination Provisions"** - Those promises contained in this Agreement that survive its expiration, Transfer, Repurchase, or Termination for any reason, including without limitation the confidentiality, non-

competition, indemnification, ᵈispute resolution and other provisioⁿ ⁿtained in Articles 7, 8, 17, 19, 20 and 21.

**"Premises"** - The facility in which you will operate a single Traditional CARTRIDGE WORLD Store.

**"Products" and "Services"** - Goods, products and services designated by us from time-to-time for use, sale or otherwise to be provided (and/or used) at and/or from your Traditional CARTRIDGE WORLD Store and/or in association with the Marks.

**"Related Companies"** - CWNA, CW Inc. and CW International are each a Related Company. We are independently owned and operated and are not an Affiliate of the Related Companies.

**"Repurchase"** - Repurchase is an acquisition by us (and/or any of the Franchisor-Related Persons/Entities) of your rights in and/or to i) this Agreement; ii) the Franchised Business; iii) any Business Entity Franchisee; iv) your CARTRIDGE WORLD Store; and v) any lease or assets associated with any of the foregoing.

**"Similar Business"** - Any enterprise that offers, is otherwise involved in, or deals with any goods, products and/or services, which are substantially similar to those goods, Products and/or Services now or in the future authorized by us to be offered at or from CARTRIDGE WORLD Stores (including any such enterprise and/or entity awarding franchises or licenses to operate or be involved with any such business). Our receipt of any royalties with respect to any Similar Business is not an approval of your involvement with any Similar Business.

**"Special Accounts"** - Classes of special customers (which may include national accounts, other large businesses, government agencies, and/or otherwise) as designated by us from time-to-time in our Business Judgment.

**"System"** - The distinctive format and method of doing business developed and used for the operation of a CARTRIDGE WORLD Store, and subject to change by us and/or a Related Company(ies) at any time in our/their Business Judgment.

**"System Standards"** - Standards prescribed by us and/or a Related Company(ies) in our/their Business Judgment from time-to-time, in the Manuals or elsewhere, for the operation, marketing and otherwise of CARTRIDGE WORLD Stores.

**"Terminate" or "Termination"** - "Terminate" or "Termination" when used in this Agreement means the Termination or cancellation of your rights and our obligations under this Agreement for any reason before the initial term expires. All of our rights are not cancelled on Termination since you have certain obligations that survive the ending of the Agreement in any manner, such as, but not limited to certain promises regarding non competition, confidentiality and indemnity. Both of us are bound by the dispute resolution provisions (Article 19) this Agreement, even after the Agreement is ended for any reason.

**"Territory"** - The geographic area described in Exhibit 2.2.

**"Trade Dress"** - The CARTRIDGE WORLD Store design and image authorized by us and subject to change by us and/or a Related Company(ies) at any time and in our/their Business Judgment.

**"Trade Secret"** - Information that is proprietary to us and/or Related Companies, including a formula, procedure, pattern, compilation, program, device, discovery, invention, method, technique or process, that i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and/or ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

**"Traditional CARTRIDGE WORLD Store"** - A "Traditional CARTRIDGE WORLD Store" means a full, standard size, "brick and mortar" retail facility located in a free-standing building or a shopping center accessible to the general public and using the Marks and CARTRIDGE WORLD System.

**"Transfer"** - Defined in Section 14.2.

**"Us," "We," "Our" or "Franchisor"** – Cartridge World Midwest, LLC, a Minnesota limited liability company.

**"CARTRIDGE WORLD Store"** - The Traditional CARTRIDGE WORLD Store you are franchised to operate by this Agreement.

**"You," "Your," or "Franchisee"** - The parties signing this Agreement as Franchisee. (If there is more than one Franchisee, each is jointly and severally obligated under this Agreement and all other agreements with us and/ or Franchisor-Related Persons/Entities). The term "you" is applicable to one or more persons or a Business Entity, as the case may be.

## 2. AWARD OF FRANCHISE.

### 2.1 Award of Franchise; Term, Your Basic Commitment.

A. We're pleased to award you a franchise to operate a single Traditional CARTRIDGE WORLD Store at a single location to be approved by us, and to use the Marks and the CARTRIDGE WORLDSystem in the operation of that Traditional CARTRIDGE WORLD Store. If this Agreement is awarded in connection with a new franchise or an existing Store transfer, the franchise is awarded for a term of ten (10) years, commencing on the Date of this Agreement and ending on the Expiration Date noted on the first page of this Agreement.

B. If this Agreement is awarded in connection with the grant of a renewal franchise, then the term of this Agreement will be governed by the renewal provisions of the franchise agreement under which you operated during the initial term (which is now expired). The Expiration Date is noted on the first page of this Agreement.

C. The Franchise awarded to you by this Agreement is to operate only a single Traditional CARTRIDGE WORLD Store and to use the Marks and the System only for purposes of conducting a business in accordance with the provisions of this Agreement, the Manuals and other communications from us. All of the business of the CARTRIDGE WORLD Store must be conducted from the Premises, although you and we understand that certain of the Products and Services may be delivered away from the Premises, such as at a customer's site. You are authorized to use the Marks only in connection with the operation of the Franchised Business at a single location, the Premises. You must not conduct any activities from the Premises other than the operation of your Traditional CARTRIDGE WORLD Store without our prior written consent. You will not engage in any other business or activity that may conflict

with your obligations under the Agreement or reduce the Gross Volume of your CARTRIDGE WORLD Store.

**2.2     Territory.**  Your rights relating to any Territory are exactly (and only) as <u>expressly</u> set forth in Exhibit 2.2.

---

**I have read Sec. 2.1, 2.2, and Exhibit 2.2 in their entirety, understand them, and agree with them.**

Your Initials: _PcS_ / _nml_

---

## 3.     DEVELOPMENT AND OPENING OF YOUR CARTRIDGE WORLD STORE.

### 3.1     Site Selection.

A.  You must have a site acceptable to us, receive the opening notice from us described in Section 3.6, below, and do everything necessary for your CARTRIDGE WORLD Store to open for business within six (6) months from the date of this Agreement.  You must not operate a CARTRIDGE WORLD Store, use any of the Marks from or at any location, or make any commitments about a site until you have our written site acceptance.  We won't unreasonably withhold our acceptance.  Acceptance by us of any location is not a recommendation, approval or endorsement of such site.  We make no representations or warranties as to the success of any site or as to any other matter of any kind relating to the site.

B.  If you are unable to acquire a site and open your Store within the time provided in 3.1 A., above, then we may Terminate this Agreement.

C.  All matters related in any way to your site are your sole responsibility, regardless of any assistance we may choose to provide. You are responsible for obtaining any architectural and engineering services required for your facility and for ensuring its compliance with local law.  Neither we, nor any Franchisor-Related Persons/Entity, nor any other person or company associated with us will have any liability for any site-related matter.  You agree not to make any claims against us and/or any of the Franchisor-Related Persons/Entities with regard to such matters.

### 3.2     Lease of Premises.

A.  You agree to submit any lease and all site-related documents to us for our review prior to their execution by you.  You shall use commercially reasonable efforts to arrange for the inclusion of provisions in a lease addendum or other appropriate site-related documents which:

1) Obligate the lessor to provide us upon request with sales and other operations information related to your CARTRIDGE WORLD Store;

2) Permit you to operate your CARTRIDGE WORLD Store in accordance this Agreement and the Manuals;

3) Provide that the Premises will be used only for the operation of a CARTRIDGE WORLD Store, and prohibit you from assigning or modifying any of your lease rights, or extending the term without our prior written consent;

4) Require the lessor to concurrently provide us with a copy of any written notices (whether of default or otherwise) to you under the lease and give us the right to cure any default if we so choose;

5) Provide us with a right to take assignment and possession of your CARTRIDGE WORLD Store Premises, without the lessor's consent or any additional consideration if you default and/or this Agreement expires or is terminated or rescinded. If we exercise this right, we will not have any liability for any obligations incurred prior to our occupancy. You agree to take whatever actions are necessary to accomplish such assignment. If you lose your lease rights to the Premises in connection with any bankruptcy, the lessor will, upon our request, enter into a new lease with us on essentially the same terms as the terminated lease;

6) Provide that the lessor consents to the use of the Marks, Trade Dress and other aspects of the System, as modified from time-to-time, and give us the right to enter the premises during normal business hours for purposes of inspection, to take steps to protect the Marks and Trade Dress and/or prevent/cure any default.

B. You shall not execute a lease or sublease, or any modification or amendment, without our prior written consent, which we can grant, condition or withhold in our Business Judgment, as we deem appropriate. When you sign this Agreement, you also will sign the Collateral Assignment of Lease attached as Exhibit 3.2. You agree to obtain the lessor's signature on the Landlord Approval included with the Collateral Assignment of Lease before or at the same time as the lease is signed. You agree to deliver a copy of the signed lease or sublease and the signed Landlord Approval to us within five (5) days after it's signed.

### 3.3 **CARTRIDGE WORLD Store Design Standards and Facility Services Fee.**

A. You agree to comply with any standards, specifications and other requirements (the "CARTRIDGE WORLD Store Design Standards") that we furnish you for design, decoration, layout, equipment, furniture, fixtures, signs and other items for your CARTRIDGE WORLD Store. Any changes from plans provided by us must be submitted to us for our consent, which may be provided in our Business Judgment. Your compliance with the standards does not release you from your obligation to ensure that your CARTRIDGE WORLD Store is designed and constructed in compliance with all federal, state, and local laws, including without limitation the Americans with Disabilities Act. You agree to execute and deliver to us an ADA Certification in the form attached to this Agreement as Exhibit 3.3., before you open your CARTRIDGE WORLD Store, to confirm and certify that your CARTRIDGE WORLD Store and any proposed renovations comply with the ADA.

B. We, or a supplier we designate, will provide you with a Store plan template and consult with you in the build out of your facility to provide space plan suggestions, among other advice, and will facilitate compliance with applicable Design Standards by interacting with your architect, contractor, materials suppliers and/or other persons hired by you. You will pay us or the designated supplier, as instructed by us, a Facility Services Fee in the amount of Two Thousand Five Hundred Dollars ($2,500) at the time of the execution of this Agreement; provided that no such Fee will be due and no such services will be provided if you are obtaining this Agreement as a renewal franchise agreement or as a result of a Transfer of the Franchised Business at an existing Cartridge World Store. The services provided for the Facility Services Fee are limited to advice to you. We will have no authority or control over, or responsibility for, the acts/omissions of any architect, contractor, materials supplier or other persons hired by you and with whom you will have a direct legal and business relationship.

**3.4    Development r Your CARTRIDGE WORLD Stor**  You must select and employ a licensed contractor reasonab., acceptable to us, which acceptance will not be unreasonably withheld. You are solely responsible for the selection and work of any contractor selected and/or employed by you, even if referred by us.

**3.5    Equipment, Furniture, Fixtures and Signs.**  You'll use only Designated Equipment and suppliers approved by us in the development and operation of your CARTRIDGE WORLD Store as we may require.  We and/or our Affiliates and/or Related Companies may be such approved suppliers.

**3.6    CARTRIDGE WORLD Store Opening.**  You will open your CARTRIDGE WORLD Store for business immediately upon our notice to you that: i) all of your pre-opening obligations have been fulfilled; ii) pre-opening training has been completed; iii) all amounts due us (and/or any Affiliate) have been paid; and iv) copies of all insurance policies (and payment of premiums), leases/subleases and other required documents have been received.

**3.7    Grand Opening Program – Marketing Fee.**  We or our designee will provide you with grand opening marketing and promotional materials and guidance (the "Grand Opening Package").  You are required to pay to us or to our designee, as instructed by us, Seven Thousand Dollars ($7,000) for the Grand Opening Package at the time that you sign this Franchise Agreement.

**3.8    Relocation of CARTRIDGE WORLD Store Premises.**  Any relocation requires our written consent, will be at your sole expense and will require that you (and each Affiliate and owner of yours) sign a General Release.  If a lease for your CARTRIDGE WORLD Store is terminated or expires, or if your CARTRIDGE WORLD Store is damaged, condemned or otherwise rendered unusable, or if, in your and our judgment, there is a change in the character of the location of your CARTRIDGE WORLD Store sufficiently detrimental to its business potential to warrant its relocation, you agree to relocate your CARTRIDGE WORLD Store.

## 4.    COMPUTER HARDWARE AND SOFTWARE SYSTEMS.

A.  You must purchase, use, maintain and update at your expense the software, computer and other systems (including point-of-sale and back-office systems) meeting our specifications, as we may modify them.  If required by us, you agree to maintain your systems on-line to allow us access to system data and information.  You agree to comply with our then-current Terms of Use and Privacy Policies and any other requirements regarding all computer and other systems, including Internet usage.  Supplier or and/or licensor charges for use, maintenance, support and/or updates of and to the required systems are payable by you upon receipt.

B.  Neither we nor any of the Franchisor-Related Persons/Entities will have any liability and/or obligation (and neither you, nor any Affiliate of yours, will make any claims) about any failures, errors or any other occurrences relating to any computer or system hardware or software without an express written warranty from us, even if recommended or specified by us.

## 5.    TRAINING AND GUIDANCE.

### 5.1    Training.

A.      You must complete the CARTRIDGE WORLD initial training program to operate your CARTRIDGE WORLD Store.  The initial training program is scheduled at our discretion and consists of a

combination of classroom training at CWNA's training center in Northern California, or such other location designated by us/CWNA, and on the job training conducted at CARTRIDGE WORLD stores or other facilities designated by us/CWNA. We can choose to eliminate or shorten training for persons previously trained or with comparable experience.

B. You must pay Training Fees when you sign the Franchise Agreement, unless we authorize you to pay at a later date. As of the date of this Agreement, the initial training program includes two (2) weeks in CWNA's Northern California facility and one (1) week each of pre and post opening training conducted at a location(s) designated by us in our Master Franchise Territory, but the location and duration of training is subject to change. The fee for the classroom portion of the initial training program for the first attendee under this Agreement is Six Thousand Three Hundred dollars ($6,300). The current fee for each additional attendee is Seven Hundred dollars ($700). The fee for the combined pre and post opening training is One Thousand dollars ($1,000) for the two sessions, regardless of the number of attendees. We may adjust all Training Fees from time to time. If the Franchise is owned by more than one person or if the Franchisee is a Business Entity, then the Designated Individual identified in Exhibit 2.2below must successfully complete the initial training program (both the classroom and on the job training sessions) and comply on an ongoing basis with all training requirements. A Designated Individual shall be deemed to be the "Franchisee" for purposes of meeting all training and similar qualifications pursuant to this Agreement. You are solely responsible for any travel, accommodations, living and other expenses associated with your attendance. The initial training program will be held at a time and for such period, as we specify in our Business Judgment You will be responsible for ensuring that each of your managers is trained to our then-current standards. We can require in our Business Judgment that each of your CARTRIDGE WORLD Store managers and/or substituted Designated Individuals attend and complete our initial training program before managing your Store or assuming their position, respectively. We will use reasonable efforts to accommodate attendance by managers and other staff members at initial training programs upon thirty (30) days advance notice. You shall be responsible for all tuition fees, airfare, travel, wages, living, incidental and other expenses for your managers and any other personnel attending the initial training program, and any other subsequent training programs, seminars or meetings, unless otherwise agreed to by us in writing.

C. If we, in our Business Judgment, determine that you have not successfully completed or are not making satisfactory progress in your initial training, we can either require that a substitute manager or Designated Individual complete the training or terminate this Agreement.

D. We can require that you, your Designated Individual and/or Store manager(s) attend additional and/or remedial training, including national and regional conferences, conventions and meetings, as we may reasonably require to correct, improve and/or enhance your operations, the System and its members. We also can require successful completion of training by all of your supervisory personnel. Meetings designated as mandatory by us will be held in North America at a location selected by us, and we will provide you with at least thirty (30) days advance written notice thereof. We may elect to charge a reasonable fee for all training.

**5.2 Guidance and Assistance.** We will provide guidance in the operation of your CARTRIDGE WORLD Store. This guidance can be furnished in whatever manner we consider appropriate in our Business Judgment, including electronically, in writing or telephonically, through training programs and/or on site consultations and/or through representatives of ours and/or Related Companies, among other methods. We will provide at your request on-site consultations at your CARTRIDGE WORLD Store, based on notice, availability of personnel and your payment of reasonable travel, food, incidental and lodging expenses. No consulting fee will be charged. If we believe in our

Business Judgment that you operations warrant it, we can require at a manager or other person designated by us be placed in your CARTRIDGE WORLD Store to supervise its day-to-day operations until operations meet System standards. If we choose to do so, you must reimburse us according to the requirements of Section 16.8.

     **5.3**   **Manuals.** During the term of the Franchise, we will <u>loan</u> you (or allow you electronic or other access to) one copy of the Manuals. You will continuously comply, at your sole expense, with all provisions of, and additions/deletions/changes to, the Manuals. Any such additions/deletions/changes will take precedence over all prior communications. Mandatory specifications, standards and operating procedures prescribed from time-to-time by us in the Manuals, or otherwise communicated to you electronically or otherwise, are a part of this Agreement. In the event of a dispute, the master Manuals maintained at our office and/or a Related Company's headquarters will control.

## 6.   <u>MARKS.</u>

     **6.1**   **<u>Goodwill and Ownership of Marks.</u>** You have a non-exclusive right to use the Marks and only as expressly authorized by us under this Agreement. CWNA/CW International has all rights in and to the Marks. All goodwill belongs exclusively to them, and you will not obtain any goodwill in the Marks as a result of this Agreement, your operation of the Franchise or for any other reason. Any unauthorized use of the Marks is a breach of this Agreement and an infringement of proprietary rights. You agree that if you breach any obligation regarding the Marks, we/Related Companies would have no adequate remedy at law and that we/Related Companies will be entitled to equitable relief. You won't oppose, or engage in any acts or omissions inconsistent with, our rights in and to the Marks. This Agreement applies to all trademarks, service marks and other commercial symbols that we authorize you to use throughout its term.

     **6.2**   **<u>Limitations and Use of Marks.</u>** You will use the Marks as the sole identification for your CARTRIDGE WORLD Store. You will not use any Mark, or modified version or derivative of a Mark, as part of any business or trade name. Prior to adoption and/or use, any proposed corporate and/or trade name must be approved by us. You agree to promptly comply at your sole expense with any request for you to modify any business or trade name adopted by you that is contrary to this Section. You agree to give such trademark and other notices (including notices of independent ownership) as we direct and will, at your expense, obtain fictitious or assumed name registrations as may be required under law. You will display the Marks as required by us and will not use the Marks so as to negatively affect their goodwill. You won't use any Mark in connection with the performance or sale of any unauthorized services or products or at any location or in any other manner not expressly authorized in writing by us.

     **6.3**   **<u>Notification of Infringements and Claims.</u>** You'll take such actions as we consider important in our Business Judgment to protect the Marks. You will not take any action that jeopardizes our or any Related Company's interests in, or the validity or enforceability of, the Marks. You agree to immediately notify us of any apparent or actual infringement of, or of any challenge to your use of, the Marks. You will not communicate with any third party with respect to such a claim (except for Related Companies and their designees). We will take such action as we deem appropriate in our Business Judgment. CWNA/CW International (and/or its designees) has the exclusive right to control any settlement, litigation or proceeding arising out of or related to any such matters.

     **6.4**   **<u>Discontinuance of Use of Marks.</u>** You agree to comply at your expense with any directions from us and/or any Related Company to discontinue, modify, substitute or add Marks. We cannot and do not make any guaranty that a modification, discontinuance or otherwise will not be required for any reason. In such event, we will have no liability or obligation to you. You agree to make

no claim in connection with any modification, discontinuance or other action, and/or with any dispute regarding the Marks against us and/or any Related Company. There is always a possibility that there might be one or more businesses using a name and/or marks similar to the Marks and with superior rights.

## 7.  RELATIONSHIP OF THE PARTIES; INDEMNIFICATION.

**7.1  Independent Contractor.** You will always identify yourself to all persons and in all dealings of your CARTRIDGE WORLD Store as an independent owner under a CARTRIDGE WORLD franchise, clearly indicating that your Franchised Business is separate and distinct from our business and that of any Related Company. You will include notices of independent ownership on such forms, business cards, stationery, advertising, signs and other materials as we require from time-to-time. Subject to the requirements of this Agreement and the mandatory provisions of the Manuals, you will have complete operational control of your business, including the right to hire and fire each employee.

**7.2  No Liability for Acts of Other Party.** You will not represent that your and our relationship is other than that of independent Franchisor and Franchisee. Neither you nor we will have any liability under any acts, omissions, agreements or representations made by the other that are not expressly authorized in writing. This Agreement does not create a fiduciary relationship between you and us and/or any Related Company.

**7.3  Taxes.** Payment of all taxes related to your Franchised Business is your sole responsibility. Neither we/nor any Related Company have any liability for any taxes on the sales made and/or business conducted by you (except for any taxes we are required by law to collect from you with respect to purchases from us.)

**7.4  Responsibility, Indemnity, etc.**

A.  You will indemnify and hold us and all of the Franchisor-Related Persons/Entities harmless from all fines, suits, proceedings, claims, demands, actions, losses, damages, costs, fees (including attorney's fees and related expenses) and/or any other liability of any kind or nature, however arising, growing out of or otherwise connected with the operation of your CARTRIDGE WORLD Store and/or related to any act, error and/or omission of yours, even if there is a claim that a Franchisor-Related Person/Entity was negligent, including, but not limited to, your ownership and/or management of your CARTRIDGE WORLD Store and/or any Transfer of any interest in this Agreement or your CARTRIDGE WORLD Store. We and/or a Related Company will have the right to control all litigation, and defend and/or settle any claim, against and/or including us and/or the Franchisor-Related Persons/Entities, or affecting our and/or their interests, in such manner as we/Related Companies deem appropriate in our/their respective Business Judgment, without affecting our/their rights under this indemnity.

B.  **Unless we give to you a specific written warranty for a particular item or service,** goods and/or services provided by us, the Franchisor-Related Persons/Entities and/or any "approved" person/company/referral are provided without any warranties, express or implied, **from us or any Franchisor-Related Person, THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE BEING EXPRESSLY DISCLAIMED. To the extent that they are transferable, we will pass on to you any warranties received from suppliers by us or Franchisor-Related Persons/Entities in connection with products distributed by us or Franchisor-Related Persons/Entities to you.**

| I have read Sec. 7.4, unde___ ___nd it, and agree with it. |
| Your Initials: _____ , _____ |

**7.5**    **Disclosure.**  You permit us to disclose, in offering circulars required by law and other places, any information relating to your CARTRIDGE WORLD Store, including your name, any address and/or phone number(s), revenues, expenses, results of operations and/or other information.   Any disclosure by us shall be for reasonable business purposes, and our rights under this Section survive the Termination, expiration or Transfer of this Agreement.

## 8.    CONFIDENTIAL INFORMATION; EXCLUSIVE RELATIONSHIP.

### 8.1    Confidential Information - Non-Disclosure and Non-Use.

A.    "Confidential Information" includes all information relating to the operation of a CARTRIDGE WORLD Store or the System, including, among other things, all current and future: i) Manuals, training, techniques, Trade Secrets, processes, policies, procedures, systems, data and know how regarding the development, marketing, operation and franchising of CARTRIDGE WORLD Stores; ii) specifications and information about Products and Services; iii) all information regarding customers and suppliers, including any statistical and/or financial information and all lists;   iv) methods of refilling printer cartridges; and v) any Related Company's engineered jigs.   Specifically, and without limitation, the Related Companies own and control all domain names and URLs ("Uniform Resource Locator") relating to any and all CARTRIDGE WORLD Stores, as well as all information, lists and data related to past, present and future customers of your CARTRIDGE WORLD Store.   Your only interest in any of this Confidential Information is the right to use it pursuant to this Agreement.  You have the burden of proof and of going forward in any dispute between you and us or the Related Companies involving the proprietary or confidential nature of any information.

B.    Both during and for five (5) years after the term of this Agreement, you agree i) to use the Confidential Information only for the operation of your CARTRIDGE WORLD Store under a CARTRIDGE WORLD Franchise Agreement; ii) to maintain the confidentiality of the Confidential Information; iii) not to make or distribute, or permit to be made or distributed, any unauthorized copies of any portion of the Confidential Information; and iv) to implement all prescribed procedures for prevention of unauthorized use or disclosure of the Confidential Information; provided that you agree to comply with the foregoing obligations with respect to Trade Secrets both during and after the term of this Agreement and without regard to any time period limitation.

C.    You agree to disclose to us all ideas, techniques, methods and processes relating to a CARTRIDGE WORLD Store conceived or developed by you and/or your employees.  We and the Related Companies shall have the perpetual right to use, and to authorize others to use, such ideas, etc., without payment to you.  You agree to sign (and cause your employees and contractors to sign) such documents as we or any Related Company may reasonably require in order to implement this clause.

D.    You agree to have each of your employees, agents, principals and Affiliates sign a form of confidentiality agreement approved by us and our then current model form will be included in the Manuals or otherwise provided by us.   We may from time to time provide you with template or sample forms/agreements and other materials and/or require through the Manuals or other written instruction that agreement forms used by you in the Franchised Business contain certain terms and/or protections for us. We do not warrant the legal sufficiency or quality of any such documents that we may approve or provide,

and you are responsible to have all such items reviewed and modified for compliance with local law by an attorney licensed to practice in the state(s) where your Franchised Business will be located. You also agree to ensure that the collection, input, storage and use of your Franchised Business data using the Cartridge World systems complies with any applicable privacy laws and regulations within your jurisdiction and any Manuals requirements. You are solely responsible for ensuring that any confidentiality agreement used by you is in compliance with and enforceable under local law. You will give us copies of your confidentiality agreements upon request.

**8.2 Exclusive Relationship, Restrictions on Similar Businesses During Franchise Term and After Transfer, Termination, Expiration, Repurchase, etc.**

A. _In Term Restrictions:_ During the term of this Agreement and any renewal franchise, neither you, nor any Designated Individual or Affiliate of yours, nor any shareholder, member or partner of yours (if you are or become a Business Entity), nor any Immediate Family member of any of the foregoing, will:

1) have any direct or indirect interest anywhere in any Similar Business, or in any entity awarding franchises or licenses or establishing joint ventures or other business enterprises for the operation of Similar Businesses; or

2) perform any services anywhere as an employee, agent, representative or in any capacity of any kind for any Similar Business, or for any entity awarding franchises or licenses or establishing joint ventures to operate Similar Businesses; or

3) employ or try to employ any employee of ours, of a Franchisor-Related Person/Entity or of any other CARTRIDGE WORLD franchisee or Master Franchisee, without providing notice to the respective employer and obtaining their prior written consent. If you violate Section 8.2 A.3 during or after the term of this Agreement, then our remedies will include (but not be limited to) payment to us by you of $5,000, such amount having been mutually agreed on by you and us in view of the extreme difficulty in accurately determining the damages suffered as a result of such breach.

B. _Post Term Restrictions:_ For two (2) years after the later of the following terminating events: i) any Transfer, Repurchase and/or Termination of this Agreement; ii) the expiration of this Agreement (if a renewal franchise or renewal term is not granted); and/or iii) the date on which you stop operating your final CARTRIDGE WORLD Store or using the Marks and/or System, all of the persons and entities named in such Section 8.2, A, above:

1) shall not accept or solicit any person, firm or company that has been a CARTRIDGE WORLD Customer during the period twelve months prior to termination, nor try to divert any such Customers from any CARTRIDGE WORLD Store or CARTRIDGE WORLD enterprise of any kind (including any operations owned by any Franchisor-Related Persons/Entity and/or other Master Franchisees); and

2) shall be subject to all of the restrictions stated in Section 8.2 A, above, with respect to Similar Businesses located, and/or services performed, in the Non-Compete Area for any Cartridge World Store location in the United States, including the location of the Store operated by you under this Agreement. A "Non-Compete Area" shall be the circular area defined by a radius of ten (10) miles from the front door of any such Cartridge World Store location, including your own.

3) You and we have expressly bargained and agreed that is your obligation under this Agreement to ensure the compliance of each of the persons identified in Section 8.2 A., with the restrictions described in this Section 8.2. The foregoing notwithstanding, we shall use reasonable judgment in evaluating whether or not the conduct of an Immediate Family member warrants our exercising any rights under this provision, considering your actual relationship to such member and his/her activities, among other factors. The restrictions of this Section do not apply to the ownership of shares of a Similar Business (of a class of securities listed on a stock exchange or traded on the over-the-counter market) that represent less than three percent (3%) of the number of shares of that class issued and outstanding.

4) You and we share a mutual interest in ensuring compliance with the limitations on competition described in this Section 8.2. A CARTRIDGE WORLD franchisee's non-compliance with these restrictions would damage you, us and other CARTRIDGE WORLD Franchisees and unfairly limit reasonable expansion alternatives open to us and CARTRIDGE WORLD system members. You acknowledge and agree that such protections can enhance the value of the CARTRIDGE WORLD System to you as a franchisee, represent a reasonable balancing of your and our respective interests and have been expressly bargained for. You confirm that you possess valuable skills unrelated to the franchised business and have the ability to be self-supporting and employed, regardless of the competitive restrictions described in this Section 8.2.

5) If you violate any of the foregoing restrictions, our remedies will include (but not be limited to) the right to obtain equitable relief and to receive all profits generated in connection with the operation of any Similar Business until the date you cease to violate such restrictions. All competitive restrictions will be extended for the length of time that any breach of the Post Termination Obligations is ongoing. If any of the restrictions of this Section are determined to be unenforceable to an extent because of excessive duration, geographic scope, business coverage or otherwise, they will be reduced to the level that provides the greatest protection to us and the CARTRIDGE WORLD System, but which is still enforceable, notwithstanding any choice-of-law or other provisions in this Agreement to the contrary.

---

**I have read Sec. 8.1 and 8.2, understand them, and agree with them.**

**Your Initials:** _/ C.L_  ,  _nml_

---

## 9. FEES.

### 9.1 Initial Franchise Fee, Releases, etc.

A. An initial franchise fee of Thirty Thousand Dollars ($30,000) is fully earned and payable to us on signing of this Agreement. The fee is entirely nonrefundable. We will apply a credit against the initial franchise fee due, or against such other fees as may be due upon the signing of this Agreement, in the amount specified in any mutually executed Consent to Transfer Agreement, or other applicable agreement.

B. If you and we have, or have had, a pre-existing franchise relationship prior to the execution of this Agreement, the language of the General Release attached as Exhibit 1.2 is incorporated in and effective upon the signing of this Agreement, excepting only those claims solely related to the offer and sale of this Franchise where such releases are expressly prohibited by applicable law.

C.     As a condition to the occurrence of any of the following events (the "Events"), you and/or any Affiliate/owner of yours will sign a General Release, excepting only (where such releases are expressly prohibited by applicable law) those claims solely related to the offer and sale of the new Franchise:

     (i)     the awarding of any future, additional or other franchise;

     (ii)    the renewal of this franchise and/or awarding of a renewal franchise;

     (iii)   any assignment or Transfer by you and/or any Affiliate/owner of you; and/or

     (iv)    any other event described in this Agreement as being conditioned in whole or in part upon such a General Release (as defined in Article 1.2, above).

**9.2     Royalty, Payment Dates.**

A.     You agree to pay us royalties in each royalty period calculated as follows with respect to the two business segments identified below:

(a)    with respect to computer hardware (including printers) and/or software sales, six percent (6%) of Gross Profit received or earned by you during the preceding royalty period, and

(b)    with respect to all other Products and/or Services sales (including but not limited to inks, ink cartridges and related printer consumables), an additional six percent (6%) of Gross Volume received or earned by you during the preceding royalty period.

Royalties are to be paid by the tenth (10TH) day after each royalty period. Royalty payments are due commencing with the royalty period in which you begin CARTRIDGE WORLD Store operations. The current royalty period is a calendar month, but the time period may be changed by us in our Business Judgment. You must use your best efforts to maximize Gross Volume.

B.     We require that various Products and/or Services only be supplied by us, a Franchisor-Related Person/Entity, and/or a designee of ours. You understand and agree that we and/or our Franchisor-Related Person/Entity will derive additional revenues/profits as a result of your purchases of such Products/Services.

**9.3     Electronic Funds Transfer.** You must participate in our then-current electronic funds transfer and reporting program(s). The then-current transfer process (e.g., account debit dates, applicable forms and other relevant information) will be provided in the Manuals or other written instruction from us. In any event, all royalties owed and any other amounts designated by us must be received or credited to an account specified by us by pre-authorized bank debit not later than end of business on the tenth (10th) day after a royalty period. You agree to maintain sufficient funds in your authorized accounts to meet your payment obligations under this Agreement. An insufficient account balance and/or any non-payment or late payment of the actual amount due is a breach of this Agreement.

**9.4     Interest and Late Fees on Late Payments and/or Reports/Collections Costs.** All amounts you owe us and/or our Affiliates bear interest at the highest applicable legal rate for open account business credit, but not to exceed one and one-half percent (1.5%) per month. Additionally, we can require you to pay an administrative late fee of Twenty Five Dollars ($25.00) for each late report. The foregoing amount is subject to inflation adjustment under Section 9.6, but will not exceed any applicable legal restrictions. If we experience repeated late payments by you, then we can require you to pay all

amounts due us by cashier's check. You are responsible for all reasonable costs of collection incurred by us in connection with any late payments, including legal costs and attorneys' fees.

**9.5** **Application of Payments, Set-Offs etc.** As to you and/or any Affiliate of yours, we can:

A)    apply any payments received to <u>any</u> past due, current, future or other indebtedness of any kind in our Business Judgment, no matter how payment is designated by you, except that Marketing Fund contributions may only be credited to the Marketing Fund;

B)    set off, from any amounts that may be owed by us, any amount owed to us or any marketing fund; and

C)    retain any amounts received for your account (and/or that of any Affiliate of yours), whether rebates from suppliers or otherwise, as a payment against any amounts owed to us.

We can exercise any of the foregoing rights in connection with amounts owed to or from us and/or any Franchisor-Related Person/Entity.

**9.6** **Inflation Adjustments/Currency Requirements.** Amounts specified as being subject to inflation adjustment may be adjusted by us annually in our Business Judgment in proportion to the changes in the Consumer Price Index (U.S. Average, all items) maintained by the U.S. Department of Labor (or any successor index that we designate) as compared to the previous year. We will notify you of any such percentage adjustment. All amounts specified in this Agreement are in U.S. Dollars.

**9.7** **Mandatory Convention Attendance, Possible Fee.** You are required to attend all meetings designated by us as mandatory (including without limitation the CARTRIDGE WORLD annual convention), unless otherwise excused by us. One management-level individual must attend on behalf of each of your CARTRIDGE WORLD Stores. You may be required by us to pay a fee at the time of the event to offset the cost of a convention or other program. You are responsible for all other costs of attendance.

**9.8** **Payment Instructions.** You agree to comply with payment instructions for fees owed under this Agreement, as provided in the Manuals or as otherwise instructed by us, including a requirement that payments be made to CWNA or an agent for collection. Neither CWNA nor any such agent will have any responsibility for the performance of our obligations under this Agreement because of any collection activities on our behalf.

## 10.    YOUR CARTRIDGE WORLD STORE — IMAGE AND OPERATION.

### 10.1    System Compliance, Regular Upgrading.

A. You agree to operate your CARTRIDGE WORLD Store in full compliance with the then-current CARTRIDGE WORLD System and the Manuals. You agree to promptly comply at your expense with all then current requirements, standards and operating procedures relating to every aspect of a CARTRIDGE WORLD Store and its operations (including without limitation use of specified equipment, Products and Services, computer hardware and software and Point Of Sale ("POS") systems; supplier programs and operating systems; signs, logos, designs and advertising/marketing materials and forms; website designs and formats).

B. You must maintain  r CARTRIDGE WORLD Store a  ur expense according to all CARTRIDGE WORLD standa s for new stores and promptly undertake all changes as are required by us from time-to-time in our Business Judgment. . You will not make any alterations to your CARTRIDGE WORLD Store or its appearance as originally approved by us without our prior written approval.

C. You agree that you and your employees will wear then current CARTRIDGE WORLD logo apparel at your sole expense.

**10.2** **Designated Equipment, Products, Services and/or Suppliers.**

A. Your CARTRIDGE WORLD Store must purchase, use and offer such Designated Equipment, Products and Services, as are specified by us and/or a Related Company from time to time. We may designate a single or multiple suppliers for any given item or service and may concentrate purchases with one or more suppliers in our Business Judgment. Such suppliers may include, and may be limited to, us and/or companies affiliated with and/or related to us. You understand that we currently have a Related Company(ies) that derive(s) substantial revenues from i) warehousing and selling Products to CARTRIDGE WORLD Store Franchisees, including but not limited to, inks, ink cartridges and related printer consumables, and ii) Services, including construction management and facility design services. We expect these and/or other sales of Products/Services by us and/or Related Company(ies) to continue in the future. We also may develop new products and processes which you may be required to use/implement in your operations. We or an Affiliate or Related Company(ies) can be designated by us/Related Company(ies) in our/their Business Judgment as an exclusive supplier for any such Products/Services. An exclusive supplier may be designated to help ensure that such Products are of a uniform, high quality and are uniformly available in all Traditional CARTRIDGE WORLD Stores. You and we agree that the predictability of high quality Products, Product performance and similar factors are of key importance to our target consumers, to building a positive image and reputation for the CARTRIDGE WORLD Brand and Franchise system, and to individual Store and System growth. We/Related Companies may delete, substitute, modify or add to the Products/Services/suppliers in our/their Business Judgment.

B. Designation of a supplier may be conditioned on factors established by us/Related Companies in our/their Business Judgment, including without limitation performance relating to frequency of delivery, standards of service, and payment or other consideration to us or parties designated by us/them. We/Related Companies can approve, or revoke or deny approval, of particular items or suppliers in our/their Business Judgment.

C. You must purchase all goods and services for your CARTRIDGE WORLD Store from suppliers approved by us, unless otherwise permitted by us or as provided in the Manuals. You can request the approval of an item, service or supplier by notifying us in writing and submitting such information and/or materials we request. We can require you to pre-pay any reasonable charges connected with our review and evaluation of any proposal. We will notify you of our decision within a reasonable time.

D. You will not make any claims against us/Related Companies with respect to any supplier and/or related products/services, and/or our designation of, or our relationship with, any supplier/products/services. Claims by you with respect to any supplier-related and/or similar matters will be made only against the supplier in question. You will provide us with written notice prior to taking any action in connection with such a claim. We will use diligent efforts to assist you in resolving any disputes with suppliers approved and/or designated by us.

**10.3 Purchasing Cooperative.** We can require that you join and make required purchases/leases through the CARTRIDGE WORLD purchasing cooperative or other entity designated by us. Such entity may adopt its own bylaws, rules, regulations and procedures, subject to our consent in our Business Judgment. We can require each such entity to submit monthly and annual financial statements, and can require that the annual financial statements be audited, all at the expense of such cooperative. Your failure to timely pay amounts due to, or comply with the bylaws, rules, regulations and procedures of such cooperative is a breach of this Agreement. We can offset against amounts we owe to you the amount of your unpaid cooperative obligations.

### 10.4 Compliance with Laws and Ethical Business Practices.

A. You'll operate your CARTRIDGE WORLD Store in full compliance with all applicable laws, ordinances and regulations. If there is ever a conflict between the requirements imposed under this Agreement and your obligation to comply with applicable laws, ordinances, and regulations, you shall immediately: (1) comply with the applicable law, ordinance, and/or regulation; and (2) give us written notice explaining the nature and extent of the conflict.

B. We make no representations or assurances as to what (if any) licenses, permits, authorizations or otherwise may be required in connection with your CARTRIDGE WORLD Store. It is your sole responsibility to identify and obtain all authorizations necessary to your operation. You agree to maintain high standards of honesty, integrity, fair dealing and ethical conduct in your business activities. You will notify us in writing within five (5) days of the commencement of any proceeding and/or of the issuance of any governmental order or action impacting you and/or your CARTRIDGE WORLD Store.

C. You agree to comply and/or assist us in our compliance efforts, as applicable, with any and all laws, regulations, Executive Orders or otherwise relating to anti terrorist activities, including without limitation the U.S. Patriot Act, Executive Order 13224, and related U.S. Treasury and/or other regulations. In connection with such compliance efforts, you agree not to enter into any prohibited transactions and to properly perform any currency reporting and other activities relating to your Franchise Business as may be required by us or by law. You confirm that you are not listed in the Annex to Executive Order 13224 and agree not to hire any person so listed or have any dealing with a person so listed (the Annex is available at http://www.treasury.gov/offices/enforcement/ofac/sanctions/terrorism.html). You are solely responsible for ascertaining what actions must be taken by you to comply with all such laws, orders and/or regulations, and specifically acknowledge and agree that your indemnification responsibilities as provided in Section 7.4 pertain to your obligations hereunder.

### 10.5 Management and Personnel of Your CARTRIDGE WORLD Store, Training.

A. Your CARTRIDGE WORLD Store must be personally managed on a full-time basis by a person who has successfully completed mandatory training and met then-current standards. We strongly recommend on-site management by you.

B. You are solely responsible for the hiring and management of your CARTRIDGE WORLD Store employees, for the terms of their employment and for ensuring their compliance with any training or other employment related requirements established by us from time to time in our Business Judgment.

C.    We have the right to deal with the manager regarding routine operations and reporting requirements. You will ensure that our records for your CARTRIDGE WORLD Store managers/supervisors are kept current.

**10.6    Insurance.**

A.    You agree to maintain in force policies of insurance issued by carriers approved by us covering various risks, as specified in writing by us from time-to-time. We can specify the types and amounts of coverage required under such policies and require different and/or additional kinds of insurance at any time, including excess liability insurance. Each insurance policy must: i) name us and our Affiliates and Related Companies as additional named insured; ii) contain a waiver of all subrogation rights against us, our Affiliates and any successors and assigns; iii) and provide thirty (30) days' prior written notice to us of any material modifications, cancellation, or expiration of such policies.

B.    If you fail to maintain required insurance coverage, we will have the right (but not the obligation) to obtain such insurance coverage on your behalf. You will pay us on demand any costs and premiums incurred by us.

C.    Current insurance requirements include the following and are subject to change by us: (i) comprehensive general liability insurance against claims for bodily and personal injury, death and property damage caused by, or occurring in conjunction with, your CARTRIDGE WORLD Store; (ii) all risk property and casualty insurance for the replacement value of your CARTRIDGE WORLD Store and all associated items; and (iii) business interruption insurance providing for continued payment of all amounts due us and/or any Affiliate of ours under this Agreement.

**10.7    Program Participation.** We can condition your participation in any program, or your receipt of any CARTRIDGE WORLD System benefits, on you being in Good Standing.

**10.8    Continued Payment of Royalties, etc. During Closure.** You must immediately notify us of any closure of your CARTRIDGE WORLD Store for any reason and submit a plan for re-opening. All financial obligations of yours to us or to any Franchisor-Related Person/Entity (including royalties) will remain in effect during such closure period, unless we otherwise agree in writing. Any such closure not authorized and/or excused by us shall be a default of this Agreement, entitling us to all remedies available hereunder, at law and in equity.

**10.9    Customer Satisfaction, Quality Controls, etc.** We can institute various programs for auditing customer satisfaction and/or other quality control measures. We can require you to pay for such program costs. You agree to request your customers to participate in any surveys performed by or on behalf of us, using forms prescribed by us from time to time.

**10.10    Franchisee Advisory Council and Selection.** We and/or Related Companies may elect in our/their Business Judgment to form a "Franchisee Advisory Council" or "FAC," to provide Input to us. The FAC will consist of Franchisees in Good Standing, each of whom shall represent the interests of the Traditional CARTRIDGE WORLD Stores in their distinct geographical region (the "Region"). FAC members will be elected for a term or terms by a majority of the Traditional CARTRIDGE WORLD Stores situated in their respective Region. The geographical area of each Region will be established by us and/or Related Companies, as applicable, in our/their Business Judgment, with due consideration given to achieving a representative group of Stores for each Region. The number of Regions and their respective boundaries will be subject to adjustment from time to time to reflect growth and Store

population changes, among other appropriate factors. Each Store, both franchisee and FranchisorRelated Company-owned, will be entitled to one vote Store. We and/or Related Companies, as applicable, will always have the right to appoint one representative to participate in all FAC meetings and any other FAC activities, but such representative will be a non-voting participant. The FAC may adopt its own bylaws, rules, regulations and procedures, subject to our and/or Related Companies, as applicable, consent in our/their Business Judgment. While we/they are not required to do so except in those specific instances stated in this Agreement, if we/Related Companies submit any matters for approval to an FAC and approval is granted, the approval will be binding on you.

## 11.  MARKETING.

### 11.1  National Marketing Fund.

A.  CWNA has established an advertising, publicity and marketing fund (the "National Marketing Fund" or "Marketing Fund") to promote CARTRIDGE WORLD Stores and the Brand. You agree to make a marketing fund contribution calculated as follows with respect to the two business segments identified below:

> (a)  with respect to computer hardware (including printers) and/or software sales, an amount not to exceed four percent (4%) of Gross Profit received or earned by you during the preceding royalty period,

plus

> (b)  with respect to all other Products and Services sales (including but not limited to inks, cartridges and computer compatibles), an additional amount not to exceed four percent (4%) of "Gross Volume" received or earned by you during the preceding royalty period;

The percentage contributions shall be established by CWNA in its Business Judgment, subject to the maximum limitations described above. Such percentage marketing contributions will be calculated and payable at the same time and in the same manner as royalties, including any electronic funds transfer requirements. Such contributions shall be payable to CWNA, or as otherwise instructed by CWNA. CWNA may, on a temporary or permanent basis, delegate management of all or part of the Marketing Fund to us and/or other Master Franchisees and/or Related Companies, including but not limited to contribution collection activities. In such an event, all rights of, and benefits to, CWNA with respect to the Marketing Fund, whether arising under the provisions of this Agreement or otherwise, shall also accrue to us and/or such other entities. If CWNA has delegated or delegates any such management to us, it will have no obligations to you [and you will not make any claims against CWNA or any Related Company] with respect to such management activities and/or any related matter. To the extent of any such delegation, all such obligations will be ours alone.

B.  CWNA shall have sole discretion over all matters relating to the Marketing Fund, operational, marketing or any other matter (consistent with its purposes and the provisions of this Agreement). The Marketing Fund may be used for (among other things) product development; signage; creation, production and distribution of marketing, advertising, public relations and other materials in any medium, including the internet; administration expenses; brand/image campaigns; media; national, regional and other marketing programs; activities to promote current and/or future CARTRIDGE WORLD Stores and the Brand; agency and consulting services; research, any expenses approved by us and associated with FAC or other franchisee advisory groups. A brief statement regarding the availability of

CARTRIDGE WORLD franchise may be included in advertising and other items produced using the Marketing Fund.

C.     CWNA, we and/or any Franchisor-Related Persons/Entities can provide goods, services, materials, etc. (including administrative services and/or "in-house advertising agency" services) and be compensated and/or reimbursed for the same by the Marketing Fund, provided that any such compensation must be reasonable in amount.  CWNA can arrange for goods, services, materials, etc. (including administrative services) to be provided by independent persons/companies and all related costs, fees, etc. will be paid by the Marketing Fund.  While CWNA is not required to do so, if an FAC has been formed and any matters are submitted by CWNA for approval to the FAC and approval is granted by a majority of the members, the approval will be binding on you.

D.     The Marketing Fund will be accounted for separately and may be used to pay all administrative and other costs of the Marketing Fund related to its activities and purposes and/or as authorized by the relevant Franchise Agreements.  All taxes of any kind incurred in connection with or related to the Marketing Fund, its activities, contributions to the Marketing Fund and/or any other Fund aspect, whether imposed on CWNA, us, a Related Company, the Marketing Fund or any other related party, will be the sole responsibility of the Marketing Fund.  CWNA will prepare financial statements for the Marketing Fund annually, which will be furnished to you upon written request.  CWNA can choose that any such statements be audited and any related accounting/auditing costs be paid by the Marketing Fund.  Funds in the Marketing Fund must be expended, prior to termination of the Marketing Fund, only for the purposes authorized by the relevant Franchise Agreement(s.)  No profit, gain or other benefit will directly accrue to CWNA from the Marketing Fund.  All interest earned on monies contributed to, or held in, the Marketing Fund will be remitted to the Marketing Fund and will be subject to the restrictions of the relevant Franchise Agreement(s.)  In making expenditures, the Marketing Fund will first spend any contributions made by any supplier; second, any earnings on assets held by the Marketing Fund; third, any contributions made by CWNA; and finally any contributions made by Franchisees.

E.     Financial management of the Marketing Fund will be CWNA's sole responsibility.  CWNA can in its Business Judgment do any of the following:

1)   compensate us and/or any Franchisor-Related Person/Entity for salaries, administrative costs, overhead and other expenses incurred in Marketing Fund related programs/activities, including but not limited to production, research, insurance, and collection expenses, as well as any legal expense related to the activities and purposes of the Marketing Fund (consistent with the provisions of this Agreement);

2)   charge the Marketing Fund for attorney's fees and other costs related in any way to claims against us and/or any of the Franchisor-Related Persons/Entities regarding the Marketing Fund However, CWNA shall be required to reimburse the Marketing Fund for any attorneys' fees and/or costs paid by the Marketing Fund in connection with any action in which CWNA is finally found to have acted unlawfully or to be guilty of wrongdoing with respect to the Marketing Fund;

3)   spend in any fiscal year an amount greater or less than the aggregate contributions to the Marketing Fund in that year, and the Marketing Fund may borrow from CWNA or other lenders to cover deficits of the Marketing Fund or cause the Marketing Fund to invest any surplus;

4)   collect for remission to the Marketing Fund any advertising or promotional amounts offered by any supplier based upon franchisee purchases.  Any such contributions, whether or not made with respect to purchases by you, will not count toward your required Fund contributions;

5)   pay the advertising, marketing, public relations and related costs involved in any co-branding, dual franchising or other such multi-sponsor programs;

6) revise marketing and other programs, and/or make expenditures from the Marketing Fund, to take account of cultural and other differences (and/or CWNA can delegate management of a portion of the Marketing Fund in connection therewith);

7) defer, waive and/or compromise claims for current/future contributions to, and/or claims against or with respect to, the Marketing Fund and fund the same with the Marketing Fund;

8) take legal or other action against any franchisee in default of their obligations to the Marketing Fund;

9) merge the Marketing Fund with any marketing fund otherwise established for CARTRIDGE WORLD Stores for use as described in this Section 11.1, so long as the restrictions of the relevant Franchise Agreement(s) continue to apply to contributions made by Franchisees under such arrangements;

10) maintain Marketing Fund assets in one or more accounts designated as "trust accounts" for purposes of protecting such assets from claims of third-party creditors, (however, such action shall not be deemed to create any "trust," "fiduciary relationship" or similar special arrangement);

11) incorporate the Marketing Fund or operate it through an entity separate from CWNA, which is subject to all rights and duties of CWNA relating to the Marketing Fund;

12) take such other actions in connection with the Fund as CWNA considers to be appropriate and as are consistent with the provisions of this Section 11.1.

F.      You acknowledge and agree that we have no obligation to ensure that expenditures by the Marketing Fund are or will be proportionate or equivalent to contributions to the Marketing Fund by CARTRIDGE WORLD Stores operating in any geographic area, or that any CARTRIDGE WORLD Store will benefit directly, indirectly or in proportion to its contribution to the Marketing Fund; provided that contributions from Traditional CARTRIDGE WORLD Stores in the United States will be used in accordance with this Agreement for the primary benefit of Traditional CARTRIDGE WORLD Stores in the United States. We have no obligation to cause other CARTRIDGE WORLD Stores to contribute to the Marketing Fund or engage in local marketing, and we can permit a franchisee to make direct advertising expenditures in place of contributions to the Marketing Fund. You understand that some CARTRIDGE WORLD franchisees may have Marketing Fund obligations that are different from yours, if any. However, all CARTRIDGE WORLD Stores owned by CWNA and/or us will make contributions to the Marketing Fund as if they were subject to the then-current form of Franchise Agreement.

G.      Neither CWNA nor we (nor any of the Franchisor-Related Persons/Entities, including the FAC) will be liable for any act or omission in connection with the Marketing Fund which is consistent with this Agreement. You and we expressly agree that none of the relationships with you in connection with the Marketing Fund are in the nature of a "trust," "fiduciary" or similar special arrangement.

H.      Subject to the express requirements of this Agreement that your contributions will only be spent as authorized herein, you agree that CWNA and/or us and/or any Related Company can deny access to any and all programs and/or materials created by, and benefits of, the Marketing Fund to you and to any Franchisees who are in default in any obligations to the Marketing Fund and/or otherwise in default under this Agreement.

**11.2    Your Participation in the Marketing Fund.** You agree to participate in all Marketing Fund programs. You have the right to set your own prices, except that we can specify maximum prices for goods or services to the greatest degree permitted by law. You will fully honor all coupons, price reduction and other promotions/programs as directed by us. CWNA can choose for the Marketing Fund to furnish you with marketing, advertising and promotional materials and also can choose to require that you pay the cost of producing, shipping and handling for such materials.

**11.3    Your Local St    Marketing Activities.**

A.    You must spend at least Four Hundred Dollars ($400.00) each calendar month for local advertising and promotion of your CARTRIDGE WORLD Store, subject to inflation adjustment as set forth in Section 9.6 and to the additional Grand Opening requirements provided in Section 3.7, above.  You agree to submit, upon our request, verification of your expenditures in a form prescribed by us in our Business Judgment.  Appropriate local advertising expenditures may include, but are not limited to, classified telephone directory listings and advertising. The value of discounts, coupon redemptions and/or products or services given without charge shall not be considered to meet your local advertising obligation under this Section.

B.    Your advertising must be in good taste and conform to ethical and legal standards.  We can require that samples of all advertising and promotional materials for any media, including the Internet, be submitted to us for our review and approval prior to use.  You agree not to use any materials or programs disapproved by us/CWNA at any time in our/their Business Judgment.  We can require that a brief statement regarding the availability of CARTRIDGE WORLD franchises is included in advertising used by you and/or that brochures regarding purchase of CARTRIDGE WORLD franchises are displayed in your CARTRIDGE WORLD Store.

C.    You agree to comply with the Manuals and any other specifications we give to you regarding your use of the Internet, World Wide Web or other electronic media in connection with your CARTRIDGE WORLD Store, including, but not limited to, any requirement that any such use be only through us/any Related Company, and/or a designated Internet/Intranet Service Provider (which can be us or an Affiliate), and/or that all web pages related to your Store be accessed through a designated site and/or meet specifications  You agree that you will not establish and/or maintain without our prior written consent any independent website, domain name, e-mail address or other such presence for use in connection with your Franchised Business and may not use the CARTRIDGE WORLD name or marks in connection with any of the foregoing A CARTRIDGE WORLD internet/intranet system has been implemented to enhance communications by and among CARTRIDGE WORLD network members, to help support various system maintenance services, and to permit the efficient/economic delivery of a variety of information, such as Manuals, System bulletins, marketing materials, financial data, reporting information, technical instructions, etc.  You agree to participate in any such intranet/internet activities as required from time to time and to maintain the necessary hardware, software, POS Systems, equipment, High-Speed Internet Service (Cable, DSL) (based on availability) or dial-up modem and other items as we require r to enable you to do so on an ongoing basis at your expense.  You agree to pay by credit card, bank autodraft, or other method required by us, an Internet/Intranet Service Fee to support such Systems and programs, which Fee is $100 per month as of the date of this Agreement and is subject to adjustment by us based upon product/service vendor price increases and/or the formula provided in Section 9.6 above.  In addition to any other rights and remedies we may have, if you are not in Good Standing we may limit or suspend your access to and/or use of systems and programs related to this Fee, including but not limited to your POS system operation, until any defaults by you are cured or we are otherwise satisfied, and you return to Good Standing.

**11.4    Regional Franchisee Marketing Group(s) ("FMG").**  We/ CWNA can elect in our/their Business Judgment to form any regional association(s) of CARTRIDGE WORLD franchisees to conduct various marketing-related activities on a cooperative basis (an "FMG").  If an FMG is formed covering your area, then you must join and actively participate.  You may be required to contribute such amounts as are determined from time-to-time by the FMG.  Contributions will be established on a per Store basis.

The FMG can adopt its own laws, rules, regulations and procedures subject to our consent in our Business Judgment. Any failure to timely pay amounts due to, or to comply with the bylaws, rules, regulations and procedures of, the FMG shall be a breach of this Agreement. We can offset against amounts we/CWNA owe to you the amount of your unpaid FMG obligations. While neither we nor CWNA are required to do so, if we/they submit any matters for approval to the FMG and approval is granted, the approval will be binding on you.

## 12. STORE RECORDS AND REPORTING.

**12.1 Bookkeeping, Accounting and Records, Cash Register, Computer and Other Systems.** You must obtain and maintain at your sole expense accounting, sales, reporting and records retention systems conforming to any requirements prescribed by us from time-to-time, including any such electronic systems with on line access for us. Such systems may include, but are not limited to, electronic cash register, computer and point-of-sale systems, and software programs, and may have components only available from us, a Franchisor-Related Person/Entity and/or designated suppliers. We reserve the right to use in our Business Judgment, and to have full access to, all cash register, computer and any other systems, and the information and data they contain. We can charge a reasonable fee for the license, modification, maintenance or support of software or any other goods and/or services that we furnish to you in connection with any of the systems.

**12.2 Reports, Financial Statements and Tax Returns.**

A. You will provide to us such information regarding the sales and operation of your CARTRIDGE WORLD Store, and in such form and format, as we/Related Companies specify from time-to-time in their Business Judgment. Such information may be obtained through a variety of methods, including among them direct on line access, facsimile transmissions and written copies. Current information requirements include, but are not limited to, the following, and are subject to change by us/Related Companies:

1) Sales and operations reports for each royalty period, which are due at the same time as the corresponding royalty payment; and

2) within forty-five (45) days after the end of each fiscal year, an unaudited fiscal year-end balance sheet and income statement for your CARTRIDGE WORLD Store, prepared in accordance with generally accepted accounting principles, and verified and signed by you;

3) retention of all records of or relating to your CARTRIDGE WORLD Store, including all income, sales and other tax returns, for the term of this Agreement and one year thereafter.

B. You agree to provide such other data, information and supporting records for your CARTRIDGE WORLD Store as we/Related Companies reasonably may request from time to time, including without limitation copies of your CARTRIDGE WORLD Store's state sales tax returns and those portions of your income tax returns relating to your CARTRIDGE WORLD Store. We reserve the right to require you to provide us at your expense with an annual audited financial statement prepared by a certified public accountant upon a reasonable belief by us that such statements are required to help ensure reporting accuracy.

## 13. INSPECTIONS AND AUDITS.

**13.1 Our Inspections, etc.** We and/or our agents and/or Related Companies will have the right, at any time during business hours, and without prior notice to you, to: i) inspect your CARTRIDGE

WORLD Store and related activities and items and record the same; remove samples for testing and analysis; iii) interview personnel; iv) interview customers; and v) conduct inventories. You agree to cooperate fully in connection with such matters. We may require you or an individual we designate to meet at our principal business address or other location we specify, for the purpose of discussing and reviewing your CARTRIDGE WORLD Store's operations, financial performance and other matters.

**13.2** **Audit.** We and/or our agents and/or Related Companies will have the right at any time during business hours, and without prior notice to you, to inspect and/or audit business records relating in any way to your CARTRIDGE WORLD Store and the books and records of any person(s), corporation or partnership which holds, or does business with, the Franchise. Such business records may include, but are not limited to, bookkeeping and accounting records, sales and income tax records and returns, cash register tapes, invoices, and deposit receipts. Our right to audit includes the right to access all cash registers, computers and other equipment by electronic means. You'll cooperate fully with such an audit. Notwithstanding any provision to the contrary in this Agreement or otherwise, our audit rights will continue in effect for two years after the Repurchase, Termination, expiration, or Transfer of this Agreement and/or any renewal franchise. Our or your failure to exercise any rights to conduct an audit will not act as a waiver of any rights or constitute a lack of diligence for purposes of the delayed discovery doctrine or otherwise.

**13.3** **Gross Volume Understatements.** If any inspection or audit discloses an understatement of Gross Volume, you must pay to us the royalties and marketing contributions due on the understated amount, plus interest, from the date originally due until the date of payment. We can require you to reimburse us for the cost of the inspection or audit, including, without limitation, the charges of any independent accountants, and related travel and per diem charges for our and their employees, if:

A) any inspection or audit is necessary because of your failure to timely furnish required information/reports; or

B) Gross Volume is understated for any period by more than two percent (2%).

In addition to all other remedies and rights of ours hereunder or under applicable law, we may Terminate this Agreement if:

A) Gross Volume is understated for any period by more than five percent (5%); or

B) any understatement is determined by us to be intentional.

## 14. **TRANSFER.**

### 14.1 **Transfers by Us.**

A. This Agreement, and any or all of our rights and/or obligations under it, are fully transferable by us in our Business Judgment, in whole or in part, without your consent; provided that any such transferee shall appear at the time of the transfer to have financial resources reasonably appropriate to fulfill its obligations under this Agreement. For the purposes of this Section 14.1, we shall be entitled to rely upon financial statements provided to us by the transferee. If we transfer this Agreement, only the transferee will have obligations to you. Our obligations to you (and those of any of the Franchisor-Related Persons/Entities) will be extinguished. You specifically acknowledge and agree that we and/or any Franchisor-Related Entity/Person can be sold and/or we and/or any Franchisor-Related Entity/Person can sell any or all intellectual property and/or other assets (including the Marks); go public; engage in a

private or other placement of me or all of our/their securities; me, acquire other entities and/or assets (competitive or not); acquired by a competitive or other entity; and/or undertake any refinancing, leveraged buy-out and/or other transaction.

B. On any repurchase, Termination or expiration of the Master Franchise Agreement between us and CWNA, or notice by CWNA to you of our having committed a default or of CWNA's election to receive direct payment, you will (1) pay to CWNA or its nominee all amounts owed or to be owing, and submit all reports due or to become due, under this (and/or any other) Agreement and (2) allow to be assigned to CWNA (or its nominee) this Franchise Agreement and any other Franchise or other agreement between us and you (or any Affiliate of yours). You hereby award to CWNA a power of attorney authorizing CWNA to execute any and all such assignments.

C. You agree that neither we nor any Franchisor-Related Person/Entity will have any liability to you resulting from our entering into any transactions permitted hereunder.

### 14.2   Transfers by You.

A. The rights and duties created by this Agreement are personal to you (or your owners, if the Franchisee is a Business Entity). We have awarded the Franchise relying on the individual integrity, ability, experience and financial resources of you or such owners. Therefore, neither this Agreement, the Franchise, the Franchisee or your CARTRIDGE WORLD Store (or any interest in, or the assets of, any of them) can be transferred without our prior written approval. Any transfer or attempted transfer without our approval is null and void.

B. The term "Transfer" includes (but is not limited to) any voluntary or involuntary assignment, sale, gift, pledge or any grant of any security or other interest (whether partial or whole, or direct or indirect), by you (or your owners, if the Franchisee is a Business Entity). A Transfer also includes the following events: i) any transfer of ownership of capital stock or any partnership or similar interest; ii) any merger, consolidation or issuance of additional securities representing an ownership interest in the Franchisee; iii) any sale of voting stock of the Franchisee or of any security convertible to voting stock; iv) any transfer in a corporate or partnership dissolution, divorce, insolvency proceeding or otherwise by operation of law; v) any transfer of any interest in any revenues, profits, or assets of your CARTRIDGE WORLD Store and which is not in the ordinary course of business; or vi) any transfer to a Business Entity and/or a trust or similar entity. A transfer of ownership, possession or control of your CARTRIDGE WORLD Store, or of its assets, may only be made with a Transfer of the Franchise. Any Transfer in the event of death or disability will be governed by Section 14.5, below.

### 14.3   Conditions for Approval of Any Transfer.

A. All of the following conditions must be met prior to, or concurrently with, the effective date of any Transfer. We can waive any condition in our sole and absolute discretion.

1)   You must be in compliance with this Agreement, the Manuals, all other agreements between you and us (including any of our respective Affiliates), and all leases/subleases with any party, and the transferee must expressly assume all obligations under all such agreements; and

2)   The transferee and its owners must meet our then current requirements for new franchisees, including but not limited to business experience, aptitude and financial resources; and

3) You must meet all payment and reporting obligations under the Franchise Agreement and any other agreements between you and us (and any of our respective Affiliates/Related Companies). Promissory notes shall be accelerated and paid in full; and

4) All obligations to third parties in connection with your CARTRIDGE WORLD Store must be satisfied or assumed by the transferee; and

5) All aspects of your CARTRIDGE WORLD Store, including but not limited to its design, appearance, equipment, and operations, must have been brought into full compliance with the Manuals and specifications and standards then-applicable for new CARTRIDGE WORLD Stores; and

6) At our option, the transferee must successfully complete, or agree to complete, our training program for new franchisees, and transferee is responsible for all travel and training costs, including then applicable training fees; and

7) The transferee must, at our option, i) agree to be bound by all the terms and conditions of this Agreement for the remainder of the term, or ii) execute our then current form of franchise agreement and ancillary documents (including guarantees) as are then customarily used by us in the grant of franchises, which may contain terms materially different from this Agreement. The term of any such new franchise agreement shall be for the full term generally awarded to new franchisees as of the time of the transfer. We will require a payment from the transferee concurrent with the signing of the new franchise agreement. Such payment shall be calculated by multiplying the then-current Initial Franchise Fee by the percentage representing the difference between the full term of the new agreement and the remaining term of the existing franchise agreement for the Store the transferee is acquiring. By way of illustration, if four years of the initial term of a transferring franchise are remaining at the time of Transfer, and if a new ten-year term is awarded by us, then we will charge the pro-rated fee, which shall be 60% of the then-current initial franchise fee. Any such fee is in addition to any training or other fees owed by the transferee in connection with such Transfer.

8) The Transfer must be completed in compliance with the terms of any applicable leases and other agreements and with all applicable laws, including but not limited to licensing and operations-related laws and/or laws governing franchise sales; and

9) You or the transferee must pay us with your application for a Transfer a non-refundable transfer fee of Five Thousand Dollars ($5,000), subject to inflation adjustment as provided in Section 9.6, above, but only if such proposed Transfer involves a change in ownership or control of fifty percent (50%) or more.

10) You and each of your owners and/or Affiliates, and the transferee (and each owner and/or Affiliate of the transferee), must sign a General Release; and

11) Any grant of a security or similar interest in connection with a Transfer (which grant may or may not be permitted by us in our Business Judgment), will be subordinated to our rights and the rights of any Franchisor-Related Person/Entity under the Franchise Agreement or any other agreement; provided that we can refuse to allow you or anyone else to grant or receive a pledge, mortgage, lien or any security or similar interest in and/or to the Franchise or the Franchised Business (or any of its assets) if, after having expended commercially reasonable efforts in discussions with lenders or other applicable parties, we are unable in our Business Judgment to obtain appropriate protections for our rights under this Agreement and/or for CARTRIDGE WORLD System interests; and

12) You must agre  ith the transferee not to compete af  he Transfer in accordance with restrictions acceptable to us and substantially similar to those described in Section 8.2 B, above, to the maximum extent permitted by law. We shall be named a third party beneficiary of such agreement; and

13) We can (but are not required to) withhold or condition our consent to any Transfer in our Business Judgment, particularly if we believe that the terms of Transfer jeopardize the economic viability of the franchise or based on other circumstances of the Transfer, and/or if we would not normally directly award a franchise in such a situation.

14) We may, but are not required to, refer to you a prospect(s) for the possible purchase of your Franchised Business. You agree to pay to us a referral fee equal to ten percent (10%) of the total and final purchase price for your Franchised Business (or any interest therein), if your Franchised Business (or any interest therein), is transferred to such a prospect. The fee calculation shall be based upon the total purchase price, regardless of whether or not you actually receive the full purchase price at closing (e.g., regardless of any financing by you, notes payable, negotiated payment installments, etc.). We must receive the referral fee in cash at or prior to closing as a pre-condition to the effectiveness of any consent to transfer from us. You agree to comply with the then current provisions in the Manuals and/or other written requirements established by us regarding processing prospect referrals and other matters relating to any prospect referral program operated by us.

B. You agree that we may (but are not required to) discuss with you and/or the proposed transferee all matters related to any Transfer and/or proposed Transfer at any time which we consider to be appropriate in our Business Judgment without liability (including our opinion of the terms of sale, performance of your franchise, etc.). You expressly consent to any such discussions by us.

C. Neither you nor any transferee shall rely on us to assist in the evaluation of the terms of any proposed Transfer. You acknowledge and agree that an approval of a proposed transfer shall not be deemed to be an approval of the terms, nor any indication as to any likelihood of success or economic viability.

### 14.4    Additional Conditions for Transfer to a Business Entity.

A. We will consent to a Transfer from you to a Business Entity owned by you and formed for the sole purpose of operating the CARTRIDGE WORLD Store if the conditions described in 14.3, above, and the following conditions are met. Such a Transfer will not relieve you of your obligations under this Agreement. You will remain jointly and severally liable to us for your and the Business Entity's obligations.

1) The Business Entity's stock certificates (and/or other applicable evidences of ownership and all documents of formation/governance) must recite that any ownership interest in the Business Entity is restricted by the terms of this Agreement; and

2) You must have (and continue to maintain) management control and ownership of at least fifty-one percent (51%) of the Business Entity and personally manage its affairs; and

3) The individual Franchisee (or, if the Franchisee is a partnership, at least one of the partners) must be and remain the chief executive officer, chief operating officer or chief financial officer and meet our then-current training requirements. If the Franchisee is or becomes a corporation, LLC, partnership

or other Business Entity, the ch ' executive officer, chief operating offi' or chief financial officer of such entity must always meet all of ... then-current training and other standu s; and

4) The transferee must enter into an approved form of assignment in which the Business Entity assumes all of the Franchisee's obligations under this Agreement and any other agreements with us and/or a Franchisor-Related Person/Entity, and any other documents we can require as provided in 14.3 A. (7), above. If the assignment is to a Business Entity wholly-owned by you, we will waive the transfer fee stated in Section 14.3 A 9), above, but we may in our Business Judgment require you to pay a reasonable administrative services fee of Five Hundred Dollars ($500) for any such assignment occurring more than 120 days after the Effective Date of this Agreement; and

5) All current and future owners of the Business Entity must agree in writing to comply with this Agreement and any other agreements with us and/or any Franchisor-Related Persons/Entities. We can at our option and in our Business Judgment require any and all owners to jointly and severally guarantee (in a written form approved by us) any such obligations of the Business Entity under any such agreements. The current approved form of Continuing Personal Guarantee is attached as Exhibit 1 to this Agreement; and

6) No public offerings of debt or equity ownership in the transferee entity can be conducted, and no shares of any type issued without obtaining our prior written consent; and

7) We can require that each of the present and/or future shareholders, directors, and/or officers execute confidentiality and non-competition agreements with terms substantially similar to those described in Sections 8.1 and 8.2, respectively; and

8) In any event, we can withhold or condition our consent to any Transfer as we deem appropriate in our Business Judgment, based on the circumstances of the Transfer or otherwise.

### 14.5    Death or Disability of Franchisee.

A.    If the Franchisee, or if the owner of the Franchisee with a controlling interest, dies or is permanently disabled, then his or her interest in this Agreement, the Franchise and/or the Franchisee shall be transferred to a third party subject to all of the provisions of this Article 14. A "permanent disability" occurs if you are not able to personally, actively participate in the management of your CARTRIDGE WORLD Store for (6) consecutive months. Any Transfer under this Section shall be completed within six (6) months from the date of death or permanent disability. If no Transfer occurs, the Franchise will automatically terminate at the end of such period, unless a written extension is granted by us in our Business Judgment.

B.    We can (but are not required to) operate the Franchised Business on your behalf and at your expense in the event of your death, disability or absence. We can pay ourselves a reasonable amount for our management services and other costs. We will use reasonable efforts and business judgment in managing the business, but in all cases be indemnified by you (and/or your estate) against any costs and/or liabilities related in any way to our management and the operation of the Franchised Business. We are expressly authorized by you to manage in good faith and on terms that we consider appropriate in our Business Judgment, including payment of any past, current and/or future obligations to us or to any other creditor out of assets and/or revenues of the Franchised Business.

**14.6** **Effect of Consent to Transfer.** Our consent to a Transfer is not a waiver of any claims we may have against you, and you are not relieved of any obligations to us or any Franchisor-Related Persons/Entities, unless you have an express written release signed by us. Your obligations under the Post Termination Provisions will survive any Transfer of this Agreement. Any dispute regarding any proposed or completed Transfer will be resolved through the dispute resolution provisions of this Agreement. Neither we nor any Franchisor-Related Persons/Entities will have any liability to you or any proposed or actual transferee in connection with our examination and/or possible consent or withholding of consent involving any Transfer or proposed Transfer, or our exercise of any right of ours, which is consistent with this Agreement. You agree to indemnify and hold us harmless from any liability to you, the proposed transferee or otherwise.

### 14.7 Our Right-of-First-Refusal.

A. We have a right of first refusal regarding any proposed Transfer subject to this Agreement. With each proposed Transfer, you will provide us with a true and complete copy of the offer received by you (and any ancillary agreements), and the conditions to Transfer described in Sections 14.3 and 14.4, as applicable, will be met. The offer and the price and terms of purchase must apply only to an interest in this Agreement, the Franchise, your CARTRIDGE WORLD Store or the Franchisee. Any value attributable to the goodwill of the Marks, CARTRIDGE WORLD System elements, Confidential Information or any other assets, tangible or intangible, related to the CARTRIDGE WORLD brand and System will be excluded from the purchase price.

B. We will give you written notice of our decision to exercise our right of first refusal within fourteen (14) days from the date of our receipt of the offer and ancillary documents. If any of the assets to be purchased do not meet the standards we then apply to new CARTRIDGE WORLD Stores, or if you are in default, we can require that the store be brought into compliance and any defaults cured before the 14 day period begins. We can substitute cash for any form of payment proposed in such offer and will have a reasonable period of time in which to prepare for the close of the transaction (generally 60 days). We'll be entitled to purchase any interest subject to all Customary Representations, Warranties and Agreements. We can require that the closing of the sale be through an escrow. You and we will comply with any applicable bulk sales and/or similar laws, and you will maintain all insurance policies until the date of closing. We will have the right to set off against any amount of money payable by us all amounts due from you and/or your Affiliates to us and/or our Affiliates and/or Related Companies. We will also have the right, in our Business Judgment, to pay any amount otherwise payable to you directly to your creditors in satisfaction of your obligations. If you violate any of your obligations that expressly or by their nature survive this Agreement, we will not be obligated to pay any amount otherwise due or payable to you thereafter. In connection with such purchase, you and each transferor (and your respective Affiliates) will sign a General Release.

C. If we do not exercise our right-of-first-refusal, you or your owner can complete the sale to such purchaser on the exact terms of such offer, subject to the conditions of this Article 14. If there is a material change in the terms of the sale, we will have an additional right-of-first-refusal on the same terms and conditions as are applicable to the initial right-of-first-refusal. Our rights under this or any other Section are fully assignable.

### 14.8 Our Right to Repurchase

A. We have a right, but not an obligation, to repurchase your Franchise, your Franchised Business and the assets of your Franchised Business (the "Repurchase"). We may exercise this right in

our Business Judgment by giving you written notice at any time during the term of this Agreement and on or within 120 days of Termination expiration thereof.

B.  The Repurchase price shall be established subject to the following limitations.  If you and we are unable to agree on the Repurchase price, then the fair market value will be determined by an independent appraiser selected by you and us and subject to the limitations provided herein.  If you and we are unable to agree on an appraiser, you and we will each select one appraiser, who together will select a third appraiser.  The fair market value will be deemed to be the average of the three (3) independent appraisals.  All sales, transfer and/or similar taxes are to be paid by you.  Any going concern value of the Franchised Business shall be factored into the Repurchase price, but in no event will the Repurchase price include:

1)  any goodwill or other monetary factor for the Marks, CARTRIDGE WORLD System elements, Confidential Information or any other assets, tangible or intangible, which are proprietary to us and/or a Related Party; and/or

2)  any assets which are not bona fide Franchise assets integrally related to the operation of the Franchised Business and which are excluded from the purchase by us in our Business Judgment.

Pending the closing of such a Repurchase, we will have the right to appoint a manager to maintain the operation of your Franchise.  You will forever indemnify and hold us harmless against all obligations incurred in connection with the business prior to purchase.  You'll furnish us with a complete list of accounts unpaid by you within ten (10) days of our notice of intent to exercise this option.  We may (but are not required to) pay these unpaid bills directly to the parties owed and deduct them from the purchase price in lieu of paying such portion of the purchase price directly to you.

C.  The Post Term restrictions described in Section 8.02 B, above, and elsewhere in this Agreement will be continuing obligations of yours.  We shall receive all Customary Representations and Warranties from you, your owners and your Affiliates in connection with any such Repurchase.  We can require that the closing of the sale be through an escrow.  You and we will comply with any applicable bulk sales and/or similar laws, and you will maintain all insurance policies until the date of closing.  We will also have the right, in our Business Judgment, to pay any amount otherwise payable to you directly to your creditors in satisfaction of your obligations.  If you violate any of your obligations that expressly or by their nature survive this Agreement, we will not be obligated to pay any amount otherwise due or payable to you thereafter.

D.  Any Repurchase price to be paid under this Section 14.8 will be paid, at our sole option, either in cash at closing, or under an unsecured, interest free promissory note, as follows: Twenty Percent (20%) at closing, Twenty Percent (20%) no later than 90 days after closing, Twenty Percent (20%) no later than 180 days after closing, Twenty Percent (20%) at the first anniversary date of the closing, and the final Twenty Percent (20%) at the second anniversary date of the closing.  We can offset against the Repurchase price, and any installments thereof, any amounts owed by you (or any Affiliates) to us (or any Franchisor-Related Persons/Entities).  In connection with our exercise of any rights under this Section 14.8, you (and each owner/Affiliate) will execute a General Release.

E.  We will not assume any liabilities, debts or obligations of yours in connection with any such Repurchase, and you will indemnify us and each of the Franchisor-Related Persons/Entities from any and all claims arising out of any such Repurchase.  Notwithstanding the foregoing sentence, costs paid or incurred in connection with the transaction, including but not limited to, all appraisal fees and closing

costs, shall be shared equally between you and us, but excluding attorneys' fees paid or payable to the respective attorneys for the parties. You and we will comply with all applicable laws in connection with any such Repurchase and will cooperate in complying with all such requirements.

F. This Agreement shall Terminate upon the date the above-described Repurchase becomes effective, subject to any surviving obligations described in this Agreement (unless earlier Terminated as a result of a default by you or by expiration of the Agreement). If you fail to complete or to continue to comply with any surviving obligation(s), we will not be obligated to pay that portion of the Repurchase price otherwise due or payable following such failure, in addition to any other remedies to which we are otherwise entitled.

## 15. RENEWAL FRANCHISE.

### 15.1 Your Rights.

A. If you are awarded this Agreement for the initial term of your franchise, then this Agreement Terminates at the expiration of the initial term. At that time, subject to the provisions of this Article 15, you will be eligible to be awarded a renewal franchise. The renewal Franchise Agreement may differ materially from this one in financial and other ways and terms. The renewal term will be a single ten (10) year period, without any further term. You have no right to an additional renewal term if this Agreement is being awarded to you as a renewal franchise agreement, although we may grant you an additional renewal term in our Business Judgment.

### 15.2 Notice of Election.

A. You must give us written notice of election to obtain the renewal franchise not less than six (6) months, but not more than twelve (12) months, before the expiration of the initial term of this Agreement. Within ninety (90) days after our receipt of the notice, we will give to you in writing:

1) any reasons which could cause us to not award the renewal franchise, including any deficiencies requiring correction; and

2) our/Related Company(ies)'s then-current requirements relating to all aspects of a Cartridge World Store, including, but not limited to, image, appearance, decoration, furnishing, equipment, operations, and programs for a CARTRIDGE WORLD Store (collectively, the "specifications and standards then-applicable for new CARTRIDGE WORLD Stores and with the Manuals").

B. If you are subject to a Correction Process under Section 16.5 when i) you provide us with notice of your intent to obtain a renewal franchise, or ii) the renewal franchise would be awarded, then we can in our Business Judgment, choose to defer the award of any renewal until you have successfully complied with the applicable CARTRIDGE WORLD System Standards and Financial Standards.

### 15.3 Conditions to the Award of a Renewal. Any award of the renewal franchise must meet all of the following conditions, together with the then current standards applicable to renewal franchisees, each of which are agreed to be reasonable:

A. You (and each Affiliate of yours) must be in Good Standing;

B. Your CARTRIDGE WORLD Store and its operations must fully comply with all specifications and standards then-applicable for new CARTRIDGE WORLD Stores and with the Manuals by the expiration of this Agreement;

C. You must present evidence satisfactory to us that you have the right to remain in possession of your CARTRIDGE WORLD Store for the duration of the renewal franchise, unless we otherwise agree in writing. If you are unable to maintain possession of your CARTRIDGE WORLD Store, or in our judgment your CARTRIDGE WORLD Store should be relocated, you must have obtained our consent to and secured substitute premises by the Expiration Date of this Agreement. Such premises must comply with all specifications and standards then-applicable for new CARTRIDGE WORLD Stores and with the Manuals;

D. You (and each Affiliate of yours) must have paid all amounts owed to us and any Franchisor-Related Persons/Entities;

E. You must have executed our then-current form of Franchise Agreement and related documents then customarily used by us (with appropriate modifications to reflect the fact that the Franchise Agreement to be awarded relates to a single renewal franchise as contemplated by this Agreement). You will not be required to pay the then-current initial franchise fee, and we will not be required to provide you any site location, initial training or other "start-up" services in connection with the award of any renewal franchise;

F. You must have complied with our then-current qualification and training requirements. We can require your personnel to successfully complete any retraining program(s), at such times and location(s) as we then specify. There will be no charge for any retraining program(s), but you will be responsible for all travel, meals, lodging and other expenses of your personnel;

G. You (and each owner and/or Affiliate of yours) must have executed a General Release, except for any claims exclusively related to the renewal franchise (where expressly so required by applicable law). If you, your owners and your Affiliates comply with all of the requirements of this Article 15, including providing us with a General Release; and

H. You must have paid us a renewal fee equal to twenty percent (20%) of our then-current initial franchise fee for a first franchise (but not less than $5,000, which minimum amount is subject to adjustment according to the inflation formula described in Section 9.6). The fee must be received from you at the time of your election and is non-refundable unless we do not grant a renewal agreement to you.

Failure by you and/or your owners to timely complete all of the foregoing requirements will be deemed an election by you not to obtain the renewal franchise.

## 16. TERMINATION OF THE FRANCHISE.

**16.1 Defaults with No Right to Cure.** This Agreement will automatically Terminate upon delivery of our written notice of Termination to you in compliance with Article 20 (without further action by us and without opportunity to cure) if you (or any of your owners):

A.  fail to timely meet the site selection, development, opening and other requirements provided in Sections 3.1A and 3.6, above or failure to successfully complete training to our satisfaction as required in Section 5.1 above; or

B.  abandon your CARTRIDGE WORLD Store; fail to conduct business on a continuous basis for the time periods specified in the Manuals or during the operating hours approved by us for your CARTRIDGE WORLD Store, without our prior written consent; or lose the right to possession of your Store and fail to relocate before the termination/expiration of any applicable lease/sublease to a substitute location authorized by us; or

C.  make any material misrepresentation or omission in your application for the Franchise; or

D.  are judged bankrupt, become insolvent, make an assignment for the benefit of creditors, are unable to pay his or her debts as they become due, or a petition under any bankruptcy law is filed by or against you or any of your owners or a receiver or other custodian is appointed for a substantial part of the assets of your CARTRIDGE WORLD Store; or

E.  are convicted of, or plead no contest to, a felony, or to any crime or offense that is likely to adversely affect the reputation of the Franchisee or any owner, your CARTRIDGE WORLD Store, us or the goodwill associated with the Marks; or

F.  engage in any misconduct which unfavorably affects the reputation of the Franchisee or any owner, your CARTRIDGE WORLD Store, us, a Related Company or the goodwill associated with the Marks (including, but not limited to, child abuse, health or safety hazards, drug or alcohol abuse, or permitting unlawful activities at your Store); or

G.  make, or attempt to make, an unauthorized "Transfer," as defined in this Agreement, or surrender control without our prior written approval; or

H.  make an unauthorized use of the Marks or any unauthorized copy, use or disclosure of any Confidential Information; or

I.  violate any of the In Term or Post Term Restrictions against competition provided in Section 8.2, above (or any other person identified therein commits such a violation); or

J.  commit any act or omission of fraud or misrepresentation, whether with respect to us, any of the Franchisor-Related Persons/Entities and/or any third party, including (but not limited to) any misrepresentation of Gross Volume; or

K.  fail to permit or cooperate with us or our designee in any audit or inspection or fail to retain (or to produce on request) any records required to be maintained by you;

**16.2    <u>Defaults with Right to Cure</u>.** This Agreement will automatically Terminate on delivery of our written notice of Termination to you, without further action by us and without further opportunity to cure beyond that set forth in this Section:

A.  <u>10 Day Cure</u>  If within ten (10) calendar days after delivery of our written notice to you, you (or any of your owners) do not cure any:

1) failure to maintain required insurance;
2) failure to correct any condition that, in our reasonable judgment, might pose a danger to public health and/or safety;
3) failure to report accurately Gross Volume or fail to submit any other report due under this Agreement or any lease/sublease in accurate and complete form and when required;
4) failure to make payments of any amounts due us, any Franchisor-Related Person/Entity, any designee of ours and/or any supplier/creditor of yours and do not correct such failure(s);
5) failure to comply with any of the dispute resolution provisions of this Agreement, including (but not limited to) failure to pay/deposit any amounts or otherwise and/or unexcused failure to appear or respond to any dispute resolution proceedings.

With respect to items A.1 and/or A.2 above, we may require you to immediately cease all operations until such defaults are fully cured.

B. **30 Day Cure**  If within thirty (30) calendar days after delivery of our written notice to you, you (or any of your owners) do not cure any:

1) default under the lease or sublease for your CARTRIDGE WORLD Store within the applicable cure period set forth in the lease or sublease (if such applicable cure period is less than 30 days, then such applicable cure period will apply);
2) delinquency in your obligations to taxing authorities, landlords, equipment lessors, suppliers or others;
3) failure to comply with any other provision of this Agreement, any other agreement with us and/or any Affiliate of ours and/or any Related Company, or any specification, standard or operating procedure or rule prescribed by us in the Manuals or by other writing which does not provide for a shorter notice period.

If a default under this Section 16.2 B cannot reasonably be corrected within thirty (30) day period, then you must undertake diligent efforts within the thirty (30) day period to come into full compliance. On our request, you must furnish, proof acceptable to us of such efforts and the date full compliance will be achieved. In any event, all such defaults must be fully cured within sixty (60) days after delivery of the initial written notice to you of Termination.

**16.3     Repeated Defaults.**  This Agreement will automatically Terminate upon delivery of our written notice of Termination to you (without further action by us and without opportunity to cure) if you or any Affiliate has committed two or more applicable defaults within any twelve (12) consecutive months, or three or more applicable defaults within any twenty-four (24) consecutive months. An "applicable default" is a single breach of any obligation under this Agreement and/or the Manuals, or under any other agreement with us and/or any of our Affiliates/Related Companies, whether or not such default is cured, or is the same as or similar to a prior event of default.

**16.4     Cross-Defaults.**  Any default by you (or any owner or Affiliate of yours) under this Agreement may be regarded by us as a default under any other agreement between us (or any Franchisor-Related Persons/Entities) and you (or any owner or Affiliate of yours). Any such default under any other agreement or any other obligation between us (or any Franchisor-Related Persons/Entities) and you (or any owner or Affiliate of yours) may be regarded as a default under this Agreement. Any default

by you (or any owner or Affiliate of yours) under any lease, sublease, loan agreement, or security interest related to the Franchise Business can be regarded as a default under this Agreement, regardless of whether or not any such agreements are between you (or any owner or Affiliate of yours) and us (or any Franchisor-Related Persons/Entities).

**16.5    Non Exclusive Remedies.**  Whenever we have a right to Terminate this Agreement, we (and any Franchisor-Related Person/Entity) will have all remedies allowed at law and in equity.  No right or remedy which we and/or any Franchisor-Related Person/Entity may have under this Agreement or otherwise (including Termination) is exclusive, and we and/or any Franchisor-Related Person/Entity may pursue any rights and/or remedies available at law and in equity.  If we have the right to Terminate this Agreement, we can elect in our Business Judgment to cancel any and/or all of your territorial or similar rights (including, but not limited to, any rights-of-first-refusal), whether arising under this Agreement or in any other manner or document.

**16.6    No Equity on Termination, etc.**  Your rights regarding the Franchise are controlled by the provisions of this Agreement.  You will have no equity or any other continuing interest in the Franchise, any goodwill associated with it, or any right to compensation or refunds at the expiration and/or Termination of the Franchise.

**16.7    Extended Cure Period**.  Notwithstanding anything to the contrary in this Agreement, we reserve the right to grant to you in our Business Judgment an extended cure period for any breach.  You acknowledge that our decision to grant such an extended cure period shall not operate as a waiver of any of our rights and that we can choose to condition such any such an extension upon the signing of a General Release by you, each owner and Affiliates of yours.

**16.8    Management of the Store After Issuance of Notice of Default.**

A.  If we issue a notice of default, we will have the right (but not the obligation) to manage your CARTRIDGE WORLD Store until you have cured all defaults.  All revenues received by the CARTRIDGE WORLD Store while we (or our designee) are managing it will be kept in a separate fund.   All CARTRIDGE WORLD Store expenses, including compensation, travel and living expenses for our appointed manager, may be paid out of such fund.  We shall be paid Five Hundred Dollars ($500.00)/day as a management fee (subject to adjustment as provided in Section 9.6).  If such fund is insufficient to pay CARTRIDGE WORLD Store expenses, we shall notify you.  You must, within five (5) business days, deposit such amounts as shall be required by us to attain a reasonable fund balance.

B.  Operation of the CARTRIDGE WORLD Store by us during any such period shall be on your behalf; provided that we shall only have a duty to use reasonable efforts and shall not be liable to any creditor of yours or for any debts, losses or obligations incurred by the CARTRIDGE WORLD Store.  This Section 16.8 shall not limit our right to Terminate this Agreement as herein provided or affect any of our indemnity or other rights under this Agreement.

**16.9    Our Right To Discontinue Supplying Items Upon Default.**  If we deliver a notice of default to you, we and/or each Franchisor-Related Persons/Entity have the right to (a) require that you pay C.O.D. (i.e., cash on delivery) or by certified check for goods/services and/or (b) stop selling and/or providing any goods/services to you until you have cured all defaults.  No such action by us and/or any Franchisor-Related Persons/Entity shall be a constructive termination of this Agreement, change in competitive circumstances or similarly characterized, and you agree that you will not be relieved of any obligations under this Agreement because of any such action.

**16.10 Termination, Expiration, or Repurchase of Our Master Franchise Agreement.** On any Repurchase, Termination or expiration of the Master Franchise Agreement between us and CWNA, CWNA has the right, but not the obligation, to assume the rights and obligations of any or all unit agreements. CWNA also can terminate any or all Unit Franchise Agreements if it elects not to continue to regularly award Franchises and maintain a Franchise program for CARTRIDGE WORLD Stores in your state/country/Territory. If CWNA (1) makes an announcement (at any time) that it has made a determination that continued franchising (on a national, regional or other basis) is not appropriate in its Business Judgment and that it does not intend to continue to regularly award franchises and maintain a franchise program for CARTRIDGE WORLD Stores in your state and (2) does not open or award franchises for CARTRIDGE WORLD Stores in your state for 12 months after the date of such announcement (provided that CWNA can award renewal franchises where an older form of Franchise Agreement or otherwise requires us to do so, and/or continue to service existing Franchisees under outstanding agreements), then it will be considered to have made a general market withdrawal and will have no liability to you with respect thereto. In that event and if you are in Good Standing, you will not be required to comply with your non-competition obligations under Section 8.2 B, above. You agree that if any statute or court decision requires "good cause" (or any similar standard) for non-renewal, compliance by CWNA with the provisions of this subsection will be considered to be good cause.

**16.11 Prompt Notice of Claims by You.** You understand that you are not permitted to terminate this Agreement for any default committed by us, except as permitted by applicable law. If you claim that such a default exists, or that you have any other basis for terminating your obligations under this Agreement or making any other claim against us, you must give us written notice and 30 days to cure; any action by you to terminate will not proceed until we have had such notice and an opportunity to cure. If we cannot reasonably cure within such 30 day period, and we are diligently continuing efforts to cure, then we will have 90 days to cure; provided that:

A. any dispute regarding our withholding consent with respect to a proposed Transfer by you, or any other dispute in which delay may cause you significant harm or loss, may be immediately processed as provided in Section 19.1; and

B. any claim for equitable relief with respect to a dispute under Section 19.1 (H) will not be subject to this Section 16.11. Any applicable statutes of limitations will be tolled during such 30 and 90-day periods.

## 17. RIGHTS AND OBLIGATIONS ON TRANSFER, REPURCHASE, TERMINATION AND/OR EXPIRATION OF THE FRANCHISE.

**17.1 Payments of All Amounts Owed, etc.** You must pay all royalties, marketing contributions and all amounts of any kind owed to us and/or any Franchisor-Related Persons/Entities within ten (10) days after the Repurchase, Termination or expiration of the Franchise, or from a later date when the amounts due can be determined.

**17.2 Intellectual Property, Confidential Information, Trade Dress, etc.** After any Transfer, Repurchase, Termination or expiration of the Franchise:

A. You agree to immediately and permanently discontinue your CARTRIDGE WORLD business and any use of the Intellectual Property and/or the Confidential Information, as defined in Article 1.2, and will not use any similar or derivative marks, or materials, or colorable imitations of any of the Intellectual Property in any medium or manner or for any purpose;

B. You must return to us or (at our option) destroy all software, Manuals, forms, materials, signage and any other items containing any Intellectual Property or Marks, or otherwise identifying or relating to a CARTRIDGE WORLD Store (to the extent they have not been assigned in connection with an authorized Transfer or a Repurchase);

C. You must take such actions as may be required to cancel all fictitious or assumed name or equivalent registrations relating to your use of any Mark which have not been assigned in connection with an authorized Transfer or a Repurchase;

D. You must de-identify the Premises in every manner and remove any distinctive signage, physical and/or structural features associated with the Trade Dress of CARTRIDGE WORLD Stores (and remodel, repaint, or otherwise alter the appearance of the Premises), so that the Premises are clearly distinguished from other CARTRIDGE WORLD Stores and do not create any public confusion (to the extent the Premises have not been assigned in connection with an authorized Transfer or a Repurchase);

E. You agree not to identify yourself, or any business you may operate or in which you may become involved, or to advertise or promote yourself in any manner, as a present or former CARTRIDGE WORLD franchisee;

F. You must furnish to us within thirty (30) days satisfactory evidence of your compliance with the obligations described in this Section 17.2 and in Section 17.3, below. If you operate any business using any of the Intellectual Property, Marks, Confidential Information or any aspect of the System, our remedies will include (but will not be limited to) recovery of the greater of i) all profits earned by you in the operation of such business, or ii) all royalties, advertising contributions and other amounts which would have been due if this Agreement remained in effect with you.

### 17.3 Telephone and Other Directory Listings, Internet Sites.

A. You understand and agree that we own all telephone numbers, domain names, Internet addresses/sites and/or other communications services links (collectively, the "Numbers"), and any related directory listings/advertising, used in connection with the operation of your CARTRIDGE WORLD Store. We can in our Business Judgment require you to sign an assignment of such Numbers prior to training or at another time. After any Termination, Repurchase and/or expiration of the Franchise, you must promptly transfer, call-forward, discontinue or otherwise deal with the Numbers and any related directory listings/advertising as we direct. You agree to sign any documents and/or pay any amounts required by a telephone/communication services provider as a condition to our dealing with the Numbers and any related directory advertising/listings. By signing this Agreement, you irrevocably appoint us your attorney in fact to take any such actions regarding the Numbers and any related directory listings/advertising if you do not do so yourself within ten (10) days after the Termination, Repurchase or expiration of this Franchise. Such companies may accept this Agreement as conclusive evidence of our exclusive rights in such Numbers and related directory listings, web pages and advertising/marketing.

B. If we choose at any time to be direct billed by a provider for any account for the Numbers and/or directory listings/advertising, you agree to pay us all amounts due such providers within ten (10) days of our written notice to you. If you fail on two or more occasions to pay any such amounts to us when due, then we can require you to maintain a deposit with us in an amount reasonably determined by us based upon usage history and other relevant factors.

### 17.4    **Continuing Obligations.**

A.  All obligations and rights which expressly or by their nature survive the Transfer, Repurchase, expiration or Termination of this Agreement will continue in full force and effect until they are satisfied or by their nature expire (including but not limited to indemnity, non-competition, audit, and confidentiality rights and obligations; obligations to pay and the provisions of Articles 19 and 21).  These obligations continue notwithstanding any rejection of this Agreement in a bankruptcy proceeding or otherwise.

B.  If this Agreement is Terminated because of a default of yours, you will not be released or discharged from your obligations, including payment of all amounts then due and other amounts which would have become due under this Agreement if you had continued in operation as a CARTRIDGE WORLD Franchise for the full term.  Our remedies will include (but are not limited to) the right to collect the present value of these amounts and to receive the benefit of our bargain with you, as well as to accelerate the balances of any promissory notes owed and to receive any other unpaid amounts owed to us or any Affiliates of ours.  You and we agree that it would be commercially unreasonable and damaging to the integrity of the CARTRIDGE WORLD system if a CARTRIDGE WORLD Franchisee could default and then escape the financial consequences of his contractual commitment to meet payment obligations for the term of the Franchise Agreement.  You (and each of your owners/Affiliates) agree to sign a General Release if we choose in our Business Judgment to waive our rights to collect any amounts that would have become due if you had continued in operation as a CARTRIDGE WORLD Franchisee.

---

**I have read Sec. 17.1-17.4, understand them, and agree with them.**

**Your Initials:** _l cℓ, nml_

---

### 18.    **GRANT OF SECURITY INTEREST.**

For valuable consideration, as security for the payment of all amounts owing or to be owed by you (and/or any Affiliate of yours) to us (and/or any Affiliate/Related Company of ours) under this Agreement or any other agreements, and your performance of all obligations thereunder, you hereby grant to us a security interest in all proceeds of your CARTRIDGE WORLD Store and in all of the assets, including equipment, furniture, fixtures and signs, used by, at or in connection with, your CARTRIDGE WORLD Store and its related business and (the "Collateral").  You will not remove the Collateral or any portion thereof without our prior written consent.  You represent and warrant that the security interest granted is prior to all other security interests in the Collateral except for (a) bona fide purchase money security interests and (b) the security interest granted to a third party in connection with your original financing for your CARTRIDGE WORLD Store, if any.  In connection with any request for our approval of a security interest, we will make commercially reasonable efforts to accommodate reasonable lender's requirements, including the subordination of our interests to the lender's and/or lessor's, as applicable, in our Business Judgment, bearing in mind the interests of the borrower, lender, ourselves and the System. On the occurrence of any event entitling us to Terminate this Agreement or any other agreement between the parties, or if we reasonably determine that we are not assured that your (and/or any Affiliates') obligations will be timely and fully paid and/or performed, we will have all the rights and remedies of a secured party under the Uniform Commercial Code of the State in which your CARTRIDGE WORLD Store is located, including, without limitation, the right to take possession of the Collateral.  You will execute and deliver to us financing statements and/or such other documents as we reasonably deem necessary to perfect our interest in the Collateral within ten (10) days of your receipt of such documents from us.

I have read Art. 18, understand it, and agree with it.

Your Initials: _____

## 19. DISPUTE AVOIDANCE AND RESOLUTION.

For the purposes of this Article 19, "you" shall be deemed to include you, your owners and Affiliates and their respective employees, and "we" shall be deemed to include "Franchisor-Related Persons/Entities."

**19.1 MEDIATION AND MANDATORY BINDING ARBITRATION, WAIVER OF RIGHT TO TRIAL IN COURT, etc.** You and we believe that it is important to resolve any disputes amicably, quickly, cost effectively and professionally and to return to business as soon as possible. You and we have agreed that the provisions of this Article 19 support these mutual objectives and, therefore, agree as follows:

A. Claim Process: Any litigation, claim, dispute, suit, action, controversy, or proceeding of any type whatsoever including any claim for equitable relief and/or where you are acting as a "private attorney general," suing pursuant to a statutory claim or otherwise, between or involving you and us on whatever theory and/or facts based, and whether or not arising out of this Agreement, ("Claim") will be processed in the following manner, you and we each expressly waiving all rights to any court proceeding, except as expressly provided below at Section 19.1 H.

1) First, discussed in a face-to-face meeting held within thirty (30) days after either you or we give written notice to the other proposing such a meeting.

2) Second, if not resolved, submitted to non-binding mediation for a minimum of four (4) hours before i) Franchise Arbitration and Mediation, Inc. ("FAM") or its successor (or an organization designated by FAM or its successor), or ii) any other mediation organization approved by all parties, or iii) by Judicial Arbitration and Mediation Service ("JAMS") or its successor (or an organization designated by JAMS or its successor), if FAM cannot conduct such mediation and the parties cannot agree on a mediation organization. We will pay the costs of the first four (4) hours of any mediation, and no mediation is required to extend beyond such four (4) hour period. Any mediation/arbitration (and any appeal of arbitration) will be conducted by a mediator/arbitrator experienced in franchising. Any party may be represented by counsel and may, with permission of the mediator, bring persons appropriate to the proceeding.

3) Third, submitted to and finally resolved by binding arbitration before and in accordance with the arbitration rules of FAM or its successor(or an organization designated by FAM or its renewal); provided that if such arbitration cannot be heard by any such organizations, then the arbitration will be conducted before and in accordance with the arbitration rules of JAMS or its successor (or an organization designated by JAMS or its successor); provided that, in any case, arbitration may be filed prior to a face-to-face meeting and/or mediation, with such face-to-face meeting and/or mediation to follow as quickly thereafter as possible. All arbitrators must be experienced in franchising. On election by any party, arbitration and/or any other remedy allowed by this Agreement may proceed forward at the same time as mediation. Judgment on any preliminary or final arbitration award will be final and binding, and may be entered in any court having jurisdiction (subject to the opportunity for appeal as contemplated below). The arbitrator's award shall be in writing. On request by either party, the arbitrator shall provide

to all disputants a reasoned  inion with findings of fact and con  ions of law and the party so requesting shall pay the arbitra.../s fees and costs connected therewith.

4) <u>Fourth</u>, a final award by an arbitrator (there will be no appeal of interim awards or other interim relief), may be appealed within thirty (30) days of such final award. Appeals will be conducted before a three (3) arbitrator panel appointed by the same organization as conducted the arbitration, each member of which must be experienced in franchising. The arbitration panel will not conduct any trial de novo or other fact-finding function. Such panel's decision shall be in writing, may be entered in any court having jurisdiction and will be binding, final and non-appealable. On request by either party, the arbitration panel shall provide to all disputants a reasoned opinion with findings of fact and conclusions of law and the party so requesting shall pay the arbitration panel's fees and costs connected therewith.

B. <u>Confidentiality</u>: The parties to any meeting/mediation/arbitration will sign confidentiality agreements, excepting only public disclosures and filings as are required by law.

C. <u>Location and Attendees</u>: Any meeting/mediation/arbitration (and any appeal) will be conducted exclusively at neutral location in the county for our then-current principal business address, which may change from time to time, and be attended by you and us, and/or designees authorized to make binding commitments on each of our respective behalfs; provided that if any court determines that this provision is unenforceable for any reason, mediation/arbitration (and any appeal) will be conducted at a location near your unit.

D. <u>Arbitration Authority</u>: Arbitrators in any proceeding under this Article 19 shall apply all applicable law, and a failure to apply the applicable law in accord with Section 19.14 shall be deemed an act in excess of authority. The arbitrator shall decide any questions relating in any way to the parties' agreement (or claimed agreement) to arbitrate, including but not limited to applicability, subject matter, timeliness, scope, remedies, claimed unconscionability and any alleged fraud in the inducement. The arbitrator may issue summary orders disposing of all or part of a claim and provide for temporary restraining orders, preliminary injunctions, injunctions, attachments, claim and delivery proceedings, temporary protective orders, receiverships and other equitable and/or interim/final relief. Each party consents to the enforcement of such orders, injunctions, etc. by any court having jurisdiction. The subpoena powers of the arbitrator with respect to witnesses to appear at the arbitration proceeding shall not be subject to any geographical limitation.

E. <u>Discovery</u>: The disputants shall have the same discovery rights as are available in civil actions under the state law selected in Section 19.14.

F. <u>Compulsory Counter-claims</u>: Each participant must submit or file any claim which would constitute a compulsory counter-claim (as defined by the applicable rule under the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates. Any such Claim which is not submitted or filed in such proceeding will be forever barred. In no event may offers and/or other communications made in connection with, or related in any way to, mediation, possible settlement or other resolution of a dispute be admitted into evidence or otherwise used in any arbitration or other proceeding, and any arbitration award in violation of this provision shall be vacated by the arbitration appeal panel (described above) and/or any court having jurisdiction.

G. <u>Fees and Costs</u>: Subject to the provisions of Section 19.7, the parties will bear their own fees and costs, including attorneys' fees; provided that for matters not settled through agreement of the parties, the

arbitrator may assess all, or a portion, of the fees and costs incurred connection with any arbitration and/or appeal (but not any attorneys' fees) against the party who does not prevail.

H. <u>Disputes Not Subject to the Mediation/Arbitration Process</u>: Claims or disputes relating primarily to the validity of the Marks and/or any Intellectual Property licensed to you may be subjected to court proceedings or to the Process outlined in 19.1 A, above, at our sole election; provided that only the portion of any claim or dispute relating primarily to the validity of the Marks and/or any Intellectual Property licensed to you and requesting equitable relief shall be subject to court action, and any portion of such claim seeking monetary damages will be subject to the Process outlined in 19.1 A, above. Any action to compel a party's compliance with 19.1 A, must be consistent with Section 19.2, below.

I. <u>Your and Our Intentions</u>: You and we mutually agree (and have expressly had a meeting of the minds) that, notwithstanding any contrary provisions of state, provincial or other law, and/or any statements in our Offering Circular required by a state/province as a condition to registration or for some other purpose:

1) <u>all</u> issues/disputes relating to arbitrability of issues (including whether or not any particular Claim, issue or otherwise is to be submitted to face-to-face meeting/mediation/arbitration), arbitration, waiver of jury trial, limitation of damages, venue, choice of laws, shortened periods in which to bring Claims, jurisdiction, choice-of-laws and/or the interpretation/enforcement of any of the dispute resolution-related provisions of this Agreement (including, but not limited to all of the provisions of Articles 19 and 21) will be decided by the arbitrator (together with <u>any</u> Claims that this, or any other, agreement, and/or their terms, were procured by fraud or uneven bargaining power, are or were unconscionable, were not subject to negotiation, or similar claims) and governed only by the Federal Arbitration Act (9 U.S.C. § 1 et seq.) and the federal common law of arbitration and exclusive of state statutes and/or common law;

2) all provisions of this Agreement (including, but not limited to, Articles 19 and/or 21) shall be fully enforced, including (but not limited to) those relating to arbitration, waiver of jury trial, limitation of damages, venue, choice of laws, shortened periods in which to bring Claims;

3) you and we intend to rely on federal preemption under the Federal Arbitration Act (9 U.S.C. § 1 et seq.) and, as a result, the provisions of this Agreement will be enforced only according to its terms;

4) you and we each knowingly waive all rights to a court trial (except as expressly provided in this Agreement), understanding that arbitration may be less formal than a court or jury trial, may use different rules of procedure and evidence and that appeal is generally less available, but still strongly preferring mediation and/or arbitration as provided in this Agreement; and

5) the terms of this Agreement (including but not limited to this Article 19) shall control with respect to any matters of choice of law; and

6) notwithstanding the fact that a party to this Agreement is or may become a party to a court action or special proceeding with a third party or otherwise, and whether or not such pending court action or special proceeding (1) may include issues of law, fact or otherwise arises out of the same transaction or series of related transactions as any arbitration between or involving the parties to this Agreement, (2) involves a possibility of conflicting rulings on common issues of law, fact or otherwise, and (3) such pending court action or special proceeding may involve a third party who cannot be compelled to arbitrate, the agreement of the parties to this Agreement shall be enforced according to its terms and any party to this Agreement may bring an action to compel a face-to-face meeting, mediation and/or

arbitration, you and we strong⌐ referring arbitration to court actions ( wishing to have a single entity (the arbitrator) determine all issues of fact and law between or involving us, except as expressly provided otherwise in this Agreement.

**19.2** **Venue.** Without in any way limiting or otherwise affecting your and our obligations under Section 19.1, above, you and we agree that any litigation will be held in the United States District Court encompassing our then-current principal business address (the "Proper Federal Court.") Proceedings will be held only in the Proper Federal Court, subject to the following exceptions:

A. if a basis for federal jurisdiction does not exist, then any such proceeding shall be brought exclusively before a court in the most immediate state judicial district encompassing our then-current principal business address and having subject matter jurisdiction (the "Proper State Court");

B. proceedings to remove or transfer a matter to the Proper Federal Court and/or to compel arbitration as contemplated by this Agreement may be brought in the court where the applicable action is pending and/or the Proper State or Federal Court; and

C. any action primarily with respect to any real and/or personal property (including any action in unlawful detainer, ejectment or otherwise) may be brought in any court of competent jurisdiction and/or the Proper State or Federal Court.

**19.3** **Terms Applicable to All Proceedings, Waiver of Trial by Jury, Class Action Rights.** With respect to any arbitration, litigation or other proceeding of any kind, you and we:

A. **knowingly waive all rights to trial by jury;**

B. **Will pursue any proceeding on an individual basis only, and not on a class-wide or multiple plaintiff basis**; provided that if this provision is not enforceable for any reason, then you and we agree that with respect to any multiple plaintiff or class action, a court will supervise the procedural aspects directly related to the multiple plaintiff/class nature of the proceeding (e.g. certification of the class, appropriateness of class representation, approval of attorneys' fees incurred on behalf of the class, approval of any settlement, etc.) and the arbitrator will decide all substantive matters related to the actual claims, including liability and damages.

**19.4** **Limitations on Damages and/or Remedies, Waiver of Punitive Damages.**

A. Damages. Your liability to us and/or any of the Franchisor-Related Persons/Entities, for any and all claims, whenever brought, together with that of any and all Affiliates of yours, will be limited to a maximum of One Hundred Thousand Dollars ($100,000) for any and all claims, whenever brought, subject to inflation adjustment (liability for the present value of all payments which normally would have been owed by you if the franchise had continued in existence for its full term, together with any past due payments owed to us and/or any Affiliate, are subject to and part of such total limit); provided that there shall be no limitation on indemnity obligations. Our maximum liability, together with that of any and all of the Franchisor-Related Persons/Entities, will also be limited to the same amount, for any and all claims.

In any event and to the fullest extent permitted by law, you and we (and your Affiliates and Franchisor-Related Persons/Entities, the Marketing Fund and/or the FAC) each knowingly waive any right to or claim for punitive, exemplary, consequential, multiple or similar damages against the other party and agree that, in the event of any dispute, you and we (and your Affiliates and the Franchisor-Related

Persons/Entities, the Marketing und and/or the FAC) shall be limited to recovery of any actual damages sustained by the injured party, unless otherwise expressly stated in this agreement; provided that no such waiver or limitation shall apply to amounts owed under any indemnification obligation provided in this Agreement. To the extent that any provision of this Section 19.4 is invalid or unenforceable, you and we intend that such provision shall be severed and the remainder of this Agreement shall remain in full force and effect.

**19.5 <u>Periods In Which to Make Claims</u>.** No arbitration, action or suit (whether by way of claim, counter-claim, cross-complaint, raised as an affirmative defense, offset or otherwise) by either you or us will be permitted against the other, whether for damages, rescission, injunctive or any other legal and/or equitable relief, in respect of any alleged breach of this Agreement, or any other Claim of any type, unless such party commences such arbitration proceeding, action or suit before the expiration of the <u>earlier</u> of:

1) One (1) year after the date on which the state of facts giving rise to the cause of action comes to the attention of, or should reasonably have come to the attention of, such party; or

2) Two (2) years after the initial occurrence of any act or omission giving rise to the cause of action, whenever discovered.

The above periods may begin to run, and will not be tolled, even though the claiming party was not aware of the legal theories, statutes, regulations, case law or otherwise on which a claim might be based. Period (2) will begin to run and not be tolled even if the claiming party is unaware of the facts on which a claim is based. If any federal, state or provincial law provides for a shorter limitation period than is described in this Section, then such shorter period will govern. The time period for actions for indemnity shall not begin to run until the indemnified party(ies) have been found liable and any time for appeals has run in the underlying action.

**19.6 <u>Survival of Obligations</u>.**

A. Each provision of this Article 19, together with the provisions of Article 21, will be deemed to be self-executing and continue in full force and effect subsequent to and notwithstanding the expiration, Termination, rescission, or finding of unenforceability of this Agreement (or any part of it) for any reason; will survive and will govern any Claim for rescission; and will apply to and govern any Claim against, or with respect to, the Marketing Fund. Notwithstanding any bankruptcy or other proceeding, you and we wish to have the dispute avoidance and resolution provisions of this Agreement strictly enforced according to their terms.

B. Non-competition, confidentiality, protection of the Marks and indemnity/hold harmless obligations, audit rights, and all other Post-Termination Provisions, provided in this Agreement shall survive the expiration and/or Termination of this Agreement according to their terms.

**19.7 <u>Costs and Attorneys' Fees</u>.** Except as expressly provided regarding recovery of attorneys' fees as part of indemnification rights hereunder, or in this Section, or as otherwise expressly provided in this Agreement, the parties will each bear their own costs of enforcement and/or defense (including but not limited to attorneys' fees) in any claim or dispute between you and us, including those matters resolved pursuant to a settlement agreement between the parties. However, if such case is summarily disposed of in an arbitration or litigation proceeding for lack of merit (such as by summary judgment or award, judgment on the pleadings, judgment n.o.v., non-suit, motion to dismiss, directed

verdict or similar disposition i͞    ͞itration or court), the party bringing͞     ͞h case shall pay for the other party's costs of enforcement an͞/or defense (including but not limited to attorneys' fees.)

**19.8    Binding Effect, Modification.**  This Agreement is binding on the parties hereto and their respective executors, administrators, heirs, assigns, and successor in interest, and will not be modified or supplemented except by means of a written agreement signed by both you and our President or one of our Vice Presidents.  However, you and we understand and agree that changes to the Manuals made in accordance with this Agreement are binding and do not require any acceptance by you, written or otherwise, to be effective and enforceable.  No other officer, field representative, salesperson or other person has the right or authority modify this Agreement, or to make any representations or agreements on our behalf, and any such modifications, representations and/or agreements shall not be binding.

**19.9    Our Exercise of "Business Judgment" and/or Meaning of "Sole Discretion"; Express Agreement.**

A.  When we use the phrases "sole and absolute discretion", "sole discretion" and/or "Business Judgment", whether in this Agreement or elsewhere, and whenever we exercise a right, prescribe or forbid an act or thing, or otherwise make a choice or use discretion, you and we agree that we have the wholly unrestricted right to make decisions and/or take (or refrain from taking) actions as we deem appropriate, except that we will not act arbitrarily.  We shall use our judgment in exercising such discretion based on our assessment of the interests we consider appropriate and will not be required to consider your individual interests or the interests of any other particular Franchisee(s).  The ultimate decision-making responsibility with respect to the System must be vested in us, since ou, we and all other CARTRIDGE WORLD franchisees have a collective interest in working within a franchise system with the unrestricted flexibility to quickly adjust to changing business conditions, including but not limited to the competitive environment, new regulatory developments and emerging business opportunities.  We have this right even if a particular decision/action may have negative consequences for you, a particular franchisee or group of franchisees.   So long as we act in compliance with the requirements of this Agreement, we will have no liability for the exercise of our discretion in accordance with the provisions of this Agreement.

B.  You and we execute this Agreement in the belief that it is the basis for a long-term business relationship and should be enforced according to its express provisions.  Neither you nor we have any expectation, nor is it your or our intention or desire, that the rights and obligations set out herein will be defined or determined to be other than as expressly written, or that additional or different obligations be imposed on you or us by any court, arbitrator or otherwise which you or we have not expressly agreed to in writing.  It would be contrary to your and our mutual intentions and expectations that any court, arbitrator or otherwise use any doctrine and/or rule of interpretation (such as an "implied covenant of good faith and fair dealing") to impose additional or different obligations on you or us.

**19.10   Construction, etc.**

A.  Section and Article headings are for convenience only and do not define, limit, or construe such provisions.

B.  References to a "controlling interest" are to a shareholder, membership or partnership interest, as applicable, which enables the holder(s) of such interest to determine the outcome of a decision making process for the applicable entity.

C. This Agreement will be executed in multiple copies, each of which will be deemed an original.

D. Each of us have carefully reviewed and thought about each provision of this Agreement. Therefore, you and we agree that it should be deemed to have been drafted equally and that no presumptions or inferences concerning terms or interpretation will result because we initially prepared this Agreement.

**19.11  Non-Retention of Funds.** Neither party has the right to offset or withhold payments of any kind which are owed, or to be owed, to the other against amounts purportedly due, as a result of any dispute of any nature or otherwise, except as authorized by an arbitration award or as expressly provided otherwise in this Agreement.

**19.12  Severability; Substitution of Valid Provisions.** Each provision of this Agreement, and any portion of any provision, is severable (including, but not limited to, any provision related to dispute resolution). Each party reserves the right to challenge any law, rule or judicial or other construction which would have the effect of varying or rendering ineffective any provision of this Agreement.  To the extent that any provision of this Agreement, or any specification, standard or operating procedure prescribed by us, is invalid or unenforceable, you and we agree that such provisions will be modified or enforced to the fullest extent permissible under and to be compliant with, governing law.  This Agreement will be deemed automatically modified to comply with governing law if such law requires: i) a greater time period for notice of the Termination of, or refusal to renew, this Agreement; or ii) the taking of some other action not described in this Agreement.  Such modifications to this Agreement shall be effective only in such jurisdiction.  You and we agree that the unenforceability of any provision of this Agreement will not affect the remainder of this Agreement.  If any limitation on your and/or our rights (including, but not limited to, any limitation on damages, waiver of jury trial, shortened period in which to make any claim or otherwise) is held unenforceable with respect to one party, then such limitation will not apply to the other party.

**19.13  Waivers; Cumulative Rights.** Subject to the provisions of Section 19.5, no waiver by either party of any breach, default or unfulfilled condition under this or any other agreement between the parties shall be deemed a waiver of any subsequent or other breach, default or unfulfilled condition.  No waiver shall be effective unless in writing and signed by an authorized representative of the signing party.  The rights and remedies provided in this Agreement are cumulative.  Except as expressly provided in this Agreement, no party will be prohibited from exercising any rights or remedies provided under this Agreement or permitted under law or equity.

**19.14  Choice of Laws.** You and we agree on the practical business importance of certainty as to the law applicable to your and our relationship and its possible effect on the development and competitive position of the System.  Therefore, you and we also agree that, except with respect to the applicability of the Federal Arbitration Act, 9 U.S.C. § 1 et seq. and the effect of federal pre-emption of state law by such Act, and except to the extent governed by the United States Trademark Act and other federal laws and as otherwise expressly provided in this Agreement, this Agreement and all other matters, including, but not limited to respective rights and obligations, concerning you and us, will be governed by, and construed and enforced in accordance with, the laws of the state where your CARTRIDGE WORLD Store is, or will be, located,

You and we agree that this provision shall be enforced without regard to the laws of such state relating to conflicts of laws or choice of law; except that the provisions of any law of that state regarding franchises (including, without limitation, registration, disclosure, non-competition, and/or relationship laws)

shall not apply unless su[...]tate's jurisdictional, definitional [...] other requirements are met independently of, and without [...]erence to, this Section.

### 19.15    Application of Agreement to Parties and Others; Joint and Several Liability.

A.    The rights and obligations of this Agreement run directly between you and us and are not intended to create any third-party beneficiary or similar rights or obligations unless specifically expressed in this Agreement; except that the protections which apply to us relating to indemnification and/or releases shall also apply to any past, current and/or future Franchisor-Related Persons/Entities as if they were expressly named beneficiaries thereof.

B.    We have the right to elect in our Business Judgment to not enforce (or to selectively enforce) any provision of this or any Agreement, standard or policy, whether with respect to you and/or any other franchisee or other person, in a lawful manner without liability.

C.    If two (2) or more persons are at any time the Franchisee or the Franchisee owners, all of their obligations and liabilities under this or any other agreement with us and/or any Franchisor-Related Persons/Entities will be joint and several.  We may in our Business Judgment require any or all owners of an interest in the Franchise and Franchised Business to sign a personal guarantee in the form attached as Exhibit 1 to this Agreement.

### 19.16    Fundamental Business Intention to Mediate and/or Arbitrate, Severability of Dispute Resolution Provisions, Federal Arbitration Act Governs, etc.    Irrespective of any statute, regulation, decisional law or otherwise, it is your and our fundamental agreement and intention that you and we do not wish to engage in any court proceedings (except as expressly provided for in the rare instances specified in this Agreement), viewing the dispute resolution mechanism established by this Agreement (including, particularly, mediation and binding arbitration) to be superior from a business standpoint, less expensive, faster, more confidential, more likely to generate creative business-oriented solutions and compromise, and more accommodating to our business relationship and the needs of an evolving and diverse franchise system.   Therefore, if any provisions of this Article 19 are deemed by a court to be unenforceable for any reason, you and we agree and intend that such provisions will be i) modified so as to be enforceable or ii), if that cannot be done, severed and, in any event, any remaining portions of this Article 19 shall remain in full force and effect.   You and we agree that such remaining portions will still form an appropriate and complete dispute resolution mechanism.   You and we acknowledge that your and our activities relating to the franchise relationship are in interstate commerce and that this Agreement is governed by the Federal Arbitration Act.

---

**I have read Sec. 19.1-19.16, understand them, and agree with them.**

**Your Initials:** _ftd     i ḿul_

---

### 20.    NOTICES AND PAYMENTS.

All written notices and reports to be delivered by the provisions of this Agreement or of the Manuals will be deemed so delivered when delivered by hand, immediately on transmission by facsimile

transmission or other electron⟨   ⟩stem, including e-mail or any simila⟨   ⟩ ⟨n⟩s, one (1) business day after being placed in the hands of a commercial courier service for overnight delivery, or three (3) business days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid and addressed to us at CARTRIDGE WORLD Master Franchise, _____ (or our then-current principal business address), to the attention of the President, and to you, at your CARTRIDGE WORLD Store.  Until your CARTRIDGE WORLD Store has opened for business, we may send you notices at any address appearing in your application for a franchise or in our records.  Any required payment or report not actually received by us during regular business hours on the date due will be deemed delinquent.  Notice to any one Franchisee, or owner of the Franchise, shall be deemed effective as to all Franchisees under this Agreement and all owners of the Franchise(s).  Any party may change its address for receipt of notices by providing prior written notice of such change to the other party.

## 21.     **ACKNOWLEDGMENTS AND REPRESENTATIONS, ENTIRE AGREEMENT, NO FIDUCIARY RELATIONSHIP, ETC.**

A.   You and we agree that your and our relationship is not a fiduciary or similar special relationship, but rather is an ordinary commercial relationship between independent business people with arms length dealings.

B.   You acknowledge that you (and each of your owners, if you are a business entity) have had the opportunity and been advised by us to have this Agreement and all other documents reviewed by your own attorney, and that you've read, understood, had an opportunity to discuss and agreed to each provision of this Agreement.  You agree that you've been under no compulsion to sign this Agreement.

C.   You and we expressly acknowledge and agree that the provisions of Article 19, above, (whether relating to arbitration, mediation, waiver of jury trial, venue, limitations on damages, prohibition against multiple plaintiff-class actions, shortened statutes of limitation, and/or otherwise) may require you to travel to a distant location to resolve a dispute, expend additional funds, and/or raise challenges for you and/or us in prosecution of claims/actions.   You and we view these provisions in the context of a diverse franchise system with both large and small, sophisticated and unsophisticated participants, and that requires uniformity and predictability.   As such, you and we knowingly accept such provisions and limitations as justified by business necessities and representative of a reasonable balancing of your and our interests, and those of the System as a whole, and not as unfair or burdensome.

D.   You and we agree that this Agreement contains the final, complete and exclusive expression of the terms of your and our agreement (along with concurrently signed writings, such as but not limited to personal guarantees, Statement of Prospective Franchisee, addenda, exhibits, releases and any other related documents {collectively, the Related Documents}) and supersedes all other agreements and/or representations of any kind or nature.  Any understandings, agreements, representations, or otherwise (whether oral or written) which are not fully expressed in this Agreement and the Related Documents are expressly disclaimed by you and us, including but not limited to any promises, options, rights-of-first refusal, guarantees, and/or warranties of any nature (excepting only the written representations made by you in connection with your application for this franchise).  Where this Agreement (or anything else) indicates that we (and/or any affiliate or designee of ours) may or can do something, the meaning is permissive and we (and/or the affiliate or designee of ours) will not be required to do that thing.

E.   You specifically acknowledge that you have not received or relied on (nor have we or anyone else representing us provided) any statements, promises or representations that you will succeed in the

Master Franchise business or any location; achieve any particular sales, income or other levels of performance; earn any particular amount, including any amount in excess of your Initial Franchise fee or other payments to us; or receive any rights, goods, or services not expressly set forth in this Agreement. You understand and acknowledge that CARTRIDGE WORLD Master Franchisees and Unit Franchisees are distinct from us and are independently owned and operated. While we have encouraged you to speak with such Franchisees in evaluating this franchise opportunity, you understand and acknowledge that they do not act as our agents or representatives in providing any information to you and that no such information can be attributed to us and/ or relied upon as such.

F. You represent, warrant and agree that no contingency, prior requirement, or otherwise (including but not limited to obtaining financing) exists with respect to you fully performing any or all of your obligations under this Agreement. You further represent to us, as an inducement to our entering into this franchise relationship, that you have made no misrepresentations or material omissions in obtaining the Franchise.

**Your Initials:** _fed_ / _nnil_

G. You acknowledge that you have not received or relied on (nor have we or any representative of ours provided, except as may have been contained in the Uniform Franchise Offering Circular received by you):

1) any sales, income or other projections of any kind or nature; or
2) any statements, representations, charts, calculations or other materials which stated or suggested any level or range of sales, income, profits or cash flow; or
3) any representations as to any profits you may realize in the operations of the Franchised Business or any working capital or other funds necessary to reach any 'break-even' or any other financial level.

If any such information, promises, representations and/or warranties have been provided to you, they are unauthorized and inherently unreliable. You agree to advise us of the delivery of any such information. You must not rely upon any such information, nor shall we be bound by it. We do not, nor do we attempt to, predict, forecast or project future performance, revenues or profits of any you or any franchisee. We are unable to reliably predict the performance of a CARTRIDGE WORLD Store even operated by us, and certainly cannot predict results for your CARTRIDGE WORLD Store.

You understand and agree that our Franchisees are separate and distinct from us and are independently owned and operated and that while we strongly encourage you to speak with such Franchisees in connection with your evaluation of this franchise opportunity, they do not act as our agents or representatives in providing any information to you. We will have no obligations or liabilities with respect to (and you should not rely on) any information, opinions or otherwise they may provide to you.

**Your Initials:** _fed_ / _nnil_

H. You acknowledge and agree that the success of the business venture contemplated to be undertaken by you is speculative and will be dependent on your personal efforts, and success is not guaranteed. You further acknowledge that we have just recently begun franchising, we are not an experienced franchisor, and our business model is still under development. You acknowledge and represent that you have entered into this Agreement and made an investment only after making an

independent investigation of [ ] opportunity, including having receive[ ] ist with your Uniform Franchise Offering Circular of others currently operating, or who have operated, our franchises.

I. You acknowledge that you (and each of your owners) has received, fully read and understood, and all questions have been answered regarding, i) a copy of our Uniform Franchise Offering Circular with all exhibits at least ten (10) business days prior to signing any binding documents or paying any sums (whichever occurred first), and ii) a copy of this Agreement and all other agreements complete and in form ready to sign at least five (5) business days prior signing any binding documents (whichever occurred first).

**Your Initials:** _PCf / MML_

J. You understand, acknowledge and agree that (1) we may have offered franchises in the past, may currently be offering franchises and/or may offer franchises in the future, on economic and/or other terms, conditions and provisions which may significantly differ from those offered by this Agreement and any related documents and (2) there may be instances where we have varied, or will vary, the terms on which we offer franchises, the charges we (and/or our Affiliates/Related Companies) make or otherwise deal with our Franchisees to suit the circumstances of a particular transaction, the particular circumstances of that Franchisee or otherwise, in each case in our Business Judgment.

**Your Initials:** _PCf / MML_

K. <u>You understand that we are relying on you to bring forward in writing at this time any matters inconsistent with the representations contained in this Article 21. You agree that if any of the statements or matters set forth in this Article 21 are not true, correct and complete that you will make a written statement regarding such next to your signature below so that we can address and resolve any such issue(s) at this time</u>.

**Your Initials:** _PCf / MML_

L. You acknowledge and agree that the officers, directors, employees, and agents of the Franchisor and Related Companies act only in a representative capacity and not in an individual capacity, and that no other persons and/or entities other than the Franchisor has or will have any duties or obligations to you.

**Your Initials:** _PCf / MML_

M. You acknowledge that you have been given the opportunity and have reviewed the prices charged to franchisees for all Designated Equipment, Products and Services sold to them by CWNA and/or its Affiliates in effect as of the Effective Date of this Agreement, including, but not limited to, prices relating to inks and cartridges, and further acknowledge that CWNA and/or its Affiliates have the right to be the exclusive supplier of any such items/services and that current prices are subject to change.

**Your Initials:** _PCf / MML_

IN WITNESS WHER~ ~, you and we have executed ~ delivered this Agreement in _____ counterparts on th~ day and year first above written.

THIS AGREEMENT WILL NOT BECOME EFFECTIVE UNLESS AND UNTIL SIGNED BY THE PRESIDENT OR A VICE PRESIDENT OF FRANCHISOR. NO FIELD REPRESENTATIVE OR OTHER PERSON IS AUTHORIZED TO EXECUTE THIS AGREEMENT FOR FRANCHISOR.

FRANCHISOR:

Cartridge World Midwest, LLC
a Minnesota limited liability company

By: _____

Title: President


FRANCHISEE (Individual)

_____      _____
Signature                             Signature

Todd C. Lucich                        Nancy M. Lucich
_____      _____
Printed Name                          Printed Name


FRANCHISEE (Corp., LLC or Partnership)


_____
Legal Name of Franchisee Entity


a_____      _____
Jurisdiction of Formation      Corporation, LLC or Partnership


By: _____
    Name


_____
    Signature

Title:_____


#244334 060411 fa (22246)                                          53

**Exhibit 1**

**CONTINUING PERSONAL GUARANTEE**

In consideration of, and as an inducement to, the execution by Cartridge World Midwest, LLC, a Minnesota limited liability company, ("the Franchisor") of the franchise agreement (the "Franchise Agreement") between Franchisor and *Todd C. and Nancy M. Lucich* (the "Franchisee"), each of the undersigned hereby personally and unconditionally, jointly and severally:

(1) guarantees to Franchisor, its Affiliates, the Franchisor-Related Persons/Entities (as defined in the Franchise Agreement) and each of their respective successors and assigns, for the term of the Franchise Agreement and thereafter as provided in the Franchise Agreement, that the undersigned will be personally bound by, and punctually pay and perform, each and every agreement and obligation set forth in the Franchise Agreement;

(2) agrees to be personally bound by, and personally liable for, any breach of any provision in the Franchise Agreement;

(3) agrees to be personally bound by, and personally liable for, each obligation of the Franchisee to Franchisor, its Affiliates and/or any Franchisor-Related Persons/Entities, and

(4) agrees that neither Franchisor, its Affiliates, and/or any Franchisor-Related Persons/Entities need to bring suit first against Franchisee or any of the undersigned in order to enforce the provisions of this Continuing Personal Guarantee (the "Guarantee"), and each may enforce this Guarantee against any or all of the undersigned as it chooses in its sole and absolute discretion.

Each of the undersigned waives presentment, demand, notice of dishonor, protest, nonpayment and all other notices whatsoever, including without limitation: notice of acceptance hereof; notice of all contracts and commitments; notice of the existence or creation of any liabilities under this Guarantee and/or otherwise and of the amount and terms thereof; and notice of all defaults, disputes or controversies between Franchisee and Franchisor, and the settlement, compromise or adjustment thereof.

Further, each of the undersigned consents and agrees that:

(1) his or her direct and immediate liability under this Guarantee will be joint and several and shall not be relieved or diminished by any release or compromise of any liability of any of the other undersigned or of any party or parties primarily or secondarily liable under the Agreement, this Guarantee and/or otherwise;

(2) such liability will not be diminished, relieved or otherwise affected by any extension of time, credit or other indulgence which Franchisor may from time-to-time grant to the Franchisee and/or to any other person, including without limitation the acceptance of any partial payment or performance, or the compromise or release of any claims, none of which will in any way modify or amend this Guarantee, which will be continuing and irrevocable;

(3) the liabilities and obligations of the undersigned, whether under this Guarantee or otherwise, will not be diminished or otherwise affected by the termination, rescission, expiration, renewal or modification of the Franchise Agreement;

(4) the undersigned will comply with the Post Termination Provisions of the Franchise Agreement, as that term is defined in the Franchise Agreement; and

(5) the provisions of Articles 19 and 21 of the Franchise Agreement are incorporated in and will apply to this Guarantee as if fully set forth herein and shall apply to any dispute involving the Franchisor and any of the undersigned; provided that in all events the undersigned agrees to pay all expenses paid or incurred by Franchisor in enforcing the provisions of this Guarantee against the undersigned and in collecting or attempting to collect any amounts due hereunder, including reasonable attorneys' fees.

In connection with the execution of this Guarantee and with the Franchisor permitting the Franchise Agreement to be awarded to the Franchisee, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the undersigned hereby grants a General Release of any and all claims, liabilities and/or obligations, of any nature whatsoever, however arising, known or unknown, against the Franchisor and/or any or all of the Franchisor-Related Persons/Entities, excepting only those claims solely related to the offer and sale of the Franchise, where such releases are expressly prohibited by applicable law.

Terms not defined in this Guarantee shall have the same meanings as in the Franchise Agreement.

IN WITNESS WHEREOF, each of the undersigned has here unto affixed his or her signature on the same date as the Franchise Agreement has been executed.

GUARANTOR(S)

PERCENTAGE OF OWNERSHIP
OF FRANCHISEE

_Todd C Lucich_       _50_ %

_Nancy M Lucich_       _50_ %

_____       _____ %

Corporate Franchisee:

_____, a _____ (specify jurisdiction of formation) _____
(specify corporation, LLC, LLP or otherwise).

By _____

Its _____

Franchise Agreement Number: _____

**Exhibit 1.2**

**Current Form of**
**CARTRIDGE WORLD Releasing Language**
**(subject to change)**

<u>Release-General Provisions</u>.  The Franchisee(s), jointly and severally, hereby release and forever discharge each and all of the Franchisor-Related Persons/Entities (as defined below) of and from any and all causes of action, in law or in equity, suits, debts, liens, defaults under contracts, leases, agreements or promises, liabilities, claims, demands, damages, losses, costs or expenses, of any nature whatsoever, howsoever arising, **<u>known or unknown</u>**, fixed or contingent, past or present, that the Franchisee(s) (or any of them) now has or may hereafter have against all or any of the Franchisor-Related Persons/Entities by reason of any matter, cause or thing whatsoever from the beginning of time to the date hereof (the "Claims"), <u>it being the mutual intention of the parties that this release be unqualifiedly general in scope and effect and that any Claims against any of the Franchisor-Related Persons/Entities are hereby forever canceled and forgiven.</u>

THE FRANCHISEE(S) ACKNOWLEDGE THAT THEY ARE FAMILIAR WITH THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542, WHICH PROVIDES AS FOLLOWS:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

THE FRANCHISEE(S), BEING AWARE OF THIS CODE SECTION, HEREBY EXPRESSLY WAIVE ALL OF THEIR RIGHTS THEREUNDER AS WELL AS UNDER ANY OTHER STATUTES OR COMMON LAW PRINCIPLES OF SIMILAR EFFECT OF ANY APPLICABLE JURISDICTION, INCLUDING, WITHOUT LIMITATION, CALIFORNIA AND/OR [JURISDICTIONS OF FRANCHISEE(S)' RESIDENCE AND LOCATION OF FRANCHISED UNITS].

The Franchisee(s) expressly assume the risk of any mistake of fact or fact of which they may be unaware or that the true facts may be other than any facts now known or believed to exist by Franchisee(s), and it is the Franchisee(s) intention to forever settle, adjust and compromise any and all present and/or future disputes with respect to all matters from the beginning of time to the date of this document finally and forever and without regard to who may or may not have been correct in their understanding of the facts, law or otherwise.  All releases given by the Franchisee(s) are intended to constitute a full, complete, unconditional and immediate substitution for any and all rights, claims, demands and causes of action whatsoever which exist, or might have existed, on the date of this document.  The Franchisee(s) represent and warrant that they have made such independent investigation of the facts, law and otherwise pertaining to all matters discussed, referred to or released in or by this document as the Franchisee(s), in the Franchisee(s) independent judgment, believe necessary or appropriate.  The Franchisee(s) have not relied on any statement, promise, representation or otherwise, whether of fact, law or otherwise, or lack of disclosure of any fact, law or otherwise, by the Franchisor-Related Persons/Entities or anyone else, not expressly set forth herein, in executing this document and/or the related releases.

Franchisee(s) Initials: _____

No Assignment or Transfer of Interest.  The Franchisee(s) represent and warrant that there has been, and there will be, no assignment or other transfer of any interest in any Claims that the Franchisee(s) may have against any or all of the Franchisor-Related Persons/Entities, all Claims having been fully and finally extinguished, and the Franchisee(s) agree to forever indemnify and hold the Franchisor-Related Persons/Entities harmless from any liability, claims, demands, damages, losses, costs, expenses or attorneys' fees incurred by any of the Franchisor-Related Persons/Entities as a result of any person asserting any interest in any of the Claims and/or any voluntary, involuntary or other assignment or transfer, or any rights or claims under any assignment, transfer or otherwise.  It is the intention of the parties that this indemnity does not require payment by any of the Franchisor-Related Persons/Entities as a condition precedent to recovery against the Franchisee(s) under this indemnity.

Franchisee(s) Initials:

Attorneys Fees.  If the Franchisee(s), or anyone acting for, or on behalf of, the Franchisee(s) or claiming to have received, by assignment or otherwise, any interest in any of the Claims, commence, join in, or in any manner seek relief through any suit (or otherwise) arising out of, based upon or relating to any of the Claims released hereunder or in any manner asserts against all or any of the Franchisor-Related Persons/Entities any of the Claims released hereunder, the Franchisee(s) agree to pay all attorneys' fees and other costs incurred by any of the Franchisor-Related Persons/Entities in defending or otherwise responding to said suit or assertion directly to the Franchisor-Related Persons/Entities incurring such costs.

Franchisee(s) Initials:

"Franchisor-Related Persons/Entities." Us, Cartridge World North America, LLC, Cartridge World, Inc., Cartridge World Pty Ltd., and each Affiliate of any of the foregoing, each Cartridge World® marketing and/or advertising fund and each and all of the following, whether past, current and/or future:  Each and all entities and/or persons acting through or in concert with any of the foregoing; each and all of the partners, shareholders, officers, directors, agents, attorneys, accountants, and/or employees of any of the foregoing, as well as each and all of the   successors and/or assigns of any of the foregoing.

Franchisee(s) Initials:

Date of Releases, Joint and Several Liability.  The releases granted hereunder shall be deemed effective as of the date hereof.  The liabilities and obligations of each of the Franchisee(s) (and any other person/entity providing releases to the Franchisor-Related Persons/Entities) shall be joint and several.

Franchisee(s) Initials:

Copyright © 1988-2003 Microsoft Corp. and/or its suppliers. All rights reserved. http://www.microsoft.com/mappoint
© Copyright 2002 by Geographic Data Technology, Inc. All rights reserved. © 2002 Navigation Technologies. All rights reserved. This data includes information taken with permission from Canadian authorities © 1991-2002 Government of Canada (Statistics Canada and/or Geomatics Canada), all rights reserved.

**Exhibit 2.2**

**Territory and Designated Individual**

The "Designated Individual" is: Todd and Nancy Lucich

Your Cartridge World Store location is: Brookfield, Wisconsin

The "Territory" is as follows:

The territory known as Brookfield, WI begins at the intersection of Lisbon Road and Lannon Road, heading East on Lisbon Road to Pilgrim Road. Head South on Pilgrim Road which turns into Pilgrim Parkway and then Mooreland Road until you get to W. Greenfield Avenue. Head West on W. Greenfield Avenue to South Barker Road then heading North on South Barker Road. Continue North on South Barker Road until it's end at W. Capitol Drive. From W. Capitol Drive, draw an imaginary line and head directly North back to the point of beginning at Lannon Road.

*Note: Boundary lines include only the area within the boundary line and extend only to the middle of the boundary demarcation (for example, only to the middle of a street or highway.) You have no rights under this Agreement or otherwise with respect to a facility on the other side of the boundary line, street or highway or otherwise, and no matter how close to such boundary a facility may be, regardless of the distance from, impact on, or vicinity of, your CARTRIDGE WORLD Store or the number of CARTRIDGE WORLD Stores, other outlets or otherwise in any area or market.*

Your and our respective rights in the Territory are subject to the terms and conditions of the Franchise Agreement and this Addendum. All rights not expressly granted to you are reserved by us and Franchisor-Related Persons/Entities.

A. Traditional CARTRIDGE WORLD Stores, Other Outlets and Distribution Opportunities:

As defined in Section 1.2, above, a Traditional CARTRIDGE WORLD Store is a conventional, store front retail facility located in a free-standing building or a shopping center accessible to the general public and using the Marks and CARTRIDGE WORLD® System. The definition is intended to exclude any other channel of distribution, such as (but not limited to) direct mail and/or the Internet. An "Other Outlet" is a distribution outlet (other than a Traditional CARTRIDGE WORLD Store) for products and services like those sold through a Traditional CARTRIDGE WORLD Store and which uses the CARTRIDGE WORLD Brand. By way of illustration, an Other Outlet would include (but not be limited to) a kiosk in a shopping mall, a facility established inside an office supply store, and a service desk in the offices of a large commercial building using the CARTRIDGE WORLD Brand and refilling/selling ink cartridges and related products. Traditional CARTRIDGE WORLD Stores and Other Outlets are collectively referred to as, "Distribution Opportunities."

B.  The Start Up Period:

The "Start Up Period" is the first 24 months of your term, beginning with the Date of this Agreement. We will not enter into a Franchise Agreement licensing a Traditional CARTRIDGE WORLD Store, or open a Franchisor-owned Traditional CARTRIDGE WORLD Store, inside the Territory during the Start Up Period.  Regardless of the foregoing, if you are awarded this Franchise as a renewal Franchise Agreement or as a transferee of an existing Franchise, there shall be no Start up Period for the purposes of your Agreement.

C.  Rights of First Refusal, Terms and Conditions:

We will provide you with a right of first refusal to exercise before any additional Traditional CARTRIDGE WORLD Stores (after any Start Up Period) or Other Outlets are located in the Territory if: i) you are in Good Standing; and ii) meet our then current financial, operational and other business standards for the award of the applicable Distribution Opportunity.  Any standards may be modified by us from time to time in our Business Judgment.

D.  First Refusal Process.

A right of first refusal for Distribution Opportunities in your Territory will be processed as follows:

1.  We will provide you written notice of Distribution Opportunities expected to be physically located in your Territory;

2.  You will have fifteen (15) days in which to tell us in writing (and pay any initial fees) that you wish to participate in any applicable Distribution Opportunities;

3.  If you **do not** notify us within such period, then we may pursue the Distribution Opportunities and/or grant any other person/entity the right to participate in such Distribution Opportunities, without any liability to you;

4.  If you timely notify us in writing that you **do** wish to participate in the Distribution Opportunities, then we may condition your participation on compliance with terms and conditions that we consider appropriate in our Business Judgment to the particular Distribution Opportunities.  Conditions may include, but are not limited to: your execution of the agreements and related documents that are then generally used by us in connection with the award of the applicable Distribution Opportunity; payment of all initial fees and any other applicable fees; meeting any eligibility requirements as are then generally applied by us to candidates for a particular Distribution Opportunity; and the execution by you (and any Affiliate and owner of yours) of a General Release, as defined in Section 1.2, above. If you do not meet the conditions applicable to the award of the Distribution Opportunity and/or any opening requirements that may be included in any Distribution Opportunity agreements, then we and/or any Related Company may pursue such Distribution Opportunity, and/or grant any other person/entity the right to participate in it, without any liability to you.

5.  If you do not elect to participate in a Distribution Opportunity or fail to meet all applicable conditions/requirements, according to the process described above, you will lose any rights of first refusal and all other territory rights in all or any portion of your Territory that is assigned by us/CWNA to the person/entity that operates such Distribution Opportunity, and that person/entity may acquire a right of first refusal and/or other rights in such portion.

We and Franchisor-Related Persons/Entities expressly reserve all other rights, including among them the rights to:

1) own and/or operate ourselves, and/or authorize others to own and/or operate:

    a) any kind of business in the Territory selling to customers located anywhere, whether or not using the CARTRIDGE WORLD Marks and System, i) except for a Traditional CARTRIDGE WORLD Store during a Start up Period (if you are not a renewal or transfer franchisee) and ii) subject to any applicable right of first refusal, as described above in this Exhibit; and

    b) any kind of business outside of the Territory selling to customers located anywhere, whether or not using the CARTRIDGE WORLD Marks and System, including without limitation Traditional CARTRIDGE WORLD Stores;

2) develop or become associated with other concepts (including dual branding and/or other franchise systems), and award franchises under such other concepts for locations anywhere, and/or operate units/channels of distribution owned by us and/or any Affiliate/Related Company under such other concepts for locations anywhere, selling to customers located anywhere;

3) acquire, be acquired by, merge, affiliate with or engage in any transaction with other businesses (whether competitive or not), with units located anywhere and selling to customers located anywhere. Such transactions may include (but are not limited to) arrangements involving competing outlets and brand conversions (to or from the CARTRIDGE WORLD Marks and System). Such transactions are expressly permitted under this Agreement, and you agree to participate at your expense in any such conversion as instructed by us;

4) market and sell CARTRIDGE WORLD Brand (or any other brand) products and services (whether or not competitive) to customers located anywhere using any channel of distribution located anywhere, subject only to any applicable rights of first refusal, as provided above in this Exhibit; and

5) in every instance in which we have the right to Terminate this Agreement under Article 16, we may elect in our Business Judgment to cancel any and/or all of your territorial or similar rights (including, but not limited to, any rights-of-first-refusal), whether arising under this Agreement or in any other manner or document.

F. Customer Policies; Special Accounts and Internet Use.

1) Our current policy is to allow you to accept orders from any customer located anywhere and to market to customers located anywhere, but we can change this policy in our Business Judgment. We have the right to place geographic or other restrictions upon such activities, among other things. You agree to comply with any policy changes. You agree not to deal with Special Account(s), as we may specify from time to time.

2) Your use of the Internet, World Wide Web, and other electronic or other means of marketing and distribution of goods and/or services must be consistent with any specifications, policies and/or

standards we establish from time to time in our Business Judgment. You will not market or sell through such venue(s) or any channel of distribution other than your Traditional CARTRIDGE WORLD Store without our written permission, which we can grant, condition or deny in our Business Judgment.

3) We and/or Franchisor-Related Persons/Entities may choose in our/their Business Judgment to offer/provide Products and/or Services through the Internet, World Wide Web and/or other similar venues (no matter where the Customer is located).

FRANCHISOR:
Cartridge World Midwest, LLC


A Minnesota limited liability company

By: _____
      Signature

Title: President

FRANCHISEE:

_____
Signature

Todd C. Lucich
Printed Name

_____
Signature

Nancy M Lucich
Printed Name

# CARTRIDGE WORLD
## COLLATERAL ASSIGNMENT OF LEASE

THIS COLLATERAL ASSIGNMENT OF LEASE (this "Assignment") is entered into as of _January 17, 2007_, 20_07_, between _Todd C. Lucich and Nancy M. Lucich_ ("Franchisee") and Cartridge World _Midwest_, a _LLC_ corporation ("Franchisor.")

Subject to the provisions hereof, the Franchisee, to secure its obligations to the Franchisor under the franchise agreement between the Franchisor and the Franchisee for the operation of an "CARTRIDGE WORLD Unit Franchise" business, dated _____, 20__ (the "Franchise Agreement") and under every agreement between the Franchisee and the Franchisor, hereby assigns, transfers and sets over unto Franchisor [and/or such person(s)/entity(ies) as Franchisor may from time-to-time designate] all of Franchisee's right, title and interest, whether as tenant or otherwise, in, to and under that certain lease (the "Lease"), a copy is attached to this Assignment, dated _____, 20__, between Franchisee and _____ ("Landlord"), respecting that property commonly known as _____ _____ (the "Premises"). The Franchisor shall have no liabilities or obligations of any kind arising from, or in connection with, this Assignment, the Lease or otherwise (including, but not limited to, any obligation to pay rent and/or other amounts) **until and unless** the Franchisor, in its Business Judgment, takes possession of the Premises pursuant to the terms hereof <u>and</u> expressly (and in writing) assumes the rights and obligations of Franchisee under the Lease. The Franchisor is only responsible for those obligations accruing after the date of such assumption.

The Franchisee agrees to indemnify and hold harmless the Franchisor from and against all claims and demands of any type, kind or nature made by the Landlord or any third party that arise out of or are in any manner connected with the Franchisee's use and occupancy of the Premises subject to the Lease.

The Franchisee represents and warrants to the Franchisor that the Franchisee has full power and authority to assign the Lease and its interest in the Lease.

**The Franchisor will not take possession of the Premises until and unless the Franchisee defaults (and/or until there is a termination, cancellation, rescission or expiration of the Franchisee's rights) under the Lease, any sublease, the Franchise Agreement or other agreement between the Franchisee and the Franchisor (or any affiliate).** In such event, the Franchisor (or its designee) shall have the right, and is hereby empowered, (but has no obligation) to take possession of the Premises, expel Franchisee therefrom. Franchisee shall then have no further right, title or interest in or under the Lease or to the Premises, all such rights thereby passing to the Franchisor or its designee, in each case without the Landlord's further consent. The Franchisee agrees to do all acts necessary or appropriate to accomplish such assignment on the Franchisor's request. The Franchisee will reimburse the Franchisor for the costs and expenses incurred in connection with any such retaking, including, without limitation, the payment of any back rent and other payments due under the Lease (whether such payments are made by a separate agreement with the Landlord or otherwise), attorney's fees and expenses of litigation incurred in enforcing this Assignment, costs incurred in reletting the Premises and costs incurred for putting the Premises in good working order and repair.

Franchisee agrees it will not suffer or permit any surrender, termination, amendment or modification of the Lease without the prior written consent of Franchisor. Throughout the term of the Franchise Agreement, Franchisee agrees that it shall elect and exercise all options to extend the term of (or renew or assume in bankruptcy) the Lease not less than ten (10) days prior to the last day that said option must be exercised, unless Franchisor otherwise agrees in writing. Franchisee shall provide Franchisor with a copy of all documents related to such options, extensions and other similar documents.

Failure of the Franchisor to exercise any remedy hereunder shall not be construed or deemed to be a waiver of any of its rights hereunder. The rights and remedies of the Franchisor under this Assignment are cumulative and are not in lieu of but are in addition to any other rights and remedies which the Franchisor shall have under or by virtue of the Franchise Agreement or otherwise. The terms, covenants, and conditions contained herein shall bind the Franchisee and its successors and assigns, and inure to the benefit of the Franchisor and its successors and assigns. In the event of any dispute between the parties regarding this Assignment, or any matter related in any way to it, the dispute resolution provisions (including, but not limited to, mediation, binding arbitration, waiver of jury trial and limitation of damages) of the Franchise Agreement between the Franchisor and the Franchisee shall apply. The arbitrator in any such proceeding shall have the full power and authority to grant an appropriate award to give full effect to this Assignment, expelling the Franchisee from the Premises and awarding possession to the Franchisor, as well as granting such other relief as may be proper and fair at law and by equity. If there is more than one Franchisee, their obligations hereunder will be joint and several.

This Assignment, any memorandum hereof or any financial statement related hereto may be recorded by, and at the expense of, the Franchisor. The Franchisee hereby appoints the Franchisor as its attorney in fact to execute any and all documents and to take any and all such actions, as are necessary or appropriate to record such instrument referenced above.

FRANCHISEE:

_Todd C Lucich_
Signature

_Todd C Lucich_
Printed Name

_Nancy M Lucich_
Signature

_Nancy M Lucich_
Printed Name

**LANDLORD APPROVAL:**

The undersigned Landlord under the Lease hereby:

1. Agrees to notify Franchisor in writing of any default and any failure of Franchisee to cure any default under the Lease;
2. Agrees that Franchisor shall have the right, but not be obligated, to cure any default by Franchisee under the Lease within 30 days after delivery by Lessor of written notice thereof;
3. Consents to the foregoing Collateral Assignment and agrees that if Franchisor takes possession of the Premises and confirms to Landlord the assumption of the Lease by Franchisor as tenant, Landlord shall recognize Franchisor, or its designee, as tenant under the Lease;
4. Agrees that Franchisor may further assign the Lease or sublet the Premises to a designee and/or a person or entity who is a CARTRIDGE WORLD franchise owner reasonably acceptable to Landlord. Franchisor will have no further liability under the Lease upon such an assignment. This Approval of Landlord shall apply to any subsequent CARTRIDGE WORLD Store franchise owner;
5. Agrees to provide a copy of this Collateral Assignment of Lease to any actual and/or prospective purchaser of the Premises.

LANDLORD                                     FRANCHISOR


_____                  _____


By: _____                  By: _____

Its _____                  Its _____

**EXHIBIT 3.3**

## SITE SELECTION ACKNOWLEDGMENT
## AND ADA CERTIFICATION
## FORM

_____ ("Franchisor", or "we", "us" or "our") and *Todd C. and Nancy M. Lucich*
("Franchisee(s)" or "you") are parties to a franchise agreement dated *Jan. 17*, 200 7 (the "Franchise Agreement") for the operation of a CARTRIDGE WORLD Store at the location identified below (the "Store"). This Form refers to the following proposed location (the "site"), which we have accepted and consented to under the terms of a Franchise Agreement:

_____.

*(STORE ADDRESS)*

You understand and agree that:

- You have independently selected and are solely responsible for the selection, development and operation of the site.
- Our consent to the site is not, and should not be relied upon as, a recommendation or endorsement of such location, nor a representation or warranty as to the suitability of the site for any purpose, the likelihood of any success at such site, or otherwise. We cannot and do not guarantee the success of any location.
- Although we, or companies referred by or associated with us, may assist you in site location, identification, financing and/or development by providing consultation, evaluation and/or other assistance, including references to potential locations, contractors and other professionals (individually and collectively referenced as "site-related matters") neither we nor any Franchisor-Related Persons/Entities will have any liability with respect to any location to be selected, obtained and/or used by you or for any site-related matters. The sole responsibility for the selection of the site and all site related matters is your own.
- We and/or any Franchisor-Related Persons/Entities may have made, or may make, available to you standard and/or site specific plans and specifications to be used by you in the construction of your Store. You are solely responsible for obtaining architectural, engineering and other applicable professional services to prepare surveys, site and foundation plans and adapt any plans and specifications to the site and all applicable laws, regulations and ordinances.
- In signing this form, you acknowledge that you have not relied on any assistance or input from us or any Franchisor-Related Persons/Entities with respect to the site and any site related matter, and you waive any claims you may have against us and/or any Franchisor-Related Persons Entities in connection with the site and any such matters.
- You agree that this Form, along with the Franchise Agreement between us, contains the final, complete and exclusive expression of the terms of your and our agreement with respect to the subject matter of this document and supersedes all other agreements and/or representations of any kind or nature. Any understandings, agreements, representations, or otherwise (whether oral or written) which are not fully expressed in this document and the Franchise Agreement are expressly disclaimed by you.

**ADA Certification:**

In accordance with Section 3.3 of the Franchise Agreement, Franchisee certifies to Franchisor that to the best of Franchisee's knowledge, the Store and its adjacent areas comply with all applicable federal, state and local accessibility laws, statutes, codes, rules, regulations and standards, including but

not limited to the Americans with Disabilities Act. Franchisee acknowledges that it is an independent contractor and the requirement of this certification by Franchisor does not constitute ownership, control, leasing or operation of the Store. Franchisee acknowledges that Franchisor has relied on the information contained in this certification. Furthermore, Franchisee agrees to indemnify Franchisor and Franchisor-Related Persons/Entities, and each of their respective officers, directors, and employees, in connection with any and all claims, losses, costs, expenses, liabilities, compliance costs, and damages incurred by such indemnified party(ies) as a result of any matters associated with Franchisee's compliance (or failure to comply) with the Americans with Disabilities Act, as well as the costs, including attorneys' fees, related to the same.

In the event of any dispute concerning or relating to this document and/or any of the transactions and/or matters to which it may apply, such dispute will be resolved in accordance with the dispute resolution provisions of the Franchise Agreement (including, but not limited to, Articles 19, 20 and 21 of the Franchise Agreement, providing for <u>BINDING ARBITRATION</u> and <u>WAIVER OF JURY TRIAL among other terms</u>). Terms not defined in this document shall have the same meaning as they do in the Franchise Agreement.

All signers are jointly and severally responsible for the representations and promises described in this Acknowledgment and Certification Form.

FRANCHISEE(S)

By: _____

Printed Name: _Todd C Lucich_____

Date: __January 17, 2007_____


By: _____

Printed Name: _Nancy M Lucich_____

Date: __January 17, 2007_____


By: _____

Printed Name: _____

Date: _____

**Cartridge World**
**STATEMENT OF PROSPECTIVE FRANCHISEE**

**[Note: Dates and Answers Must Be Completed
in the Prospective Franchisee's Own Handwriting.]**

Since the Prospective Franchisee (also called "me," "our," "us," "we" and/or "I" in this document) and Cartridge World Midwest, LLC, (also called the "Franchisor," "you" or "your") both have an interest in making sure that no misunderstandings exist between them, and to verify that no violations of law might have occurred, and understanding that the Franchisor is relying on the statements I/we make in this document, I/we assure the Franchisor as follows:

**A.** **The following dates and information are true and correct:**

1. _Nov. 30_ , 20 _06_
   Initials _PCF_ _nml_

   The date on which I/we received a Uniform Franchise Offering Circular about a CARTRIDGE WORLD® Franchise.

2. _Dec. 20_ , 20 _06_
   Initials _PCF_ _nml_

   The date when I/we received a fully completed copy (other than signatures) of the Franchise Agreement and all other documents I/we later signed.

3. _Jan. 17_ , 20 _07_
   Initials _PCF_ _nml_

   The earliest date on which I/we signed the Franchise Agreement or any other binding document (not including any Letter or other Acknowledgment of Receipt.)

4. _Jan 18_ , 20 _07_
   Initials _PCF_ _nml_

   The earliest date on which I/we delivered cash, check or other consideration to the Franchisor, or any other person or company.

**B.** **Representations and Other Matters:**

1. No oral, written, visual or other promises, agreements, commitments, representations, understandings, "side deals," options, rights-of-first-refusal or otherwise of any type, including, but not limited to, any which expanded upon or were inconsistent with the Offering Circular or the Franchise Agreement or any other written documents, have been made to or with me/us with respect to any matter (including, but not limited to, advertising, marketing, site location and/or development, operational, marketing or administrative assistance, exclusive rights or exclusive or protected territory or otherwise) nor have I/we relied in any way on any such, except as expressly set forth in the Franchise Agreement or a written Addendum thereto signed by the Prospective Franchisee and the President of the Franchisor, except as follows:

   _____ _NONE_ _____.
   (If none, the Prospective Franchisee should write NONE in his/her/their own handwriting.)

   **Prospective Franchisee's Initials:** _PCF_ _nml_

2. No oral, written, visual or other claim, guarantee or representation (including, but not limited to, charts, tables, spreadsheets or mathematical calculations to demonstrate actual or possible results based on a

#247468 060530 OC WI Ribbon (22246)

combination of variables, such as multiples of price and quantity to reflect gross sales, or otherwise), which stated or suggested any specific level or range of actual or potential sales, costs, income, expenses, profits, cash flow, tax effects or otherwise (or from which such items might be ascertained), from franchised or non-franchised units, was made to me/us by any person or entity, nor have I/we relied in any way on any such, except for information (if any) expressly set forth in Item 19 of the Franchisor's Offering Circular (or an exhibit referred to therein), except as follows:

_____NONE_____.

(If none, the Prospective Franchisee should write NONE in his/her/their own handwriting.)

**Prospective Franchisee's Initials:** _____*RCS*_____*nml*_____

3. No contingency, prerequisite, reservation or otherwise exists with respect to any matter (including, <u>but not limited to,</u> the Prospective Franchisee obtaining any financing, the Prospective Franchisee's selection, purchase, lease or otherwise of a location, any operational matters or otherwise) or the Prospective Franchisee fully performing any of the Prospective Franchisee's obligations, nor is the Prospective Franchisee relying on the Franchisor or any other entity to provide or arrange financing of any type, nor have I/we relied in any way on such, except as expressly set forth in the Franchise Agreement or a written Addendum thereto signed by the Prospective Franchisee and the President of the Franchisor, except as follows: _____NONE_____

_____.

(If none, the Prospective Franchisee should write NONE in his/her/their own handwriting.)

**Prospective Franchisee's Initials:** _____*RCS*_____*nml*_____

4. The individuals signing for the "Prospective Franchisee" constitute all of the executive officers, partners, shareholders, investors and/or principals of the Prospective Franchisee and each of such individuals has received the Uniform Franchise Offering Circular and all exhibits and carefully read, discussed, understands and agrees to the Franchise Agreement, each written Addendum and any Personal Guarantees.

**Prospective Franchisee's Initials:** _____*RCS*_____*nml*_____

5. I/we have had an opportunity to consult with an independent professional advisor, such as an attorney or accountant, prior to signing any binding documents or paying any sums, and the Franchisor has <u>strongly</u> recommended that I/we obtain such independent professional advice. I/we have also been <u>strongly</u> advised by the Franchisor to discuss my/our proposed purchase of, or investment in, a CARTRIDGE WORLD Franchise with existing CARTRIDGE WORLD® Franchisees prior to signing any binding documents or paying any sums and I/we have been supplied with a list of existing CARTRIDGE WORLD Franchisees.

**Prospective Franchisee's Initials:** _____*RCS*_____*nml*_____

6. I confirm that, as advised, I've spoken with past and/or existing CARTRIDGE WORLD Franchisees, and that I made the decision as to which, and how many, CARTRIDGE WORLD Franchisees to speak with. I understand and acknowledge that CARTRIDGE WORLD Franchisees are distinct from Franchisor and are independently owned and operated. I understand and acknowledge that they do not act as Franchisor's agents or representatives in providing any information to me and that no such information can be attributed to Franchisor and/ or relied upon as such.

7.  I/we understand that: entry  any business venture necessarily in  es some unavoidable risk of loss or failure, <u>the purchase of a CARTRIDGE WORLD franchise (or any other) franchise is a speculative investment, investment beyond that outlined in the Offering Circular may be required to succeed, there exists no guaranty against possible loss or failure in this or any other business and the most important factors in the success of a CARTRIDGE WORLD Franchise, including the one to be operated by me/us, are my/our personal business, marketing, sales, management, judgment and other skills.</u>

**Prospective Franchisee's Initials:** _____ *PCL* _____ *nml* _____

If there are any matters inconsistent with the statements in this document, or if anyone has suggested that I sign this document without all of its statements being true, correct and complete, I/we will (a) **immediately** inform the Franchisor's President or Chief Executive Officer and (b) make a written statement regarding such next to my signature below so that the Franchisor may address and resolve any such issue(s) at this time and before either party goes forward.

I/we understand and agree that the Franchisor does not furnish or endorse, or authorize its salespersons or others to furnish or endorse, any oral, written or other information concerning actual or potential sales, costs, income, expenses, profits, cash flow, tax effects or otherwise (or from which such items might be ascertained), from franchised or non-franchised units, that such information (if any) not expressly set forth in Item 19 of the Franchisor's *Offering Circular* (or an exhibit referred to therein) is <u>not reliable and that I/we have not relied on it, that no such results can be assured or estimated and that actual results will vary from unit to unit and may vary significantly.</u>

**Prospective Franchisee's Initials:** _____ *PCL* _____ *nml* _____

I/we understand and agree to all of the foregoing and represent and warrant that all of the above statements are true, correct and complete.

Date: _Ianuary 17, 2007_

**PROSPECTIVE FRANCHISEE (Individual)**

_Todd C Lucich_ (signature)
Signature

_Todd C Lucich_
Printed Name

_Nancy M Lucich_ (signature)
Signature

_Nancy M Lucich_
Printed Name

**PROSPECTIVE FRANCHISI     Corp., LLC or Partnership) - Mus      accompanied by appropriate personal guarantee(s)**

_____

Legal Name of Entity

_____    _____

 Jurisdiction of Formation       Corporation, LLC or Partnership

By: _____

     Name

     _____

     Signature

Title: _____

## PRINCIPALS

_____              _____

_____              _____

All of the above is true, correct and complete to the best of my knowledge:

_____

Franchise Marketing Representative

Reviewed by: _____

_____        _____

President of Franchisor                         Franchise Agreement Number

#247468 060530 OC WI Ribbon (22246)

EXHIBIT C

## ASSIGNMENT AND ASSUMPTION OF FRANCHISE AGREEMENT

THIS ASSIGNMENT is made this day of July 16, 2012 by and between Empty Ink, Inc. with the address of 1518 Turnberry Cir., Oconomowoc, WI 53066 (the "Assignor" or "Seller"), and His Ink, LLC ("Buyer") with the address at W370A Cedar Grove Rd., Oconomowoc, WI 53066 (the "Assignee" or Purchaser").

WHEREAS, Seller has sold all of its assets at 17440-B W. Bluemound Rd., Suite 140, Brookfield, WI 53045 ("the Premises") to Purchaser pursuant to a Purchase and Sale Agreement dated July 16, 2012 (the "Sale Contract"); and

WHEREAS, Seller is a franchisee under a franchise agreement with Cartridge World Midwest, LLC, to operate a Cartridge World Franchise MIN-0722 ("store number"); and

WHEREAS, part of the Sale Contract includes the Franchise Agreement; a copy of which annexed hereto; and

WHEREAS, Cartridge World Midwest, LLC has consented to such assignment of the Franchise Agreement to the Purchase and the operation of a Cartridge World store MIN-0722 located at: 17440-B W. Bluemound Rd., Suite 140, Brookfield, WI 53045 and

WHEREAS, Assignee acknowledges Cartridge World Midwest, LLC offered an option to purchase additional operating years to bring this agreement back to a total ten (10) year term, and   Assignee has declined ("declined or accepted") this option.

WHEREAS, Assignor has agreed to assign to Assignee all of the Assignor's interest in and to that certain Franchise Agreement under which Assignor is the Franchisee and Cartridge World Midwest, LLC is the Franchisor, including any riders, extensions and modifications, which Franchise Agreement concerns the premises know as and located at 17440-B W. Bluemound Rd., Suite 140, Brookfield, WI 53045. A copy of the Franchise Agreement is annexed hereto as Exhibit "A".

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor and Assignee agree as follows:

1. Assignor hereby assigns to Assignee all Assignor's right, title and interest in the Franchise Agreement as of the date of the closing under the Sale Contract along with any and all riders, extensions, modifications and amendments made thereto;

2. This Assignment shall be binding upon and shall insure to the benefit of the parties and their respective successors, assigns, heirs and personal representatives.

3. The Assignee hereby accepts the foregoing Assignment of Franchise Agreement; any and all riders, extensions, modifications and amendments made thereto, and agrees to assume same as the date hereof, and to perform and observe all of the terms, provisions and conditions that are on the part of the Assignor to be performed and observed under the terms of the Franchise Agreement from and after the date hereof, and the Assignee furthermore agrees to indemnify the Assignor, its successors and assigns and hold them harmless from and against any and all claims, suits, actions, damages, charges and expenses, that may arise from and after the date hereof, in connection with the performance under the Franchise Agreement; including reasonable attorney's fees and disbursements incurred as a result thereof

4. As a result of this Assignment, Cartridge World Midwest, LLC hereby releases any and all claims against the Assignor related to the underlying Franchise Agreement and will look only to the Assignee for any future obligation that may arise thereunder.

**ASSIGNOR:**

Dated: July 16, 2012

By: _____

Print Name: Todd C. Lucich

Dated: July 16, 2012

By: _____

Print Name: Nancy M. Lucich

Dated: July 16, 2012

**FRANCHISOR CONSENT:**

By: _____

**ASSIGNEE:**

Dated: July 16, 2012

His Ink, LLC
a Wisconsin limited liability company

By: _____

Print Name: Shawn Nareski

Title: Member

as individual owners:

Individually: _____

Print Name: Shawn Nareski

Percentage of Ownership: 50%

Individually: _____

Print Name: Corrine Nareski

Percentage of Ownership: 50%

EXHIBIT D

Jul 10 12 03:41p      C   tridgeWorldBrookfield  l  .754.2902                    p.10

**Cartridge World**
**Unit Franchise Agreement**

**Exhibit B**
**Continuing Personal Guarantee**

In consideration of, and as an inducement to, the execution by (**Master Franchisee's Name**), a _CW Midwest_ (**NAME STATE/TYPE OF BUSINESS ENTITY**), (the "Master Franchisee") of the franchise agreement (the "Franchise Agreement") between Master Franchisee and _SHAWN NARESKI / HIS INK LLC_ (the "Franchisee"), each of the undersigned hereby personally and unconditionally, jointly and severally:

(1)     guarantees to Master Franchisee, its Affiliates, the Master Franchisee-Related Parties (as defined in the Franchise Agreement) and each of their respective successors and assigns, for the term of the Franchise Agreement and thereafter as provided in the Franchise Agreement, that the undersigned will be personally bound by, and punctually pay and perform, each and every agreement and obligation set forth in the Franchise Agreement;

(2)     agrees to be personally bound by, and personally liable for, any breach of any provision in the Franchise Agreement;

(3)     agrees to be personally bound by, and personally liable for, each obligation of Franchisee to Master Franchisee, its Affiliates and/or any Master Franchisee-Related Parties, and

(4)     agrees that neither Master Franchisee, its Affiliates, and/or any Master Franchisee-Related Parties need to bring suit first against Franchisee or any of the undersigned in order to enforce the provisions of this Continuing Personal Guarantee (the "Guarantee"), and each may enforce this Guarantee against any or all of the undersigned as it chooses in its sole and absolute discretion.

Each of the undersigned waives presentment, demand, notice of dishonor, protest, nonpayment and all other notices whatsoever, including without limitation: notice of acceptance hereof; notice of all contracts and commitments; notice of the existence or creation of any liabilities under this Guarantee and/or otherwise and of the amount and terms thereof; and notice of all defaults, disputes or controversies between Franchisee and Master Franchisee, and the settlement, compromise or adjustment thereof.

Further, each of the undersigned consents and agrees that:

(1)     his or her direct and immediate liability under this Guarantee will be joint and several and shall not be relieved or diminished by any release or compromise of any liability of any of the other undersigned or of  any party or parties primarily or secondarily liable under the Agreement, this Guarantee and/or otherwise;

(2)     such liability will not be diminished, relieved or otherwise affected by any extension of time, credit or other indulgence which Master

Franchisee may from time-to-time grant to Franchisee and/or to any other person, including without limitation the acceptance of any partial payment or performance, or the compromise or release of any claims, none of which will in any way modify or amend this Guarantee, which will be continuing and irrevocable;

(3)    the liabilities and obligations of the undersigned, whether under this Guarantee or otherwise, will not be diminished or otherwise affected by the termination, rescission, expiration, renewal or modification of the Franchise Agreement;

(4)    the undersigned will comply with the Post Termination Provisions of the Franchise Agreement, as that term is defined in the Franchise Agreement; and

(5)    the provisions of Sections 19 and 23 of the Franchise Agreement are incorporated in and will apply to this Guarantee as if fully set forth herein and shall apply to any dispute involving the Master Franchisee and any of the undersigned; provided that in all events the undersigned agrees to pay all expenses paid or incurred by Master Franchisee in enforcing the provisions of this Guarantee against the undersigned and in collecting or attempting to collect any amounts due hereunder, including reasonable attorneys' fees.

In connection with the execution of this Guarantee and with the Master Franchisee permitting the Franchise Agreement to be awarded to Franchisee, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the undersigned hereby grants a General Release of any and all claims, liabilities and/or obligations, of any nature whatsoever, however arising, known or unknown, against the Master Franchisee and/or any or all of the Master Franchisee-Related Parties, excepting only those claims solely related to the offer and sale of the Franchise, where such releases are expressly prohibited by applicable law.

Terms not defined in this Guarantee shall have the same meanings as in the Franchise Agreement.

IN WITNESS WHEREOF, each of the undersigned has here unto affixed his or her signature on the same date as the Franchise Agreement has been executed.

GUARANTOR(S)                                    PERCENTAGE OF OWNERSHIP
                                                OF FRANCHISEE

*Shawn Nareski*                                 100                        %

SHAWN NARESKI                                   _____      %

HIS INK, LLC                                    _____      %

MEMBER

EXHIBIT E

**AMENDMENT TO
FRANCHISE AGREEMENT**

**THIS AMENDMENT TO FRANCHISE AGREEMENT** (this "Amendment") is made, entered into and effective this 29th day of January 2018, by and between Cartridge World North America, LLC (the "Master Franchisee") and Corrine & Shawn Nareski and His Ink, LLC., (the "Franchisee").

**RECITALS**

**WHEREAS,** the Master Franchisee and the Franchisee entered into a Franchise Agreement, dated January 7th, 2007 (the "Franchise Agreement"), for the operation of a Cartridge World® Store 0722/Unit Franchise currently located at 19035 W. Bluemound Road #10, Brookfield, WI 53045.

**WHEREAS,** the Franchise Agreement specifies an expiration date of January 7th, 2017 (the "Expiration Date").

**WHEREAS,** the Master Franchisee and the Franchisee have agreed to amend and revise certain terms of the Franchise Agreement as set forth in this Amendment.

**NOW THEREFORE,** in consideration of the foregoing, and for other good and valuable consideration, the Master Franchisee and the Franchisee agree as follows:

1. Section 2.1(B) of the Franchise Agreement is hereby amended to provide that the term of the Franchise Agreement will continue beyond the Expiration Date, and the Franchise Agreement will remain in full force and effect for an additional period of time to be determined as follows:

    (a) The term of the Franchise Agreement will continue after the Expiration Date for 30 days and thereafter, if applicable, will automatically be extended for additional consecutive 30-day periods without any further action required by either party until:

    (1) New Expiration Date _January 29th, 2020_

2. The term of the Franchise Agreement will not expire on the Expiration Date, but the Franchise Agreement will remain in effect until the date established in the preceding paragraph of this Amendment. The Franchisee and the Master Franchisee will continue to comply with all of the terms and conditions of the Franchise Agreement while the Franchise Agreement remains in effect.

3. All references to the term of the Franchise Agreement will mean the term as extended by the provisions of this Amendment. The extension of the term of the Franchise Agreement until the date established in Paragraph 1 of this Amendment will not affect the terms, duration or enforceability of the Post-Termination Provisions of the Franchise Agreement as written including, but not limited to, the two-year duration of the post-term non-compete covenants contained in Section 8.2(8) of the Franchise Agreement, or the 10-year length of the renewal term if the Franchisee is awarded a renewal of the Franchise in accordance with Section 15.1 of the Franchise Agreement.

4. Section 14.3 9) shall be revised to state that "You or the transferee must pay us with your application for a transfer a non-refundable transfer fee of Five Thousand ($5,000.00) as provided in Section 14.3 of the Unit Franchise Agreement, but only if such proposed transfer involves a change of ownership or control of fifty percent (50%) or more."

5. To the extent these Amendments are deemed to be inconsistent with the provisions of the Franchise Agreement, the provisions of this Amendment will govern. All other terms, conditions and provisions of the Franchise Agreement will remain in full force and effect

as originally written.

6. Capitalized terms used but not defined in this Amendment will have the meanings ascribed to such terms in the Franchise Agreement.

**IN WITNESS WHEREOF,** the Franchisee and the Master Franchisee have respectively signed this Amendment as of the day and year written above.

"Master Franchisee"

X _____

"Franchisee"

X _____ 1-29-18

X _____ 1-29-18

MMB: 4838-1291-2678, v. 2

2

EXHIBIT F



EXHIBIT G

**Cartridge World®** | **Global Brand Local Experts™**

🌐 www.cartridgeworld.com

February 8th, 2021

**Cartridge World USA, LLC**
3917 Mercy Drive
McHenry, Illinois 60050
Phone: (815) 321-4406
Fax: (815) 271-5896
Email: tricchio@cartridgeworld.com

Attention: Shawn & Corrine Nareski
His Ink, LLC
19035 W. Bluemound Rd. #10
Brookfield, WI 53045

Email: scnareski@yahoo.com; cw0722@cartridgeworldusa.com and sales@cartridgeworld722.com

**Sent via: Email**

Mr & Mrs Nareski,

After being unable to collect your sales for two consecutive months and no reply to emails sent from Eric George. Tina called Corrine on Friday 5th February 2021 and was told by Corrine that your store closed in December 2020, which would mean that CWUSA would be processing an "abandonment" and begin the closing down of the unit franchise agreement and informing all vendors you are closed.

As we thought this was out of character, we checked with our approved vendors and they confirmed you were still buying products during January 2021.

Part of the abandonment procedure is to visit the store location and confirm it has indeed been closed and no Cartridge World branding remains.

This visit was carried out on Friday, February 5th, 2021 at 3:30pm which we were surprised to see the store fully operational & selling Cartridge World branded products under the Cartridges World sign to walk in customers.

 

This communication is to inform you of the following:

1. You are in default of your unit franchise agreement by not providing sales.

2. Your unit franchise agreement expired on January 31st, 2020. This does not mean you are released from the obligations of your unit franchise agreement, as operating under the Cartridge World brand merely means that your unit franchise agreement has moved to a month-by-month basis.

3. Operating on an expired unit franchise agreement on a month-by-month basis means all of your obligations to the unit franchise agreement remain the same.

4. Should you wish to terminate your unit franchise agreement as Corrine indicated to Tina, we can prepare a mutual termination and release where you will be released from your obligations under your Unit Franchise Agreement. However, it does not release you from the 2-year non-compete where you cannot operate or work at competing business as this is a direct breach of the 2 year non-compete clause (section 8.2).

Be advised should you also choose to ignore this letter; Cartridge World USA will have no choice but to enforce the unit franchise agreement and take the legal path towards an injunction to close your business.

While we have successfully enforced this type of breach in the past we would prefer not to take the legal route due to the significant amount of money ($30,000) both parties will need to spend to execute and defend.

We appreciate your earliest reply, so we can draw this matter to a close as soon as possible.


Sincerely,

Mark Pinner
Chief Executive Officer
Cartridge World USA, LLC

EXHIBIT H

1/28/21

Attn:  Cartridge World North America


Our company, His Ink LLC (DBA Cartridge World Brookfield), is no longer.

Enclosed, please find the last royalties payment.

 Gmail

Corrine Nareski <sales@cartridgeworld722.com>

## December 2020 Royalty Statement
1 message

**Eric George** <egeorge@cartridgeworld.com>
To: CW0722 <cw0722@cartridgeworldusa.com>

| | |
|---|---|
| Subject: | **Royalty Payment Statement for**  12/31/20 |
| Store Number: | **MIN-0722** |
| Store Owner: | **Corine Nareski** |
| Account #: | ******4252 |
| POS Type: | **Retail Pro** |
| Reporting Status: | **Complete** |

**Summary of Amounts Due**

| | |
|---|---|
| Royalty | $1183.22 |
| Ad Fund | ~~$213.43~~ $42.86 |
| Ops Fee | ~~$150.00~~ 60 |
| Late Fee | |
| **Total Due** | $1760.08 |

**Sales Summary**

| | Sales | Gross Margin |
|---|---|---|
| Gross Sales - other than OEM and Printer | $18725.32 | |
| Gross Sales - OEM | $3245.52 | |
| Gross Sales - Printer Items (Printers) | $634.97 | |
| **Total Gross Sales** | $22605.81 | |

**Adjustment** - Printer Sales to Gross Margin

Less: Printer Cost $634.??

**Adjustment for Sales sold on account**

Less: Current Month - A/R Sales $7809.53

Plus: Last Month - A/R Sales $7181.71

| | Rate | Ad Fund Fee |
|---|---|---|

**Sales subject to Royalty & Ad Fund Fee (Adjusted Sales)** $21343.02    2.0% $213.43 $426.86

**Royalty Calculation**

| | Rate | Royalty |
|---|---|---|

OEM Sales subject to 3% Royalty $3245.52    3.0% $97.37

(Lower of OEM Sales or 10% of Adjusted Sales)

Sales Subject to 6% Royalty $18097.50    6.0% $1085.85

Total Sales subject to Royalty $21343.02    $1183.22

**Minimum Royalty (if applicable)**

SALES: Department Summary
Sales Info: Full Detail
Sort: DCS
Filter: Receipt Date: 12/1/2020@12:00a..12/31/2020@11:59p Include

| DCS | Units Sold | Original Price | Disc % | Dollars Sold | Cost | Profit Margin | Margin % |
|---|---|---|---|---|---|---|---|
| 99 99 COU | (15) | (543.85) | 0.37 | (541.86) | 0.00 | (541.86) | 100.00 |
| NKCOM | 286 | 5,378.14 | 2.68 | 5,233.98 | 2,753.75 | 2,480.23 | 47.39 |
| NKINHREF | 136 | 1,876.64 | (0.41) | 1,884.41 | 380.46 | 1,503.95 | 79.81 |
| NKOEM | 23 | 1,130.77 | 6.19 | 1,060.82 | 887.80 | 173.02 | 16.31 |
| SRCOM | 62 | 4,429.38 | 8.21 | 4,065.88 | 2,272.58 | 1,793.30 | 44.11 |
| SRINHRMN | 17 | 1,557.83 | 17.69 | 1,282.23 | 429.15 | 853.08 | 66.53 |
| SROEM | 24 | 2,073.76 | (4.68) | 2,170.72 | 1,525.45 | 645.27 | 29.73 |
| SROSRRMN | 89 | 6,721.11 | 7.46 | 6,219.96 | 2,842.07 | 3,377.89 | 54.31 |
| MIS | 56 | 241.29 | (0.07) | 241.47 | 0.00 | 241.47 | 100.00 |
| MISCPY | 16 | 1.28 | 0.00 | 1.28 | 0.00 | 1.28 | 100.00 |
| MISLAB | 2 | 65.00 | 0.00 | 65.00 | 0.00 | 65.00 | 100.00 |
| PRR | 2 | 11.98 | 0.00 | 11.98 | 5.20 | 6.78 | 56.59 |
| RIINKCOR | 12 | 24.00 | 12.50 | 21.00 | 0.00 | 21.00 | 100.00 |
| RISLS | 4 | 899.96 | 29.44 | 634.97 | 744.96 | (109.99) | (17.32) |
| RISLSRMN | 2 | 140.00 | (21.43) | 170.00 | 130.00 | 40.00 | 23.53 |
| RTLSRDRM | 1 | 69.99 | 0.00 | 69.99 | 26.67 | 43.32 | 61.89 |
| RIBOEM | 2 | 13.98 | 0.00 | 13.98 | 3.46 | 10.52 | 75.25 |
| | 719 | 24,091.26 | | 22,605.81 | 12,001.55 | 10,604.26 | |

*(handwritten annotations)*
— 3,245.52 oem's
$19,360.29
- 634.97
$18,725.32

Case: 1:22-cv-00508 Document #: 7-6 Filed: 01/28/22 Page 119 of 155 PageID #:298

Sales Info: Full Detail
Sort: Str|DCS
Filter: Tender Name: CHRG Include | Receipt Date: 12/1/2020@12:00a..12/31/2020@11:59p Include

| Str | DCS | Units Sold | Original Price | Disc % | Dollars Sold | Cost | Profit Margin |
|-----|-----|-----------:|---------------:|-------:|-------------:|-----:|--------------:|
| 001 | INKCOM | 15 | 428.85 | 0.49 | 426.75 | 258.98 | 167.77 |
| | INKINHREF | 6 | 113.94 | 0.00 | 113.94 | 21.00 | 92.94 |
| | INKOEM | 10 | 566.90 | 6.81 | 528.31 | 440.72 | 87.59 |
| | LSRCOM | 30 | 2,492.70 | 10.15 | 2,239.70 | 1,273.66 | 966.04 |
| | LSRINHRMN | 9 | 664.91 | 6.47 | 621.91 | 216.00 | 405.91 |
| | LSROEM | 8 | 653.92 | 2.60 | 636.92 | 494.74 | 142.18 |
| | LSROSRRMN | 40 | 3,506.60 | 7.55 | 3,242.00 | 1,496.23 | 1,745.77 |
| | | 118 | 8,427.82 | 7.34 | 7,809.53 | 4,201.33 | 3,608.20 |
| | | 118 | 8,427.82 | | 7,809.53 | 4,201.33 | 3,608.20 |

CWNA: Department Charge Report
Sales Info: Full Detail
Sort: Str|DCS
Filter: Tender Name: CHRG Include | Receipt Date: 11/1/2020@12:00a..11/30/2020@11:59p Include

12/31/2020 @ 11:50 AM
Page: 1

Case: 1:22-cv-00508 Document #: 7-6 Filed: 01/28/22 Page 120 of 155 PageID #:299

| Str | DCS | Units Sold | Original Price | Disc % | Dollars Sold | Cost | Profit Margin |
|-----|-----|-----------:|---------------:|-------:|-------------:|-----:|--------------:|
| 001 | INKCOM | 30 | 585.70 | 0.68 | 581.70 | 341.61 | 240.09 |
| | INKINHREF | 7 | 123.93 | 0.00 | 123.93 | 18.50 | 105.43 |
| | INKOEM | 11 | 385.89 | 10.37 | 345.89 | 307.34 | 38.55 |
| | LSRCOM | 21 | 1,808.79 | 14.87 | 1,539.79 | 923.25 | 616.54 |
| | LSRINHRMN | 4 | 304.96 | 6.56 | 284.96 | 107.98 | 176.98 |
| | LSROEM | 6 | 732.94 | 7.30 | 679.44 | 516.18 | 163.26 |
| | LSROSRRMN | 44 | 3,626.56 | 13.05 | 3,153.47 | 1,414.59 | 1,738.88 |
| | MISCPY | 30 | 56.70 | 0.00 | 56.70 | 0.00 | 56.70 |
| | PPRSPL | 2 | 39.98 | 5.00 | 37.98 | 22.00 | 15.98 |
| | PRISLS | 1 | 269.99 | 25.93 | 199.99 | 199.99 | 0.00 |
| | PRTLSRDRM | 2 | 139.98 | 7.14 | 129.98 | 74.67 | 55.31 |
| | RIBCOM | 12 | 47.88 | 0.00 | 47.88 | 21.00 | 26.88 |
| | | 170 | 8,123.30 | 11.59 | 7,181.71 | 3,947.11 | 3,234.60 |
| | | 170 | 8,123.30 | | 7,181.71 | 3,947.11 | 3,234.60 |

EXHIBIT I

February 10th, 2021

**Cartridge World USA, LLC**
3917 Mercy Drive
McHenry, Illinois 60050
Phone: (815) 321-4406
Fax: (815) 271-5896
Email: tricchio@cartridgeworld.com

Attention: Shawn & Corrine Nareski
His Ink, LLC
19035 W. Bluemound Rd. #10
Brookfield, WI 53045

Secondary Address: 285 Kossow Rd.
Waukesha, WI 53186

Email:  scnareski@yahoo.com & cw0722@cartridgeworldusa.com

**Sent via: Email & Certified Mail**

Mr & Mrs Nareski,

On February 10th, 2021 we received the following from you:

Letter:  *Our company, His Ink LLC (DBA Cartridge World Brookfield), is no longer. Enclosed, please find the last royalty payment (see copy attached).* - This letter, along with the fact your store is still operating do not align.

Check: $1,760.68 – This is an incorrect and unverified amount, as we have not received your monthly sales for the months of November 2020 or January 2021.

*The below email sent Feb 9th, 2021 Remains in place:*

After being unable to collect your sales for two consecutive months and no reply to emails sent from Eric George. Tina called Corrine on Friday 5th February 2021 and was told by Corrine that your store closed in December 2020, which would mean that CWUSA would be processing an "abandonment" and begin the closing down of the unit franchise agreement and informing all vendors you are closed.

As we thought this was out of character, we checked with our approved vendors and they confirmed you were still buying products during January 2021.

Part of the abandonment procedure is to visit the store location and confirm it has indeed been closed and no Cartridge World branding remains.

This visit was carried out on Friday, February 5th, 2021 at 3:30pm which we were surprised to see the store fully operational & selling Cartridge World branded products under the Cartridges World sign to walk in customers.

 

This communication is to inform you of the following:

1. You are in default of your unit franchise agreement by not providing sales.

2. Your unit franchise agreement expired on January 31st, 2020. This does not mean you are released from the obligations of your unit franchise agreement, as operating under the Cartridge World brand merely means that your unit franchise agreement has moved to a month-by-month basis.

3. Operating on an expired unit franchise agreement on a month-by-month basis means all of your obligations to the unit franchise agreement remain the same.

4. Should you wish to terminate your unit franchise agreement as Corrine indicated to Tina, we can prepare a mutual termination and release where you will be released from your obligations under your Unit Franchise Agreement. However, it does not release you from the 2-year non-compete where you cannot operate or work at competing business as this is a direct breach of the 2 year non-compete clause (section 8.2).

Be advised should you also choose to ignore this letter; Cartridge World USA will have no choice but to enforce the unit franchise agreement and take the legal path towards an injunction to close your business.

While we have successfully enforced this type of breach in the past, we would prefer not to take the legal route due to the significant amount of money ($30,000) both parties will need to spend to execute and defend.

We appreciate your earliest reply, so we can draw this matter to a close as soon as possible.


Sincerely,

Mark Pinner
Chief Executive Officer
Cartridge World USA, LLC

1/28/21

Attn: Cartridge World North America

Our company, His Ink LLC (DBA Cartridge World Brookfield), is no longer.

Enclosed, please find the last royalties payment.

Shawn & Cortina Naresh

 Gmail

Corrine Nareski <sales@cartridgeworld722.com>

## Dumbr 2020 Royalty Statement
1 message

Eric George <egeorge@cartridgeworld.com>
To: CW0722 <cw0722@cartridgeworldusa.com>

| | |
|---|---|
| Subject: | Royalty Payment Statement - for   $12/31/20$ |
| Store Number: | MIN-0722 |
| Store Owner: | Corine Nareski |
| Account #: | ******4252 |
| POS Type: | Retail Pro |

**Reporting Status:** Complete

---

**Summary of Amounts Due**

| | |
|---|---|
| Royalty | $1183.22 |
| Ad Fund | $213.13  $42.86 |
| Ops Fee | $150.00  40 |
| Late Fee | |
| **Total Due** | $1760.08 |

---

| Sales Summary | Sales | Gross Margin |
|---|---|---|
| Gross Sales  - other than OEM and Printer | $18725.32 | |
| Gross Sales - OEM | $3245.52 | |
| Gross Sales - Printer Items (Printers) | $634.97 | |
| **Total Gross Sales** | $22605.81 | |

Adjustment – Printer Sales to Gross Margin

4



Less: Printer Cost                                          $634.97

**Adjustment for Sales sold on account**

Less:        Current Month - A/R Sales          $7809.53

Plus:        Last Month - A/R Sales             $7181.71        | Rate | Ad Fund Fee |

**Sales subject to Royalty & Ad Fund Fee (Adjusted Sales)**

$21343.02          2.0%  $213  $426.86

**Royalty Calculation**                                        | Rate | Royalty |

OEM Sales subject to 3% Royalty        $32455?        3.0%  897.37

(Lower of OEM Sales or 10% of Adjusted Sales)

Sales Subject to 6% Royalty            $18097.50        6.0%  1085.85

Total Sales subject to Royalty         $21343.02              $1183.22

**Minimum Royalty (if applicable)**

SALES  Department Summary                                     12/31/2020 @ 11:50 AM
Sales Info  Full Detail                                                      Page: 1
Sort: UUS
Filter: Receipt Date: 12/1/2020@12:00a, 12/31/2020@11:59p Include

| DCS | Unit Sold | Original Price | Disc % | Extend Sold | Cost | Profit Margin | Margin % |
|---|---|---|---|---|---|---|---|
| 99 89 COU | (15) | (543.86) | 0.37 | (541.86) | 0.00 | (541.86) | 100.00 |
| INKCOM | 286 | 5,370.14 | 2.68 | 5,233.98 | 2,753.75 | 2,480.23 | 47.39 |
| INKINHREF | 136 | 1,876.64 | (0.41) | 1,884.41 | 380.46 | 1,503.95 | 79.81 |
| INKOEM | 23 | 1,130.77 | 6.19 | 1,060.62 | 887.80 | 173.02 | 16.31 |
| LSRCOM | 62 | 4,429.38 | 8.21 | 4,065.88 | 2,272.58 | 1,793.30 | 44.11 |
| LSRINHRMN | 17 | 1,557.63 | 17.69 | 1,282.23 | 429.15 | 853.08 | 66.53 |
| LSROEM | 24 | 2,073.76 | (4.68) | 2,170.72 | 1,525.45 | 645.27 | 29.73 |
| LSRDSRRMN | 89 | 6,721.11 | 7.46 | 6,219.96 | 2,842.07 | 3,377.89 | 54.31 |
| MIS | 56 | 241.29 | (0.07) | 241.47 | 0.00 | 241.47 | 100.00 |
| MISCPY | 16 | 1.28 | 0.00 | 1.28 | 0.00 | 1.28 | 100.00 |
| MISLAB | 2 | 65.00 | 0.00 | 65.00 | 0.00 | 65.00 | 100.00 |
| PPRR | 2 | 11.98 | 0.00 | 11.98 | 5.20 | 6.78 | 56.59 |
| PRIINKCOR | 12 | 24.00 | 12.50 | 21.00 | 0.00 | 21.00 | 100.00 |
| PRISLS | 4 | 899.96 | 29.44 | 634.97 | 744.96 | (109.99) | (17.32) |
| PRISLSRMN | 2 | 140.00 | (21.43) | 170.00 | 130.00 | 40.00 | 23.53 |
| PRTLSRORM | 1 | 69.99 | 0.00 | 69.99 | 26.67 | 43.32 | 61.89 |
| RIBOEM | 2 | 13.98 | 0.00 | 13.98 | 3.46 | 10.52 | 75.25 |
|  | 718 | 14,691.20 | | 22,889.91 | 12,003.85 | 10,924.26 | |

- 32455.00 om

$19,360.29
- 634.97

$18725.32

CWNA Department Charge Report
Sales Info, Full Detail
Sort: Str|DCS

12/31/2020 @ 11:52 AM
Page 1

Filter: Tender Name: CHRG include | Receipt Date 12/1/2020@12:00a. 12/31/2020@11:59p include

| Str | DCS | Units Sold | Original Price | Disc % | Dollars Sold | Cost | Profit Margin |
|-----|-----|-----------|---------------|--------|--------------|------|---------------|
| 001 | INKCOM | 15 | 428.85 | 0.49 | 426.75 | 258.98 | 167.77 |
| | INKINHREF | 8 | 113.94 | 0.00 | 113.94 | 21.00 | 92.94 |
| | INKOEM | 10 | 565.90 | 6.81 | 528.51 | 440.72 | 87.59 |
| | LSRCOM | 30 | 2,492.70 | 10.15 | 2,239.70 | 1,273.66 | 966.04 |
| | LSRINHRMN | 9 | 664.91 | 6.47 | 621.91 | 216.00 | 405.91 |
| | LSROEM | 8 | 653.92 | 2.60 | 636.92 | 494.74 | 142.18 |
| | LSROSRRMN | 40 | 3,506.80 | 7.56 | 3,242.00 | 1,496.23 | 1,745.77 |
| | | 118 | 8,427.82 | 7.34 | 7,809.63 | 4,201.33 | 3,608.20 |
| | | 118 | 8,427.82 | | 7,809.63 | 4,201.33 | 3,608.20 |

CWNA Department Charge Report
Sales Info, Full Detail
Sort: Str|DCS

12/31/2020 @ 11:50 AM
Page 1

Filter: Tender Name: CHRG include | Receipt Date 11/1/2020@12:00a. 11/30/2020@11:59p include

| Str | DCS | Units Sold | Original Price | Disc % | Dollars Sold | Cost | Profit Margin |
|-----|-----|-----------|---------------|--------|--------------|------|---------------|
| 001 | INKCOM | 10 | 585.70 | 0.69 | 581.70 | 341.61 | 240.09 |
| | INKINHREF | 7 | 123.93 | 0.00 | 123.93 | 18.50 | 105.43 |
| | INKOEM | 11 | 345.89 | 10.37 | 345.89 | 307.34 | 38.55 |
| | LSRCOM | 21 | 1,808.79 | 14.87 | 1,539.79 | 993.25 | 616.54 |
| | LSRINHRMN | 4 | 304.98 | 8.56 | 264.98 | 107.98 | 176.98 |
| | LSROEM | 6 | 732.94 | 7.30 | 679.44 | 516.18 | 163.26 |
| | LSROSRRMN | 44 | 3,636.59 | 13.05 | 3,153.47 | 1,414.69 | 1,738.68 |
| | MISCPY | 30 | 56.70 | 0.00 | 56.70 | 0.00 | 56.70 |
| | PRRSPL | 2 | 39.98 | 5.00 | 37.98 | 22.00 | 15.98 |
| | PRISLS | 1 | 269.99 | 25.53 | 159.99 | 199.99 | 0.00 |
| | PRTLSRORM | 2 | 139.98 | 7.14 | 129.98 | 74.87 | 55.51 |
| | RIBCOM | 12 | 41.86 | 0.00 | 47.82 | 21.00 | 26.68 |
| | | 170 | 8,123.30 | 11.59 | 7,181.71 | 3,947.11 | 3,234.60 |
| | | 170 | 8,123.30 | | 7,181.71 | 3,947.11 | 3,234.60 |

EXHIBIT J

**TO: Shawn & Corrine Nareski**
**Cartridge World Brookfield**
**His Ink, LLC**
**19035 W. Bluemound Rd. #10**
**Brookfield, WI 53045**

**DATE: February 26th, 2021**

**FROM: Mark Pinner**

**Sent via email:** cw0722@cartridgeworldusa.com; scnareski@yahoo.com

**Sent via Electronic Mail**

**SUBJECT:**
YOU ARE IN BREACH OF YOUR UNIT FRANCHISE AGREEMENT AND CORRECTIVE ACTION IS REQUIRED BY YOU IMMEDIATELY.

You are in breach of your Unit Franchise Agreement:

1. Failure to report sales for October & November 2020 & January & February 2021; and
2. Failure to pay royalties on sales for October & November 2020 & January & February 2021.

After multiple communication efforts from the Finance Manager, Eric George and Operations Manager, Tina Ricchio with no resolution or explanation provided, we are informing you that should we not receive the following corrective actions by **April 27th, 2021**, we will have no choice but to proceed with the termination your Unit Franchise Agreement:

| CORRECTIVE ACTION REQUIRED BY YOU | REQUIRED BY |
|---|---|
| Provide past Sales Reporting for October-November 2020 & January-February 2021 (continuing forward from March 2021) | April 27th, 2021 |
| Prepare your bank for royalty Collections for past Sales for October-November 2020 & January-February 2021 (continuing forward from March 2021) | April 27th, 2021 |

We appreciate your timely response in curing the above breaches.

Kindest Regards,

**Mark Pinner**
**CEO Cartridge World USA, LLC**
**Email:** mpinner@cartridgeworld.com

EXHIBIT K



Lathrop GPM LLP
lathropgpm.com

**Craig P. Miller**
Attorney
craig.miller@lathropgpm.com
612.632.3258

80 South Eighth Street
500 IDS Center
Minneapolis, MN 55402
Main: 612.632.3000

May 21, 2021

Shawn & Corrine Nareski                    **VIA EMAIL AND FEDERAL EXPRESS**
His Ink, LLC
19035 W. Blumound Rd. #10
Brookfield, WI 53045
Email: scnareski@yahoo.com

Shawn & Corrine Nareski
285 Kossow Rd.
Waukesha, WI 53186

> **Re:      Notice of Termination of Unit Franchise Agreement dated January 17, 2007**
> **Notice to Cease and Desist Operating Competing Business**

Dear Mr. and Ms. Nareski:

Our law firm represents Cartridge World USA, LLC ("CW USA"), which is the Master Franchisee of the Cartridge World® franchise system in the United States. You are hereby notified that His Ink, LLC's ("His Ink") Unit Franchise Agreement dated January 17, 2007, which was assigned to His Ink on July 16, 2012 and granted His Ink the right to operate a Cartridge World® store in Brookfield, Wisconsin ("UFA" or "Agreement"), will terminate effective May 27, 2021. As the personal guarantor to the UFA, Mr. Nareski is personally liable for His Ink's payment and performance obligations under the Agreement. You and His Ink are collectively referred to as "you." Capitalized terms not defined in this letter have the meanings ascribed to them in the UFA.

As you know, you were advised by letter dated February 26, 2021 ("Notice of Default") that you were in default of the UFA for (1) failing to report sales for October and November 2020 and January and February 2021, and (2) failing to pay royalties on the sales for those months.[1] CW USA provided you with sixty (60) days, until April 27, 2021, to cure those defaults. Because you did not cure the defaults by the stated deadline, under applicable law your UFA will terminate effective May 27, 2021, which is ninety (90) days from the date of the Notice of Default.

---

[1] You were also advised of these defaults by letter dated February 8, 2021.

His Ink, LLC
Page 2
May 21, 2021

You are also in default under the UFA because: (1) you have abandoned and ceased operating your Cartridge World® business in violation of Section 16.1(B) of the UFA; (2) you are operating a competing business under the name "Printer World" in the exact same location as your former Cartridge World® business in violation of Section 8.2 of the UFA; and (3) you are continuing to use the Cartridge World® trademarks and trade name in the operation of your competing business in violation of Section 6.1 of the UFA. For example, the Google page for your business was updated on April 12, 2021 to read: "We are now PRINTER WORLD!!! Formally 'Cartridge World'. Same location, same customer service, and pricing. Stop by to see what's new!!" You are also advertising your business under the Cartridge World® trademarks and trade name on the Facebook, Yelp, Visit Brookfield Wisconsin, and Malls & Centers Shopping Guide websites, among others.

These ongoing violations of the UFA constitute an additional basis to terminate your UFA. Further, you must immediately cease operation of your competing Printer World business and cease using the Cartridge World® trademarks and trade name in the operation of that competing business. If you fail to do so, CW USA will take immediate legal action, as discussed below.

You must also comply with all of the post-termination obligations in the UFA, including those in Sections 8 and 17, upon termination of the UFA, which becomes effective on May 27, 2021. This includes, but is not limited to, the following:

1.  Pay all royalties, marketing contributions, and all amounts of any kind owed to CW USA and/or any of its related entities within 10 days after the termination;

2.  Immediately and permanently discontinue operation of your Cartridge World® store and any use of the Intellectual Property, Confidential Information, Marks and the System;

3.  Return to CW USA or (at CW USA's option) destroy all software, Manuals, forms, materials, signage, and any other items containing any Intellectual Property or Marks, or otherwise identifying or relating to your Cartridge World® store;

4.  Take such actions as may be required to cancel all fictitious or assumed name or equivalent registrations relating to any of the Marks;

5.  De-identify the location of your Cartridge World® store in every manner and remove any distinctive signage, physical and/or structural features associated with the Cartridge World® trade dress and Marks;

6.  No longer identify yourself as a present or former Cartridge World® business or unit franchisee; and

7.  Transfer to CW USA or discontinue your use of all telephone numbers, domain names, internet addresses or sites, directory listings, and other communications services used in connection with the operation of your Cartridge World® store.

His Ink, LLC
Page 3
May 21, 2021

      If you fail to cease your illegal activities or fail to comply with your post-termination obligations in the UFA, CW USA will immediately file the enclosed Complaint in United States Federal District Court for the Northern District of Illinois and seek an injunction prohibiting you from (1) operating your competing business in violation of the non-compete provisions in Section 8.2 of the UFA, (2) infringing upon the Cartridge Worlds® trademarks and name in violation of federal trademark laws, and (3) violating the post-termination obligations in Sections 8 and 17 of the UFA. As part of the lawsuit, CW USA will seek damages related to your unlawful and unfair competition and trademark infringement, including a disgorgement of all profits earned by your competing Printer World business. It will also seek lost future profits and attorneys' fees and costs, as allowed by federal trademark law and Section 19.7 of the UFA.

      To avoid immediate legal action, you must provide CW USA with evidence demonstrating that you have (1) ceased operation of your competing business, (2) ceased your improper use of the Cartridge World® trademarks and trade name, (3) complied with all of the post-termination obligations in the UFA by no later than May 28, 2021. Failure to do so will result in CW USA immediately filing the attached Complaint in federal district court.

      Nothing contained in this Notice shall constitute a waiver of any rights or remedies that CW USA has or may have under the UFA, any other Notices, and applicable law. CW USA does not waive, but rather specifically reserves, any and all of its claims, rights and remedies under the UFA, any other Notices, and applicable law.

      Please govern yourself accordingly. Thank you.

              Sincerely,

              */s/ Craig P. Miller*

              Craig P. Miller

cc:    Mark Pinner (Via Email)
       Ryan Palmer, Esq. (Via Email)
       Maisa Frank, Esq. (Via Email)

46922058v4

EXHIBIT L

cartridge world brookfield

All  Maps  News  Shopping  Images  More  Tools

Sign in

About 312,000 results (0.50 seconds)

https://www.facebook.com › category › Office-Supplies
### Cartridge World-Brookfield, Wisconsin - Home | Facebook
**Cartridge World-Brookfield**, Wisconsin · 6 people checked in here · http://www.**cartridgeworld**.com/ · (262) 754-2901 · Office Equipment Store.
Rating: 5 · 2 votes

https://www.facebook.com › ... › Shopping & Retail
### Cartridge World-Brookfield, Wisconsin - Home | Facebook
Across the street from Brennan's fruit Market. We are on the south side of Bluemound. Next to... 19035 W Bluemound Rd, **Brookfield**, WI 53045.
Rating: 5 · 2 votes

https://m.yelp.com › Local Services › Printing Services
### CARTRIDGE WORLD - 19035 W Bluemound Rd, Brookfield, WI
**Cartridge World** · 19035 W Bluemound Rd. Ste B **Brookfield**, WI 53045. Directions · (262) 754-2901. Call Now · More Info. Hours, Accepts Credit Cards.
Rating: 5 · 1 review

How is Cartridge World rated?

What days are Cartridge World open?

https://www.visitbrookfield.com › Directory
### Cartridge World - Directory | Visit Brookfield
Jan 16, 2017 — **Brookfield**, WI 53005. PHONE (262) 789-0220. Contact Us. Copyright 2019 - Visit **Brookfield**, All Rights Reserved

https://www.loc8nearme.com › cartridge-world
### Printer World Brookfield, WI 53045 - 19035 W Bluemound Rd
**CARTRIDGE WORLD** of **Brookfield** is the place to go for your printing needs! A family business built on excellent customer service, professionalism, ...
Rating: 4.9 · 8 votes

https://www.mapquest.com › wisconsin › cartridge-worl...
### Cartridge World 19035 W Bluemound Rd Brookfield, WI ...
Get directions, reviews and information for **Cartridge World** in **Brookfield**, WI.

https://www.yellowpages.com › ... › Toner Cartridges
### Cartridge World - Brookfield - Yellow Pages
Get reviews, hours, directions, coupons and more for **Cartridge World**. Search for other Toner Cartridges on The ... 17440 W Bluemound Rd**Brookfield**, WI 53045.

https://www.mallscenters.com › ... › Wisconsin
### Cartridge World - Brookfield, Wisconsin WI 53045 - Brooktown ...
**Cartridge World** store or outlet store located in **Brookfield**, Wisconsin - Brooktown Plaza location, address: 19035 W Bluemound Road, **Brookfield**, WI 53045.
Address: 19035 W Bluemound Road, Brookfiel...  Mall/Shopping Center/Outlet: Brooktown Pl...
Stores in mall: All stores in Brooktown Plaza
Rating: 3 · 1 vote

See photos

Se

## Printer World
Directions  Save
4.9  26 Google reviews
$$  Toner cartridge supplier in Waukesha County, Wiscons

**Address:** 19035 W Bluemound Rd, Brookfield, WI 53045
**Hours:** Closed · Opens 10AM
**Phone:** (262) 333-0770

Suggest an edit

### Add missing information
Add website

### Questions & answers
See all questions (2)
Ask a

### Popular times
MON TUE WED THU FRI SAT

### Reviews from the web

| Facebook | Loc8NearMe | MallsCent |
|---|---|---|
| 5/5 | 4.9/5 | 3/5 |
| 2 votes | 8 votes | 1 vote |

### Reviews
Write a review  Ad

"Always great **prices** and super friendly **service**!"

A "**Staff** is efficient, knowledgeable, and **customer** focu

N "These **people** define customer service."

View all Google reviews

### From Printer World



https://patch.com › wisconsin › waukesha › an--shawn-... ⋮

### Shawn & Corrine Nareski Acquire Cartridge World in ... - Patch

Sep 11, 2012 — The **Cartridge World** – **Brookfield**, Wis. location that opened in 2007 in The Brown Stones Shopping Center, has been purchased by Shawn ...

https://usa-services.worldorgs.com › catalog › fax-service ⋮

### Cartridge World in the city Brookfield - USA services ...

**Cartridge World** in the city **Brookfield** by the address 19035 W Bluemound Rd, **Brookfield**, WI 53045, United States.

"Printer World provides businesses with local, cost-effective solutions to fit every business and budget. To qualified busi we offer managed print services, no-cost printers, and onsite service and repairs and much more!... **More**

### Updates from Printer World

**View previous updates on Google**

### People also search for

View 1

| FedEx Office Print & Ship C... | The UPS Store | Xerox Of Mid West | HP Printer Repair | La... Sy... Inc |
|---|---|---|---|---|
| Shipping and mailing service | Shipping and mailing service | Office equipment supplier | Printer repair service | Pri ser |

About this data

## Related searches ⋮

| | |
|---|---|
| **printer** world brookfield | **hp 910 ink** cartridges |
| **office depot** | **hp printer ink 63** |
| **hp 64 ink** cartridge | |

1 2 3 4 5 6 7 8 9 10    Next

**64106, Kansas City, MO** - Based on your past activity - Update location

Help    Send feedback    Privacy    Terms



      





Updates

Recent updates

Printer World
Apr 12, 2021

We are now PRINTER WORLD!!! Formally "Cartridge World". Same location, same customer service, and pricing. Stop by to see what's new!!

# Cartridge World-Brookfield, Wisconsin

5 (2 reviews) · Office Supplies

Home  About  Photos  Reviews  More ▾        ■ Like   ···

## About                                    See all

- 19035 W Bluemound Rd Brookfield, WI 53045

- Across the street from Brennan's fruit Market. We are on the south side of Bluemound. Next to Health Hut.

- 160 people like this

- 178 people follow this

- http://www.cartridgeworld.com/

- (262) 754-2901

- sales@cartridgeworld722.com

- Open now
  9:00 AM - 6:00 PM ■

- Office Supplies · Computer Store · Office Equipment Store

      

### Suggest Edits

Is this the right phone number for this place?

(262) 754-2901

Yes          Unsure          No

### Photos                    See all



### Videos                    See all



We wish you and your family a happy and safe Memorial D...

5 views · 2 years ago

Page transparency                    See all



     

Facebook is showing information to help you better understand the purpose of a Page. See actions taken by the people who manage and post content.

**Page created - September 3, 2009**

## Related Pages

 **Brookfield Bulldogs U-9 Team**
Stadium, Arena & Sports Venue

Like

 **Ronmel Wholesale & Retail Hatfield**
Wholesale & Supply Store

Like

 **KERink Rennes**
Computer Repair Service

Like

## Add your business to Facebook

Showcase your work, create ads and connect with customers or supporters.

**Create Page**

Privacy · Terms · Advertising · Ad Choices ▪ · Cookies · More · Meta © 2021

 **Create post**

Photo/video          Check in          Tag friends

 **Cartridge World-Brookfield, Wisconsin**
November 17 · 🌐                                          ···

Your time and printing is money. See how we're helping people everyday just like you!  https://cartridgeworldusa.com





      



Like        Comment        Share

---

 **Cartridge World-Brookfield, Wisconsin**
November 16 · 🌐

Entrepreneurs play a major role in the economic growth of any country by bringing new ideas and innovation to the market. Today is an opportunity to create awareness about entrepreneurship, new ideas, and leadership. #NationalEntrepreneur'sDay



Like        Comment        Share

---

 **Cartridge World-Brookfield, Wisconsin**
November 15 · 🌐

 










no-charge, simply by buying our quality toner.
https://cartridgeworldusa.com/why-buy-a-printer/



 1

| Like | Comment | Share |

Write a comment...

**Cartridge World-Brookfield, Wisconsin**
November 12 · 🌐

Re-manufactured printer cartridges, also known as after-market or third-party, are very popular today because of their cost and sustainability. But are they right for your printing experience?





      



YOUTUBE.COM
**Are Remanufactured Printer Cartridges Right for You? 5 Steps to Know**

| Like | Comment | Share |

 **Cartridge World-Brookfield, Wisconsin**
November 11 · 

Today we pay tribute to all Veterans young and old who have served our country and protected our freedoms. Thank you for your service. #veteransday2021







👍 1

| Like | Comment | Share |

 Write a comment...

 **Cartridge World-Brookfield, Wisconsin**
November 10 · 

No more business interruptions like malfunctioning printers or out-of-stock toner. http://www.cartridgeworldusa.com



      



Like          Comment          Share

 **Cartridge World-Brookfield, Wisconsin**
November 9 · 🌐                                    ···

Free up time and print-related operating expenses with a sensible managed print service that can also help you reduce business costs by 20-30%. https://cartridgeworldusa.com/managed-print-services/





Like      Comment      Share



Case: 1:22-cv-00508 Document #: 7-6 Filed: 01/28/22 Page 146 of 155 PageID #:325

 tacos, cheap dinner, M    Kansas City, KS 66101    For Businesses    Write a Review    Log In    Sign Up

Restaurants ⌄    Home Services ⌄    Auto Services ⌄    More ⌄

# Cartridge World

⭐⭐⭐⭐⭐ 1 review

 Claimed • Printing Services    Edit

**Open** 9:00 AM - 6:00 PM

Write a Review    📷 Add Photo    ⬆ Share    🔖 Save

## Photos & videos


⊞
**Add photo**

## You Might Also Consider    Sponsored ⓘ

 **Postal Xpress**

Postal Xpress is the one stop shop for dozens of business products & services that will allow you to do what you're good at while we take care of the "other stuff" you need to succeed. **read more**

in Printing Services

 **uBreakiFix**

⭐⭐⭐⭐⭐ 29    📍 **2.3 miles** away from Cartridge World

**Erica L. said** "I heard of this place through a coworker. Looked at their website to get the price to fix my screen. Booked an appointment online for the next night. I came in & the man who helped me asked me if I knew if they put aside a screen..." **read more**

in Mobile Phone Repair, Electronics Repair

**Pak Mail**

📍 **5.9 miles** away from Cartridge World

We pack and ship your heirlooms anywhere in the world. We ship more than heirlooms, we ship your memories. **read more**

in Packing Services, Movers, Shipping Centers

## Location & Hours



**19035 W Bluemound Rd**

| | |
|---|---|
| Mon | 9:00 AM - 6:30 PM |
| Tue | 9:00 AM - 6:30 PM |
| Wed | 9:00 AM - 6:30 PM |
| Thu | 9:00 AM - 6:30 PM |
| Fri | 9:00 AM - 6:00 PM    Open now |
| Sat | 10:00 AM - 3:00 PM |

### Reach out to similar pros

This business has not enabled messa but you can still request quotes from businesses like them.

Start request

**https://www.cartridgeworld.com...**

(262) 754-2901

**Get Directions**
19035 W Bluemound Rd Ste B
Brookfield, WI 53045

### You Might Also Consider
Sponsored ⓘ

 **The UPS Store**
1.2 miles

The friendly staff at The UPS Store® is ready to help you need. This... **read more**

 **Iron Mountain**
13.1 miles

Contact us today for an affordable shredding, storag scanning solution that's... **read more**

Case: 1:22-cv-00508 Document #: 7-6 Filed: 01/28/22 Page 147 of 155 PageID #:326

Ste B
Brookfield, WI 53045

[ Get directions ]

Sun          Closed

🖉 **Edit business info**

## Amenities and More

✓  Accepts Credit Cards

## Ask the Community

Ask a question  +

Yelp users haven't asked any questions yet about **Cartridge World**.

## Recommended Reviews

ⓘ  **Your trust is our top concern,** so businesses can't pay to alter or remove their reviews. **Learn more.**                    ✕

[ Search within reviews          🔍 ]        [ Yelp Sort ⌄ ]

| Username | |
| --- | --- |
| Location | With so few reviews, your opinion of **Cartridge World** could be huge. Start your review today. |
| 🖼 0  ▦ 0 | |

**Katheren R.**                    ···
Dousman, WI
🖼 6  ▶ 19  🖼 7

⭐⭐⭐⭐⭐  5/30/2014

ⓘ First to Review

Great customer service! Wide range of ink and toners. They are very knowledgeable about printers and printer problems. They also clean and fix printers, which is a bonus! Love that it is run by a family!

[ ⊚ Useful ]  [ 😊 Funny ]  [ ▱ Cool ]

1 of 1

2 other reviews that are not currently recommended  ⌄

## You Might Also Consider  Sponsored ⓘ

**UScellular Authorized Agent - MK Cellular**                    ···
📍 **5.3 miles** away from Cartridge World
**Switch to UScellular**
Deals on new phones and 5G on all plans at no extra charge.  **read more**
in Mobile Phone Repair, Mobile Phones, Internet Service Providers

### Tech Tock

 15

**Candy F. said** "The service I got from tech tock and Chanoy was above and beyond! I am not tech savvy and could have easily been taken advantage of! They were very quick to get back to me .Thanks for being honest and I would highly recommend this…" **read more**

in Home Network Installation, It Services & Computer Repair

## People Also Viewed



### Brilliant DPI

1

Vehicle Wraps, Printing Services, Graphic Design

### Near Me

Printing Services Cost Guide

Bulk Mailing Companies Near Me

### Service Offerings in Brookfield

Resume Printing

## Frequently Asked Questions about Cartridge World

**What forms of payment are accepted?**

Cartridge World accepts credit cards.

**How is Cartridge World rated?**

Cartridge World has 5 stars.

**What days are Cartridge World open?**

Cartridge World is open Mon, Tue, Wed, Thu, Fri, Sat.

**About**

About Yelp

Careers

Press

**Discover**

Yelp Project Cost Guides

Collections

Talk

**Yelp for Business**

Claim your Business Page

Advertise on Yelp

Yelp for Restaurant Owners

**Languages**

English ⌄

**Countries**

United States ⌄

| | | |
|---|---|---|
| Investor Relations | Events | Table Management |
| Trust & Safety | The Local Yelp | Business Success Stories |
| Content Guidelines | Yelp Blog | Business Support |
| Accessibility Statement | Support | Yelp Blog for Business |
| Terms of Service | Yelp Mobile | |
| Privacy Policy | Developers | |
| Ad Choices | RSS | |

Copyright © 2004–2021 Yelp Inc. Yelp, **yelp** and related marks are registered trademarks of Yelp.

Case: 1:22-cv-00508 Document #: 7-6 Filed: 01/28/22 Page 150 of 155 PageID #:329



Stay     Do     Dine     Shop     Meet     Resources     About Us

# CARTRIDGE WORLD



📍 19035 W. Bluemound Rd., Suite 9 Brookfield WI 53045
19035 West Bluemound Road Brookfield Wisconsin 53045 US
📞 26275429012627542901
✉ cw0722@cartridgeworldusa.com
🌐 Visit Website



- Map
- Photos (1)



Enter a location

Get Directions

- By public transit
- Walking
- Bicycling

Sort by: **Votes**

- Newest First
- Oldest First
- Random



Showing 1 result

To request visitor information

Click Here

**OFFICE**

325 S Moorland Rd. Suite 100
Brookfield, WI 53005

**PHONE**

(262) 789-0220

Contact Us

Copyright 2019 - Visit Brookfield, All Rights Reserved

Website Handrafted by Ocreative

Case: 1:22-cv-00508 Document #: 7-6 Filed: 01/28/22 Page 153 of 155 PageID #:332

# Cartridge World - Brookfield, Wisconsin WI 53045 - Brooktown Plaza

Store location, hours, contacts

Advertisement



Cartridge World store or outlet store located in Brookfield, Wisconsin - Brooktown Plaza location, address: 19035 W Bluemound Road, Brookfield, WI 53045. Find information about hours, locations, online information and users ratings and reviews. Save money on Cartridge World and find store or outlet near me.

|  |  |
|---|---|
| Brand: | [Cartridge World](#) |
| Rating: | 3/5 (1 rate) |
|  | [Make a Review](#) |
| Mall/Shopping Center/Outlet: | [Brooktown Plaza](#) |
| Stores in mall: | [All stores in Brooktown Plaza](#) |
| Address: | 19035 W Bluemound Road, Brookfield, WI 53045 |
| Phone number (mall): |  |
| State: | [Wisconsin](#) |
| City: | Brookfield |
| www (mall): | [https://www.midamericagrp.com/property-listings?propertyId=19035-West-Bluemound-Road-Brookfield-WI-53045](#) |
| www-source: | [www.mallscenters.com/brands/stores/cartridge-world/brookfield--wisconsin--brooktown-plaza](#) |

Advertisement



---

## Cartridge World in Brookfield, Wisconsin WI 53045 - Brooktown Plaza - MAP

GPS Coordinates: 43.0351508, -88.1487332



show on map

**More Cartridge World stores**

[All Cartridge World store locations](#)

**421 miles** - [Cartridge World in Brookfield, Wisconsin](#)
(Brooktown Plaza)
**495 miles** - [Cartridge World in Bloomingdale, Illinois](#)
(Bloomingdale Court)
**718 miles** - [Cartridge World in St. Louis, Missouri](#)
(Market at McKnight)
**1034 miles** - [Cartridge World in Greenville, South Carolina](#)
(Cherrydale Point)

Advertisement

# Hours - Cartridge World (Brooktown Plaza)

Store hours may vary.

**Nearby Malls, Shopping Centers and Outlets**

**2 mile** - Waukesha, Wisconsin - [The Shoppes At Fox River](#)
**2 mile** - Waukesha, Wisconsin - [Silvernail Plaza](#)
**2 mile** - Pewaukee, Wisconsin - [Silvernail Shopping Center](#)
**5 mile** - Delafield, Wisconsin - [Nagawaukee Shopping Center](#)

# Reviews

**There are no comments or reviews for Cartridge World**
Be the first, we are interested in your opinion...
Have you visited Cartridge World? Have you shopped at Cartridge World?

Add your comment...

Advertisement



# Insert your opinion, review - Cartridge World

Your name: [                    ]
Title: [                    ]
Star rating:
Your review text: [Your review...]

Maximum 450 characters, you have 450 chars left.

12/17/21, 9:06 AM
Cartridge World located in Brookfield, Wisconsin - Brooktown Plaza - hours
Case: 1:22-cv-00508 Document #: 7-6 Filed: 01/28/22 Page 155 of 155 PageID #:334

I'm not a robot

reCAPTCHA
Privacy - Terms

Send a review

Advertisement

UP

**COVID-19 Updates:** Stay informed about changes in operating hours, which stores are closed etc. #StayHomeSaveLives » **Read more**

Search Brand:

A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q | R | S | T | U | V | W | X | Y | Z

Search Brand by Brand / Store name: [insert name]

Search Mall or shopping center: [insert name]

Search Outlet: [insert name]

All company and product names, logos, services used and identified on www.mallscenters.com are for identification/informational purposes only.
These are trademarks or registered trademarks of their respective companies.
This website is not owned, affiliated with, funded, or in any way associated with the property operators and shopping malls/centers owners.

Black Friday & Holiday hours | Contact | Update content | Privacy policy

Copyright © MallsCenters 2015 - 2021